STATE of Utah, Plaintiff and Appellee,

v.

David Franklin YOUNG, Defendant
and Appellant.

No. 890424.

Supreme Court of Utah.

March 17, 1993.

R. Paul Van Dam, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

Nancy Bergeson, Karen Stam, Joan C. Watt, Salt Lake City, for defendant and appellant.

HALL, Chief Justice:

Defendant appeals his convictions for first degree murder[1] and theft[2] and the sentence of death imposed for the murder conviction. Defendant was charged with murdering Ember K. Mars and stealing her pickup truck. A jury convicted defendant of both charges, finding that the homicide was committed in the course of a rape or an attempted rape and for personal or other pecuniary gain. After a separate hearing, the trial court found that defendant had been previously convicted of a felony involving violence against a person. Following a four-day penalty phase hearing, the jury returned a verdict of death on the first degree murder conviction. At formal sentencing, the trial court imposed the death sentence as well as an additional sentence of one to fifteen years in the state prison and a $10,000 fine for the theft conviction. Defendant raises numerous issues on appeal.

## I. FACTS

On August 18, 1987, defendant met Ember Mars and her friends Angela Johnson and Gene Butcher at the Flying J truckstop in Salt Lake City, Utah. At Mars' invitation, defendant joined them at their table. When the group left, defendant asked if he could accompany them to Butcher's apartment to take a shower. Butcher consented, and they proceeded in Mars' truck to pick up Johnson's car before travelling on to the apartment.

Mars and defendant arrived at Butcher's apartment shortly after the others. After playing cards, Butcher and Johnson decided to lie down in the bedroom. When Johnson awoke at about 7:50 a.m., the stereo was still playing and defendant's suitcase was still in the living room, but defendant and Mars were gone. Angela became worried about Mars and called her home every ten to thirty minutes for the remainder of the day.

1. Utah Code Ann. § 76-5-202.

2. Utah Code Ann. § 76-6-404.

Defendant and Mars were later seen at Ream's market, where Mars was a regular customer. Defendant selected a video, while Mars purchased some items. Mars wrote a check to pay for the purchase. They left the store together.

Randy Powell, Mars' roommate, returned home about 5 p.m. on August 19, 1987. He noticed that the back screen door was open. On entering the house, he saw a brown paper bag on the table and an open drawer. He saw Mars' jeans and shirt lying in the middle of the living room floor. Powell went into his bedroom, where he found Mars' body. He called the police.

Upon arrival, the police found Mars' partially nude body on the floor in the bedroom. She had what appeared to be four or five stab wounds in her neck and a large amount of blood on the left side of her head. The police found blood in both bedrooms of the house, in the bathroom, and on a towel in the living room. They found a broken, bloody clothing iron on the bed next to the body. In the other bedroom, they found a large black vase wedged between the bed and the wall next to some bloody tissues.

The medical examiner testified that the cause of death was injury to the head by a blunt and sharp object. In addition, there were three stab wounds in the left side of the neck that did not cut any major blood vessels or penetrate the spinal canal, stab wounds in the right neck and chest that did not sever major blood vessels, facial injuries indicating attempted suffocation, and bruises on the back of the left hand, both thighs, the left knee, and both ankles. The medical examiner testified that the wounds were sustained over a one-half-hour to one-hour period prior to Mars' death. None of the wounds was immediately incapacitating. Examination of the victim showed no visible injury to the vagina or anus but revealed a large amount of semen in the oral cavity. The semen could have been deposited after death.

On August 28, 1987, the police apprehended defendant in Illinois driving Mars' truck. Utah authorities took custody of defendant at the Salt Lake County Airport on May 20, 1988. Detective Dick Judd transported him to the Metropolitan Hall of Justice, where he was charged with capital homicide. After being read his rights, defendant signed a waiver form and made a lengthy statement acknowledging his involvement in Mars' death. The State played a tape of this statement to the jury at the guilt phase of defendant's trial. Other facts relevant to the case are discussed in conjunction with the issues below.

## II. CONSTITUTIONALITY OF THE DEATH PENALTY

Defendant raises several objections to the constitutionality of Utah's death penalty statutes. Utah Code Ann. §§ 76–3–206 and –207; Utah Code Ann. § 76–5–202. Defendant urges us to hold Utah's death penalty scheme unconstitutional because (1) the aggravating factor in Utah Code Ann. § 76–5–202(1)(f), relating to murder for personal or pecuniary gain, is vague and overbroad and fails to channel the discretion of the jury; (2) the aggravating factor in subsection (h), relating to prior convictions, is unconstitutionally vague; (3) the death penalty scheme in Utah constitutes cruel and unusual punishment, violating the state and federal constitutions; (4) section 76–5–202 violates due process and equal protection under the state and federal constitutions; (5) the extensive list of aggravating factors in section 76–5–202 fails to narrow the class of offenders eligible for the death penalty; (6) the statute impermissibly creates a presumption of death; (7) the statute unacceptably reduces evidentiary burdens in the penalty phase; and (8) the statute fails to provide for automatic review of federal constitutional issues by the federal court system.

Defendant first challenges the constitutionality of section 76–5–202(1)(f), the "personal or pecuniary gain" aggravating circumstance. " 'The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the

statute.' " [3] Defendant had reasonable notice that the requirement of subsection (f) applied to killing the victim and taking her purse, money, credit cards, and truck.[4] Therefore, defendant's claim of vagueness is meritless. Further, because defendant was also found guilty of first degree murder with the aggravating circumstances under subsections (d) [5] and (h),[6] we may uphold the jury's verdict without addressing the constitutional adequacy of subsection (f).[7]

We have previously addressed the application of section 76-5-202(1)(h) in *State v. Gardner* [8] and *State v. James.*[9] In *Gardner,* we declined to address the constitutionality of the statute, noting instead that overwhelming evidence of guilt combined with the existence of two other aggravating factors made any error in the application of subsection (h) harmless.[10] Defendant's case mirrors Gardner's; the two other aggravating circumstances make any error in the application of subsection (h) harmless. Further, in *James* we upheld the constitutionality of subsection (h) against the claim that the subsection was void for vagueness.[11] We dismiss defendant's claims concerning subsection (h) as meritless.[12]

We have considered defendant's other challenges to the constitutionality of Utah's death penalty scheme in numerous other cases.[13] These cases addressed the constitutionality of the death penalty statutes under both the state and federal constitutions.[14] Relying on the reasoning and analysis used in those cases, we hold that the death penalty under the Utah statutory

3. *Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964) (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954)).

4. *See generally State v. Schreuder,* 726 P.2d 1215, 1226–27 (Utah 1986) (subsection satisfied when defendant believed she would inherit under deceased's will).

5. Subsection (d) makes a murder committed during the commission of or attempt to commit rape an aggravating circumstance.

6. A previous felony conviction involving violence to a person is an aggravating circumstance under subsection (h).

7. *See State v. Gardner,* 789 P.2d 273, 279–80 (Utah 1989) (no need to reach constitutionality of subsection (h) when defendant was also convicted of two other aggravating circumstances), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990); *State v. Shaffer,* 725 P.2d 1301, 1307 (Utah 1986) (no need to consider constitutionality of subsection (f) when defendant was also convicted of robbery, which constitutes an aggravating circumstance under subsection (d)).

8. 789 P.2d 273, 279 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990).

9. 819 P.2d 781, 796–97 (Utah 1991).

10. *Gardner,* 789 P.2d at 279–80.

11. *James,* 819 P.2d at 796–97.

12. In so holding, we also note that the documents presented in support of the prior conviction conformed to rule 902 of the Utah Rules of Evidence and were admissible to prove the existence of the prior convictions.

13. *See Gardner,* 789 P.2d at 278–79; *State v. Holland,* 777 P.2d 1019, 1024–26 (Utah 1989); *State v. Bishop,* 753 P.2d 439, 460 (Utah 1988); *State v. Tillman,* 750 P.2d 546, 572 (Utah 1987); *Andrews v. Morris,* 677 P.2d 81, 83–84 (Utah 1983); *State v. Wood,* 648 P.2d 71, 79–85 (Utah 1981), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *Andrews v. Morris,* 607 P.2d 816, 823–24 (Utah), *cert. denied,* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980); *Pierre v. Morris,* 607 P.2d 812, 814–15 (Utah), *cert. denied,* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980); *State v. Andrews,* 574 P.2d 709, 710 (Utah 1977), *reh'g denied,* 576 P.2d 857 (Utah), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *State v. Codianna,* 573 P.2d 343, 348 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *State v. Pierre,* 572 P.2d 1338, 1345–46 (Utah 1977), *reh'g denied,* 576 P.2d 857 (Utah), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978). We note that these cases did not address defendant's contention that the death penalty statutes are unconstitutional because they do not provide for automatic review by a federal court. This argument is frivolous. The doctrine of separation of powers prohibits the state of Utah from requiring the federal courts to review a Utah conviction. Neither this court nor the Utah Legislature has the authority to define the jurisdiction of the federal courts. *See* U.S. Const. art. I, § 8; U.S. Const. art. III, amend. X; Utah Const. arts. VI, VIII.

14. *See, e.g., Bishop,* 753 P.2d at 460; *Tillman,* 750 P.2d at 572.

scheme is constitutional and was constitutionally applied to defendant.

### III. DEFENDANT'S MOTION TO STRIKE JURY PANEL

On March 6, 1989, defendant filed a motion to strike the March jury panel, arguing that the jury selection did not comply with the Jury Selection and Service Act (the "Act")[15] and the constitutional provisions guaranteeing him trial by a jury composed of a fair cross-section of the community.[16] At the hearing on this motion, defendant presented evidence concerning the degree of noncompliance with the Act, the extent to which Hispanics comprise a distinct minority group for fair cross-section purposes, and the disparity between the number of Hispanics on the panel and the number of Hispanics in the population. The court denied defendant's motion. Defendant filed an interlocutory appeal, and this court stayed the March 1989 trial date pending our decision whether to accept that appeal. This court rejected the interlocutory appeal, and a new jury panel was selected to convene in May.

The May jury panel was selected on March 30, 1989. On April 25, 1989, the third district court approved an administrative order governing selection procedures for that court. Defendant moved to strike the May panel on the ground that the administrative order of the third district court impermissibly superseded the directives of the Act. The court took further evidence on the renewed motion. The trial judge denied defendant's motion to strike the May panel, and trial began on May 17, 1989.

Defendant claims that Salt Lake County's jury selection procedure denied him his right to trial by a fair and impartial jury as guaranteed by the Sixth and Fourteenth amendments to the United States Constitution. He alleges that the selection process deprived him of a jury consisting of a fair cross-section of the community and that he is entitled to a new trial unless the State can show that the deprivation resulted from a significant state interest. As evidence for his contention, defendant asserts that none of the 77 venire persons chosen as prospective jurors in his case were of African-American, Asian, or Hispanic descent and that the persons chosen for the month of his trial did not represent the geographical or socio-economic character of the community because they were not proportionately drawn from the county's voting districts as required by statute.

Defendant correctly asserts that he has the right to an impartial jury drawn from a fair cross-section of the community.[17] If he can show that the jury selection process deprived him of that right, the burden shifts to the State to establish that the deprivation resulted from a significant state interest that was manifestly advanced by those aspects of the selection process that resulted in the discrepancy.[18] To establish a prima facie violation of his right to a jury that represents a fair cross-section of the community, defendant must show that the excluded persons represent a distinctive group in the community, that the group is not fairly and reasonably represented in jury venires, and that this underrepresentation is due to a systematic exclusion of the group during the jury selection process.[19]

Defendant first claims that the lack of geographical and socio-economic distribution of voters on the May jury venire violates the Sixth Amendment. However,

15. Utah Code Ann. §§ 78-46-1 to -22.

16. U.S. Const. amend. VI; Utah Const. art. I, §§ 7, 10, 12, 24; Utah Const. art. V, § 1. Defendant makes no argument concerning the state constitutional issues other than citing to the relevant sections. His failure to engage in any briefing or analysis of the state constitutional issues is dispositive. *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988).

17. *See Duren v. Missouri,* 439 U.S. 357, 363-64, 99 S.Ct. 664, 668-69, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 527-28, 95 S.Ct. 692, 696-97, 42 L.Ed.2d 690 (1975); *Hoyt v. Florida,* 368 U.S. 57, 59, 82 S.Ct. 159, 161, 7 L.Ed.2d 118 (1961).

18. *Duren,* 439 U.S. at 367-68, 99 S.Ct. at 670-71.

19. *Id.* at 364, 99 S.Ct. at 668.

courts do not recognize geographical distribution or socio-economic status as a distinctive classification or group for Sixth Amendment purposes.[20] Mere geographic proximity does not endow people with the common values, culture, and history such as to create a distinctive group within our society. Therefore, we reject defendant's claim that a disproportionate representation from the county's voting districts violated his constitutional right to a fair cross-section of the community.

Defendant's allegation that persons from minority backgrounds were excluded from his jury panel fares no better. The district court did recognize in *State v. Malin*[21] that Hispanics are a distinctive group in Salt Lake County for fair cross-section purposes.[22] However, defendant has failed to show unfair or unreasonable representation of Hispanics on jury venires in Salt Lake County. He offers no evidence regarding the representation of Hispanics on jury venires other than the bare fact that the 77 venire persons chosen for his trial did not contain any Hispanic persons. He has not produced any evidence on the number of Hispanics in the jury pool drawn for the month of May, nor has he presented statistics on the number of Hispanics who were qualified as jurors for that month. Defendant has likewise produced no evidence of unfair representation of Hispanics on other jury venires drawn from the same selection process as that used for his panel,[23] nor has he shown that the underrepresentation on his panel resulted from other than a purely random selection process. The constitution does not require that each petit jury chosen contain the requisite percentage of minority members in order to meet the fair cross-section requirement.[24] Indeed, purely random drawings will not always produce the appropriate percentages of minority citizens, particularly where, as here, the percentage of minority citizens in a community is relatively small. Therefore, defendant has failed to raise a prima facie claim that he was deprived of his constitutional right to an impartial jury.

Defendant also claims that Salt Lake County's violation of the statutory procedures for selecting his jury deprived him of a fair and impartial jury. To obtain relief under the Act, defendant must show prejudice resulting from a substantial viola-

**20.** Defendant cites no cases so holding, and we are unable to locate any.

**21.** Order, *State v. Malin,* CR 86–827 (October 28, 1986). The court found in the *Malin* case that Hispanics were a distinctive group, comprising 4.99 percent of Salt Lake County's general population. Hispanics comprised 4.31 percent of the population over eighteen years of age and potentially eligible to serve as jurors.

**22.** *Id.; see also State v. Tillman,* 750 P.2d 546, 575–76 (Utah 1987) (holding that blacks and Asians are not numerous enough in Salt Lake County to constitute a distinctive group for fair cross-section purposes). By citing these statistics, we do not necessarily hold that Hispanics constitute a cognizable group within the state of Utah.

**23.** Defendant did produce evidence that the qualified jury pool drawn for March 1989 contained 2.74 percent Hispanics, less than the 4.31 percent in the community at large. However, defendant attributed this lower percentage to the use of outdated address lists in contacting potential jurors. The list used to contact the May jurors was compiled on March 21, 1989, nine days prior to the selection of the May jury pool. Therefore, defendant's claim with regard to the outdated list does not apply to the May panel.

**24.** *See Taylor,* 419 U.S. at 538, 95 S.Ct. at 701–02; *Lockhart v. McCree,* 476 U.S. 162, 173, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1988). Defendant cites *Batson v. Kentucky,* 476 U.S. 79, 95, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1990), for the proposition that he need only show underrepresentation on his own jury venire in order to make his claim. While it is true that a defendant need only bring in evidence regarding the selection process used for his own venire, that evidence must still show a *systematic* exclusion of a distinctive group to violate the fair cross-section requirement. A showing of systematic exclusion requires more evidence than a bare numerical showing from a single venire. This evidence may be a showing that the selection process affords an opportunity for purposeful discrimination or that the process regularly excludes a cross-section of the community. *Batson,* 476 U.S. at 94–95, 106 S.Ct. at 1721–22. A single instance of underrepresentation does not make a prima facie case that a group was systematically excluded.

tion of its provisions.[25] Because this court stayed defendant's March trial date to review his petition for interlocutory appeal, defendant was ultimately tried by a different panel than the one objected to in March. Therefore, defendant can show no prejudice under the Act with regard to the March panel.[26] We will accordingly limit our review to defendant's objections to the May jury panel.

Defendant complains that the jury clerk violated the Act by disqualifying prospective jurors without the supervision of the court.[27] By administrative order, the court delegated to the clerk the task of disqualifying persons according to statutory requirements.[28] The court reserved the responsibility of determining all disqualifications for physical or mental health reasons and all disqualifications requiring the exercise of discretion. The court's method of reviewing those forms requiring a discretionary determination of eligibility preserves the Act's purpose of qualifying all those who meet the statutory requirements. We do not believe the Act requires that our state judges personally use precious resources to perform the routine task of evaluating every jury form returned. We see no reason why the court cannot reasonably delegate this initial qualification function to a trained court clerk. The court's practice substantially complies with the Act.

Similarly, the court's practice of allowing the jury clerk to grant postponements to prospective jurors with difficulty or hardships substantially complies with the Act.[29] The court may reasonably delegate the authority to grant postponements to the clerk, who has more direct contact with potential jurors.

Defendant also contends that the clerk violated the provisions of the Act requiring selection of a master jury wheel from the master list.[30] The county clerk's office compiled a master list from voter registration and driver's license records. This list, comprised of 100 percent of the voters from each voting district plus driver's license records, was then designated as the master jury wheel. The court's administrative order authorized this process.

Defendant contends that this process deprived him of a jury representing a fair cross-section of the community in two respects. First, he argues that the lack of a separate master jury wheel created disproportionate representation of voters from each voting district in the county on monthly jury panels. He then argues that this disproportionate representation deprived him of a fair cross-section of voters. His contention is without merit. The Act does not prohibit the use of 100 percent of the master list to constitute the master jury wheel. The master jury wheel contains a proportionate number of persons from each district. There is substantial compliance with the Act in this respect.

Defendant argues that the clerk violated the Act by removing certain names from the source lists before compiling them into the master list. The clerk cross-checked the lists to avoid duplications

25. *See* Utah Code Ann. § 78–46–16(2).

26. Defendant also claims that the failure to appoint a proper panel in March violated his right to a speedy trial and his right to be tried within 180 days under the Interstate Disposition on Detainers Act, Utah Code Ann. §§ 77–29–1 to –11. We have reviewed this claim, including defendant's supplemental affidavit regarding the claim, and agree with the trial court that defendant affirmatively waived these rights.

27. Utah Code Ann. § 78–46–8 requires that the court determine all instances of disqualification.

28. Former section 78–46–12(3), which applies to this case, required juror qualification forms to ask whether the prospective juror was a citizen of the United States; a resident of the county; able to read, speak, and understand the English language; without any physical or mental disability impairing his or her capacity to render jury service; not a convicted felon; and not on active duty in the military service of the United States. If these criteria were met, the person was considered qualified for jury service under section 78–46–2.

29. Utah Code Ann. § 78–46–15 states that the court may excuse jurors for hardship or undue burden.

30. *See* Utah Code Ann. §§ 78–46–10 to –12 (1989).

and removed the names of those who were on active military duty, were deceased, had moved out of the county, and were under 18 years of age. The clerk also programmed the computer to pass over those persons who had been chosen from the master list as jurors during the last five years. Defendant claims that removal of all names from the list other than those known to be deceased violated the Act and deprived him of a jury representing a fair cross-section of the community.

We fail to see how removing the names of persons who are under 18, nonresidents, or on active military duty can prejudice defendant, since the Act disqualifies these persons from jury service. The court's administrative order instructed the clerk to remove those persons who had been called to jury service in the past five years. This order was a reasonable administrative decision, given the ample number of prospective jurors in Salt Lake County. Further, defendant has failed to demonstrate any actual or potential prejudice besides his bald assertion that he was deprived of a "fair cross-section." His contentions regarding the master jury wheel are therefore without merit.

Defendant next contends that the court did not sufficiently enforce the law requiring return of the jury questionnaires by prospective jurors. Defendant complains that the clerk did not further investigate the availability of those jurors whose forms were returned by the postal service as undeliverable. The court authorized the clerk to abandon further location efforts for the persons with undeliverable forms after it made the determination that efficiency and cost effectiveness prohibited a further search. This decision by the court was reasonable and not in substantial violation of the Act, which does not specifically address the problem of undeliverable jury questionnaires and notices.

Defendant's next contention is that the clerk violated the statute because she did not take sufficient steps to follow up on those persons who did not return their qualification forms. The jury clerk testified that she sends reminder notices to those persons who have not returned their forms. She refers those who still fail to respond to the presiding judge for further proceedings. This testimony shows that the court took reasonable action to enforce the return of qualification forms. Defendant has shown no violation of the Act and no prejudice resulting from the alleged lack of enforcement. Therefore, he has made no colorable claim regarding the enforcement of the selection procedures.

Defendant also claims that the county clerk did not make the master jury list available to the public because he charged $25 to $100 to view it and he did not store it in a particular order. Nothing in the Act requires that the list be available to the public free of charge, and defendant has not shown that the charges deprived him of the ability to look at the list. The county clerk keeps the list on a computerized database. He deliberately scrambles the database to obtain a random selection of jurors when he makes the monthly selections. The Act does not require that there be a hard copy of the master list. The definition of "jury wheel" includes an electronic system or database.[31] It is reasonable to conclude that such a system is also a sufficient means of storing the master list.

Defendant further complains that the jury clerk did not place the qualified list of jurors on a qualified jury wheel. The computer in the court clerk's office lists all the names for each month. It does not have a separate list of the qualified jurors for each month, merely a notation by the jurors' names indicating whether they are qualified. Therefore, in order to determine which jurors have qualified for jury service, a defendant must examine the entire list of jurors called for that month. Although this system does not facilitate instant availability of the qualified jury wheel, it does contain the names of qualified jurors. We have noted that the computer system is a legal means of storing

31. Utah Code Ann. § 78-46-4(5) (1989).

jury wheels under the statute.[32] Further, defendant has shown no prejudice resulting from this procedure, other than the requirement of a more lengthy search of the computer record. Therefore, no substantial violation occurred.

In sum, we note that, as a whole, the selection process used by Salt Lake County complied with statutory procedures. We are convinced that a random and fair cross-section of the community can be drawn using Salt Lake County's procedures and that defendant was able to obtain a fair and impartial jury.

## IV. DEATH QUALIFICATION OF THE JURY VENIRE

Defendant claims that excluding from the jury those jurors who stated that they could never vote to impose the death penalty ("death qualification" of the jury panel) violated his right to a jury panel made up of a fair cross-section of the community. Defendant bases his claim on article I, sections 10 and 12 of the Utah Constitution. Defendant contends that a death-qualified jury does not represent the community at large and is more likely to convict a person accused of a crime.

This court has examined on numerous occasions the propriety of death qualifying a jury. We have repeatedly upheld the process of death qualification in the face of claims that the practice violated the United States Constitution.[33] In *State v. Shaffer*,[34] we permitted the questioning of jurors concerning their views on the death penalty. We reserved the question of whether the exclusion of those jurors who could not vote for the death penalty violated the Utah Constitution. The Utah practice of death qualification excludes not only those jurors who would never vote to impose the death penalty, but also those jurors who would always vote to impose the death penalty upon a finding of first degree murder.[35] This practice comports with Utah law, which permits exclusion of all jurors who cannot follow their oath and apply the law as instructed by the court.[36] The death qualification process is therefore consonant with Utah law.[37]

Although our prior holdings concerning death qualification rely on the federal constitution, the analysis used in those cases applies here as well. Death qualification of the jury venire advances a significant state interest in seating jurors willing to abide by the law and follow their oath as jurors.[38] The trial court did not err in allowing the death-qualification process in defendant's trial.

32. *Id.*

33. *State v. Bishop,* 753 P.2d 439, 456 (Utah 1988); *State v. Lafferty,* 749 P.2d 1239, 1253 (Utah 1988); *State v. Valdez,* 748 P.2d 1050, 1056–57 (Utah 1987); *State v. Schreuder,* 726 P.2d 1215, 1225–26 (Utah 1986); *State v. Moore,* 697 P.2d 233, 237 (Utah 1985); *State v. Norton,* 675 P.2d 577, 588–89 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984); *State v. Codianna,* 573 P.2d 343, 351 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

34. 725 P.2d 1301, 1309 (Utah 1986).

35. *See, e.g., Schreuder,* 726 P.2d at 1225–26.

36. *See* Utah R.Crim.P. 18(e)(13)-(14).

37. In *State v. Moore,* 697 P.2d at 237, we stated:

> [T]here is some counterbalancing under Utah law.... [A] trial judge must also ask prospective jurors whether they would always vote for a death penalty upon a conviction of first degree murder.... [W]e cannot conclude that a jury of persons who may impose a death sentence, but are not committed in advance to do so, will be less than fair and impartial in determining guilt.
>
> Furthermore, the Legislature has established capital punishment as one of the options in a first degree murder case. Clearly the legislative policy would be undermined if jurors were allowed to sit who by conscience could never impose the death penalty.

38. In noting that death qualification advances a significant state interest, we do not intend to imply in any way that persons excluded due to their convictions on the death penalty constitute a distinctive cross-section of the community under the Utah Constitution or that defendant is entitled to have his individual jury panel mirror the community's general beliefs concerning the death penalty. We adhere to our prior holdings regarding the nature of the fair cross-section requirements. *See, e.g., Bishop,* 753 P.2d at 457; *State v. Tillman,* 750 P.2d 546, 575 (Utah 1987).

## V. PROSECUTION'S USE OF PEREMPTORY CHALLENGES

Prior to trial, defendant moved to prohibit the prosecution from exercising its peremptory challenges to remove those jurors who expressed hesitation about imposing the death penalty. The trial court denied the motion pending the exercise of the peremptory challenges. Following voir dire, defendant renewed the motion, focusing on the prosecution's challenges of certain jurors who defendant believed expressed hesitation about the death penalty. The trial court denied the motion and refused to require the prosecution to explain the reasons for the challenges.

Defendant bases his claim on *Batson v. Kentucky.*[39] In *Batson,* the Supreme Court held that the state may not use its peremptory challenges to exclude black jurors from a jury panel.[40] Defendant argues that *Batson* prohibits any peremptory challenge by the state that would be prohibited as a challenge for cause. Defendant's reliance on *Batson* is misplaced. *Batson* involved the discriminatory use of peremptory challenges to remove a cognizable racial group from the jury panel. Defendant cannot establish that persons who express hesitation about the death penalty are a cognizable, distinctive group in society. Therefore, the fair cross-section requirement of the Sixth Amendment cannot be used to invalidate the use of peremptory challenges against those persons.[41] Furthermore, in *State v. Bishop,* we recognized the ability of the prosecution to use its peremptory challenges in any nondiscriminatory manner, including the removal of those jurors who express hesitation about the death penalty.[42] We adhere to that ruling now. The trial court correctly refused to require the State to explain the challenges.

## VI. DEFENDANT'S CHALLENGES FOR CAUSE

Defendant contends that the trial court committed reversible error by refusing to grant his challenges for cause to four jurors, whom he then had to remove by peremptory challenge. Defendant claims that these jurors exhibited biased responses when questioned concerning their views on the death penalty, creating a jury panel prone to convict and to sentence him to death. Defendant correctly asserts that prejudicial error would have occurred if he were required to use his peremptory challenges on jurors who should have been removed for cause.[43] We therefore direct our inquiry to the propriety of the trial court's refusal to remove the jurors.

A trial court has broad discretion in determining whether to grant a challenge for cause.[44] While the law requires a jury comprised of impartial and unbiased persons, the trial court must actually determine whether the individual juror entertains such strong views that he or she cannot decide the case with appropriate impartiality.[45] Only strong and deep impressions or opinions on the part of a venire person serve as a basis for removal for cause.[46] In reviewing the trial court's decision to remove a juror for cause, this court should look at the whole voir dire exchange with the juror.[47] If the juror's answers as a whole convey the impression of bias, then removal for cause is necessary. However,

39. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

40. *Id.* at 87–88, 106 S.Ct. at 1718.

41. *Lockhart v. McCree,* 476 U.S. 162, 174, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986); *State v. Bishop,* 753 P.2d 439, 457 n. 41 (Utah 1988).

42. 753 P.2d at 456–57 & n. 41.

43. *Id.* at 451; *State v. Jones,* 734 P.2d 473, 474 (Utah 1987); *State v. Norton,* 675 P.2d 577, 589 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984).

44. *Bishop,* 753 P.2d at 451; *Jenkins v. Parrish,* 627 P.2d 533, 536 (Utah 1981); *State v. Jonas,* 793 P.2d 902, 906 (Utah Ct.App.), *cert. denied,* 804 P.2d 1232 (Utah 1990).

45. *Jones,* 734 P.2d at 475; *Norton,* 675 P.2d at 589.

46. *Bishop,* 753 P.2d at 451; *State v. Lacey,* 665 P.2d 1311, 1312 (Utah 1983).

47. *Bishop,* 753 P.2d at 452 (jury voir dire must be read as a whole).

if the answers as a whole indicate that the juror is willing to listen and consider the evidence presented and to follow the law, the court is not required to remove the juror.[48]

Our review of the entire voir dire record indicates that the trial court did not err in refusing to dismiss the challenged jurors for cause. Although the challenged jurors did express strong opinions about the appropriateness of the death penalty in certain homicide cases, each of the jurors expressed willingness to follow the law, to weigh the evidence, and to consider any mitigating evidence presented. None of the jurors expressed a strong opinion that the death penalty should be imposed in every homicide case, and all expressed the belief that death was not the appropriate penalty in all homicide cases. The jurors' responses as a whole indicated a willingness to be fair and impartial. The trial court did not abuse its discretion in denying defendant's challenges for cause.

## VII. PROSECUTION'S CHALLENGE FOR CAUSE

Defendant claims that the trial court improperly granted the prosecution's motion to excuse juror Hoffman for cause. Hoffman indicated that she would have difficulty imposing the death penalty, that she would suffer emotionally from having to decide the fate of someone's life, and that she suffered from emotional problems and a hormonal imbalance. She stated that she "hoped" she would be able to impose death if she determined that it was the appropriate penalty, but doubted her ability to do so. The prosecution moved to dismiss her for cause based on her inability to impose the death penalty. After argument, the court granted the motion on the ground that Hoffman suffered from physical and emotional problems that would impair her ability to function as a juror.

As stated above, the trial court is granted a wide range of discretion in determining whether to grant challenges for cause.[49] Although a juror may not be excused for cause simply because he or she expresses hesitation about imposing the death penalty, the trial court may excuse a juror who indicates an inability to impose the death penalty.[50] The court may also excuse a juror if it appears from the totality of the voir dire that he or she cannot perform the duties of a juror due to a physical or emotional disability.[51]

Reviewing the voir dire as a whole, it was within the trial court's discretion to remove Hoffman for cause. Her answers to the questions posed on voir dire indicated that she suffered from emotional and physical problems that affected her ability to remember, to make a decision, and to stand by her decisions if opposition arose.[52] Her difficulties in remembering and making decisions were not related merely to her inability to make a decision regarding the death penalty, but to the more general

48. *Id.* at 452; *State v. Frame,* 723 P.2d 401, 406 (Utah 1986); *Norton,* 675 P.2d at 589; *State v. Malmrose,* 649 P.2d 56, 61 (Utah 1982).

49. *Wainwright v. Witt,* 469 U.S. 412, 425–26, 105 S.Ct. 844, 852–53, 83 L.Ed.2d 841 (1985); *State v. Bishop,* 753 P.2d 439, 451 (Utah 1988); *Jenkins v. Parrish,* 627 P.2d 533, 536 (Utah 1981).

50. *Adams v. Texas,* 448 U.S. 38, 44, 100 S.Ct. 2521, 2525–26, 65 L.Ed.2d 581 (1980); *Witherspoon v. Illinois,* 391 U.S. 510, 522–23, 88 S.Ct. 1770, 1777–78, 20 L.Ed.2d 776 *reh'g denied,* 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968).

51. Utah R.Crim.P. 18(e)(2).

52. For example, when Hoffman was questioned about her ability to stand by her decisions, the following dialogue took place:

Q. If you were selected as a juror, and there were twelve of you on the jury, and you came to the time to make the decision, and eleven of you voted for the death penalty, and you voted, or you didn't know. Let's say you really were hesitant about it. Do you feel like you'd be able to stick to your guns about it, or would that kind of situation cause you to have self doubts about your own judgment, or how would you feel?

A. I have that happen to me a lot. And I do tend to have self doubts, and would wonder, well maybe I'm wrong. Like I said, I have a hard time with decisions. I don't think my decision is important, and my opinion is important. My self esteem is real low. Which is obvious, I'm sure. But I do have a hard time with decision making. So, most of the time I'll follow, regardless of how I feel. Sometimes I just go with the flow, so to speak.

task of hearing and evaluating evidence.[53] This inability to evaluate and remember evidence and to make a decision regarding the evidence would have substantially impaired her ability to serve as a juror. Therefore, Hoffman was properly excused for cause.

## VIII. ADMISSION OF EVIDENCE DURING THE GUILT PHASE

Defendant asserts that the trial court should have excluded several of the prosecution's exhibits because they were irrelevant and inflammatory. Specifically, he objects to the introduction of several items found in the truck when he was apprehended in Illinois, including four credit card purchase receipts, credit cards, and identification cards belonging to the victim. Defendant objects to the introduction of these items of evidence on several statutory and constitutional grounds.

We initially note that, contrary to defendant's argument, the majority of the items are relevant to establish the aggravating factor that the murder was committed for pecuniary or other personal gain.[54] However, we need not reach the issue of the items' admissibility because it is clear that any error committed in admitting them was harmless.[55] In *State v. Bishop,* we reviewed the standard for harmless error in criminal cases, including capital cases. We held that for an error to require reversal, the likelihood of a different outcome must be sufficiently high and undermine our confidence in the jury's verdict.[56] The prosecution presented substantial evidence, including defendant's taped confession, that tended to prove defendant's guilt of the crimes charged. It is highly unlikely that the minor bits of evidence objected to here persuaded the jury to convict defendant or to sentence him to death. We are convinced that the jury would have reached those same verdicts had the evidence been excluded.

Defendant next contends that the trial court erred in admitting evidence of his attempted flight from the police who apprehended him in Illinois. Over objection, the arresting officer testified that defendant ran a police roadblock before being apprehended. In light of the overwhelming evidence of defendant's guilt, we find this evidence harmless and therefore decline to consider his arguments concerning its probativeness.[57]

Defendant also claims that the trial court violated his Sixth Amendment right to confrontation when it refused to permit him to question witness Angela Johnson concerning the victim's prior sexual activity. Defendant contends that this testimony was relevant to the issue of consent on the aggravating factor of rape or attempted rape. Evidence of a rape victim's prior sexual activity with individuals other than the defendant has little, if any, relevance to the question of her consent to sexual activity with the defendant.[58] Moreover, defendant did not seriously dispute the issue of consent in this case and admitted raping the victim. Therefore, the evidence was irrelevant, and defendant's right

53. Hoffman stated:

> A. Remembering could be a problem. I have a very bad memory, and I have a wandering mind, where I can't even read a book, because two pagess [sic] later I've got to go back, and start all over. I have a bad problem with a wandering mind. And I can't remember. I'm the person with the sunglasses on the head, and can't find them.

These answers indicate that her memory problems extended beyond the ability to decide on the death penalty issue and would affect her general ability to hear and decide the case. Therefore, regardless of her views on the death penalty, her inability to remember would appear to be sufficient grounds to excuse her for cause.

54. Utah Code Ann. § 76-5-202(1)(f).

55. *See State v. Bishop,* 753 P.2d 439, 477 (Utah 1988); *State v. Knight,* 734 P.2d 913, 919 (Utah 1987); *State v. Banner,* 717 P.2d 1325, 1335 (Utah 1986); *State v. Fontana,* 680 P.2d 1042, 1048 (Utah 1984); Utah R.Crim.P. 30.

56. *Bishop,* 753 P.2d at 477 (citing *Knight,* 734 P.2d at 920).

57. *See id.*

58. *State v. Johns,* 615 P.2d 1260, 1263-64 (Utah 1980).

to confrontation under the state and federal constitutions was not denied.[59]

## IX. GUILT PHASE REASONABLE DOUBT INSTRUCTIONS

During the guilt phase of the trial, defendant requested that the trial court give his proposed instruction number 8, regarding the reasonable doubt standard of proof. Instead, the trial court gave instructions 15 and 16, regarding proof beyond a reasonable doubt. Defendant objects to these instructions, arguing that they are erroneous and misleading and tend to trivialize the jury's decision-making process. He contends that the erroneous reasonable doubt instructions violated his right to due process of law.[60]

Specifically, defendant objects to the instructions on three grounds. First, he objects to the language of instruction 16 informing the jury, "[Y]ou must have greater assurance of the correctness of such a decision than you would normally have in reaching the weighty decisions affecting your own life." Defendant contends that this court disapproved of that language in *State v. Johnson.*[61] In *Johnson,* Justice Stewart, writing for a majority of the court, held that an instruction equating the reasonable doubt standard with the weighty decisions of the jurors' lives incorrectly trivialized the constitutionally required burden of proof.[62]

However, the language in instruction 16 did not equate the reasonable doubt burden with the weighty decisions of the jurors' lives; it impressed upon the jurors that the reasonable doubt standard requires *greater* proof than such decisions. No talismanic phraseology is required to articulate the reasonable doubt standard. An instruction must merely impress upon the jurors the heavy burden the prosecution must meet to prove guilt beyond a reasonable doubt.[63] Instruction 16 conveyed the proper impression of the gravity of the jurors' decision.

Second, defendant objects to the language used in instruction 15 regarding a "mere possibility."[64] He contends that this language violates *Johnson,* which disapproved of the "mere possibility" language.[65] Defendant misreads the import of instruction 15. Actually, the instruction favored defendant since it told the jurors that they must find guilt beyond a reasonable doubt and that they must not base their verdict on mere speculation or possibility. This instruction conveyed to the jurors that the State could not rely on "mere possibility" to obtain a conviction.

Third, defendant objects to the language defining reasonable doubt in instruction 16. He again contends that prohibiting a "possibility" from comprising a reasonable doubt deprived the jurors of the ability to act upon doubts that they may have entertained. Instruction 16 informed the jurors that "[a] reasonable doubt cannot be a doubt that is merely fanciful or imaginary or is based on a wholly speculative possibility" and that "it must arise from the evidence or lack of evidence in this case." This correctly informed the jurors that they were to base their deliberations on the evidence in the case and not to entertain imaginary or speculative suggestions as reasonable doubts. The language

59. *See State v. Moton,* 749 P.2d 639, 643–44 (Utah 1988); *Johns,* 615 P.2d at 1264.

60. U.S. Const. amend. V.

61. 774 P.2d 1141, 1148–49 (Utah 1989) (Stewart, J., concurring in the result).

62. *Id.*

63. *State v. Eagle,* 611 P.2d 1211, 1213 (Utah 1980) (no apparent reason to mandate one particular instruction on reasonable doubt); *see also Johnson,* 774 P.2d at 1147–49; *State v. Ireland,* 773 P.2d 1375, 1380 (Utah 1989); *State v. Standiford,* 769 P.2d 254, 266 (Utah 1988) (framing of instructions lies in the trial court's discretion).

64. Instruction 15 reads: "The law does not permit you to reach a verdict upon speculation, conjecture, or mere possibilities. Before you can make a finding of guilt, the State must convince you of the defendant's guilt beyond a reasonable doubt."

65. *Johnson,* 774 P.2d at 1148–49 (arguing that a mere possibility may indeed establish a reasonable doubt).

of instruction 16, taken as a whole, did not minimize the scope of the reasonable doubt or exclude legitimate doubts a juror may have entertained.

Even if defendant can show that the instructions given by the trial court were in a technical sense incorrect, he has not shown that the instructions prejudiced him. Only harmful and prejudicial errors constitute grounds for granting a new trial.[66] Defendant does not argue that the jury would have reached a different verdict if his requested instruction had been given instead of instructions 15 and 16. He has not demonstrated that the qualitative difference in these instructions affected the verdict he received, in either the guilt or the penalty phase. We therefore reject his contention that the instructions entitle him to a new trial.

## X. GUILTY AND MENTALLY ILL VERDICT

Prior to trial, defendant was interviewed by several alienists. The prosecution received these experts' reports at least two months prior to trial. On March 7, 1989, defendant filed a notice of intent to rely on a defense of diminished mental capacity and/or insanity. Defendant filed the motion less than thirty days before the March trial date, but the trial court permitted him to proceed with the reports necessary to present the defense.[67] On March 22, 1989, defendant withdrew the notice of intent to seek a diminished capacity defense. During the guilt phase of the trial, however, defendant presented the testimony of Dr. Lancaster to establish defendant's mental state.[68] The prosecution did not object to this testimony. Defendant requested an alternative verdict form that allowed the jury to enter a verdict of guilty and mentally ill ("GAMI"). Defense counsel also requested an instruction regarding the GAMI verdict. The trial court denied these requests because defendant had not presented evidence that he lacked the mens rea necessary for conviction of the crimes charged and because he had not given notice that he intended to rely on the defense of insanity or diminished mental capacity.

Defendant argues that the Utah Rules of Criminal Procedure require a trial court to instruct a jury that it may find a defendant guilty and mentally ill in any case in which the defendant requests such a verdict and presents evidence which would tend to support that verdict. Defendant claims that Utah Rule of Criminal Procedure 21.5 does not require that a defendant request a verdict of insanity prior to being entitled to a guilty and mentally ill instruction.

Defendant ignores the requirement of rule 21.5 that the guilty and mentally ill verdict option is to be offered if a defendant at trial asserts a defense of "not guilty by reason of insanity."[69] Rule 21.5 links the GAMI option to the statutory requirement of notice of a defendant's intent to rely on the defense of insanity.[70] This requirement also notifies the prosecution of the defendant's intent to seek one of the alternative verdict forms available under the rule. A rule 21.5 verdict form, based on the mental condition of the defendant, is available only if the defendant has given notice of his or her intent to seek it. In this case, defendant withdrew his notice to rely on a defense of diminished capacity or insanity. Therefore, the prosecution

66. *Johnson,* 774 P.2d at 1146 & n. 16; *State v. Tillman,* 750 P.2d 546, 561 (Utah 1987).

67. Utah Code Ann. § 77-14-3(1) requires a defendant to give notice of an insanity defense at least thirty days prior to trial. The trial court did not make a ruling regarding the timeliness of the motion.

68. Dr. Lancaster testified that defendant had a tendency to lie and puff himself up to fill in gaps in his memory and to make himself appear smarter. Although Dr. Lancaster testified that defendant was mentally deficient, the thrust of the testimony was that defendant's confession was unreliable and should not be regarded as conclusive evidence that defendant committed the crime charged.

69. Utah R.Crim.P. 21.5(2)(a).

70. *See* Utah Code Ann. § 77-14-3(1). We do not reach the issue of whether defendant's March 7, 1989, notice was sufficient under this statute, since that notice was withdrawn on March 22, 1989.

had no notice of his intent to seek an alternative verdict under rule 21.5.

Defendant asserts that our holding in *State v. DePlonty*[71] requires that we grant him a new trial to allow the jury an opportunity to reach a verdict of guilty and mentally ill. *DePlonty* held that a defendant need not prove that he or she is insane to receive a GAMI verdict.[72] However, *DePlonty* does not negate the requirement that the defendant must give notice of his intention to seek a verdict predicated on mental illness. Indeed, defendant DePlonty gave the requisite notice to the state prior to his trial.[73] Because defendant did not give proper notice of his intent to seek a verdict based on mental illness or insanity, he was not entitled to a GAMI instruction.

Additionally, we fail to see how defendant was prejudiced by the trial court's refusal to submit a GAMI verdict form to the jury. Contrary to defendant's argument, a verdict of guilty and mentally ill does not preclude the jury from returning a verdict of death.[74] Although the United States Supreme Court has held that an insane person may not be executed,[75] the Court has also held that retardation or mental illness less severe than insanity does not in and of itself preclude a death sentence.[76] The jury heard extensive evidence concerning defendant's mental illness at the penalty phase of the trial. The trial court gave a lengthy instruction concerning the mitigating circumstance of mental illness, including the particular circumstances of defendant's mental condition.[77] The jurors apparently found this evidence insufficient to mitigate against the imposition of the death penalty. We fail to see how the additional fact of a GAMI verdict would have changed this result.[78]

## XI. PROSECUTORIAL MISCONDUCT

Defendant next claims that the prosecutor's improper comments during his opening statement[79] and his questioning of one witness, Detective Couch,[80] deprived defendant of a fair trial. Defendant claims that the prosecutor insinuated that additional

71. 749 P.2d 621 (Utah 1987).

72. *Id.* at 627.

73. *Id.* at 623.

74. *See* Utah R.Crim.P. 21.5(3). *See generally Utah Legislative Survey—1983,* 1984 Utah L.Rev. 115, 156–57.

75. *Ford v. Wainwright,* 477 U.S. 399, 401, 106 S.Ct. 2595, 2596–97, 91 L.Ed.2d 335 (1986).

76. *Penry v. Lynaugh,* 492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989). It is interesting to note that the mental illness and retardation described in *Penry* is similar in severity and effect to defendant Young's. *See id.* at 307–10, 109 S.Ct. at 2941–42.

77. Instruction 14 explained that the jury could find as mitigating evidence the fact that defendant was impaired by mental illness. The instruction then related several circumstances of defendant's claimed mental illness as possible mitigating circumstances.

78. A GAMI verdict would have afforded defendant an additional hearing to determine his mental state. Defendant has not shown that he meets the additional requirements for treatment at the Utah State Hospital pending the execution of his sentence. Therefore, the provisions of rule 21.5 allowing for imprisonment at the state hospital are not a sufficient basis for assuming prejudice to defendant.

79. During his opening statement, the prosecutor stated:

> The State does not intend to bring in every single piece of evidence in this case. The State will bring in the evidence that will indicate to you what occurred that evening. I don't intend to bring in every blood splatter on the wall. I don't intend to bring in every piece of blood pooling on the floor, but I will bring in to you enough evidence to you [sic] to prove what occurred that night.

80. The prosecutor questioned State's witness Detective Couch regarding his investigation of the case. During questioning, the prosecutor asked:

> Q: ... Detective Couch, as numerous as those photos were that we went through, they are not all, each and every photograph that was taken of the scene, are they?
> A: No. They would be just a small portion.
> Q: And as many of the exhibits that you have testified about, the physical evidence that we have brought into court today, these are not every single piece of evidence that was seized at the scene; is that correct?
> A: That's correct.
> Q: What portion of it would you expect it to be?
> A: Approximately a third to maybe a half.

evidence existed which had not been introduced and that this insinuation encouraged the jury to decide the case on the basis of evidence not introduced at trial, thereby prejudicing defendant's case.

Initially, defendant must show that his claims are properly before this court. Defense counsel made no objections to either of these statements during the trial of the case. Therefore, we deem the issue waived unless we determine that the statements constituted plain error.[81] This court will review the record of a capital case for manifest or plain error, whether or not objected to at trial.[82] We discussed the plain error doctrine in *State v. Eldredge.*[83] We stated that for an error not raised at trial to constitute "plain error," it must have been obvious to the trial court and it must have been harmful.[84] Therefore, for defendant to succeed on his claim, he must show that the prosecutor's statements constituted obvious error and that absent this error, there is a reasonable likelihood that defendant would have received a more favorable result.[85]

Although we give counsel considerable latitude in making arguments to the jury, "counsel exceeds the bounds of this discretion and commits error if he or she calls to the jury's attention material that the jury would not be justified in considering in reaching its verdict." [86] The Utah Rules of Professional Conduct also prohibit an attorney from alluding to matters not introduced as evidence at trial.[87] The insinuation that other evidence exists encourages the jury to determine its verdict based upon evidence outside the record and jeopardizes a defendant's right to a trial based upon the evidence presented.[88] The prosecutor's remarks and his questions asked of Detective Couch constituted obvious error.

Although defendant has shown the plain error of the prosecution's statements, he has not shown prejudice. When there is strong proof of guilt, the conduct or remark of a prosecutor is not presumed prejudicial.[89] Therefore, unless the error undermines our confidence in the jury verdict, we will not overturn that verdict.[90] The prosecutor presented overwhelming evidence of guilt. In addition to defendant's confession, the jury heard numerous witnesses testify to their observations of the crime scene and the evidence of repeated beatings, multiple stab wounds, and extensive blood spatters found there. At the penalty phase, numerous witnesses testified about defendant's prior criminal history, his violent nature, and the aggravating circumstances of the crime. In both the guilt and penalty phases, the court instructed the jury to base its verdict solely on the evidence that was admitted at the trial and that the arguments of the prosecution and defense counsel did not constitute evidence. It is unlikely that the jury was significantly influenced in its verdicts of guilt and death by the prosecutor's comments. The references to other evidence were therefore harmless.

## XII. SHACKLING OF DEFENDANT DURING PENALTY PHASE

Defendant did not attend the penalty phase hearing for a portion of the first day

**81.** *State v. Holland,* 777 P.2d 1019, 1026 (Utah 1989).

**82.** *Id.*

**83.** 773 P.2d 29, 35 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989).

**84.** *Id.* at 35–36.

**85.** *See State v. Rimmasch,* 775 P.2d 388, 407 (Utah 1989); *State v. Verde,* 770 P.2d 116, 122 (Utah 1989); *State v. Bell,* 770 P.2d 100, 106 (Utah 1988) (all regarding standard for harmless error).

**86.** *State v. Dibello,* 780 P.2d 1221, 1225 (Utah 1989); *see also State v. Troy,* 688 P.2d 483, 486 (Utah 1984); *State v. Valdez,* 30 Utah 2d 54, 60, 513 P.2d 422, 426 (1973).

**87.** Utah R. Professional Conduct 3.4(e).

**88.** *See United States v. Young,* 470 U.S. 1, 18, 105 S.Ct. 1038, 1047–48, 84 L.Ed.2d 1 (1985).

**89.** *Troy,* 688 P.2d at 486 (citing *State v. Seeger,* 4 Or.App. 336, 479 P.2d 240 (1971)).

**90.** *Dibello,* 780 P.2d at 1225; *State v. Lafferty,* 749 P.2d 1239, 1255 (Utah 1988).

and for the entire second day of the hearing. He returned to the courtroom on the third day and stated that he planned to attend the remainder of the hearing. He then asked permission to testify immediately. After some discussion concerning the propriety of defendant's decision to testify, the trial judge stated that he would require restraints on defendant. Defendant was required to wear a waist chain attached to handcuffs. He stated that he would like to leave the courtroom to "think some things over" but that he would come back.

Following noon recess, defendant returned to the courtroom wearing the restraints. The jury entered the courtroom while defendant sat at counsel table in the chains. Counsel asked to approach the bench, and the court excused the jury. Counsel made arguments concerning the shackles; the judge refused to remove them. Thereafter, defendant again left the courtroom.

Defendant argues that the court's shackling order denied his right to due process under the Fifth Amendment. He claims that the court must show necessity prior to requiring a defendant to appear before a jury wearing restraints. He claims that restraints are inherently prejudicial and are an affront to his human dignity. Defendant also claims that the restraints violated his right to be free from cruel and unusual punishment under the Eighth Amendment because the restraints invited a death sentence imposed through caprice or emotion. He bases his claims on *Holbrook v. Flynn,*[91] which states that restraints on a defendant are inherently prejudicial, and on *Elledge v. Dugger,*[92] which holds that the prohibition against restraining defendants in front of a jury extends to the penalty phase of a capital trial.

With the exception of *Elledge v. Dugger,* defendant's argument relies on cases that arose from a trial court's shackling order during the guilt-innocence phase of a trial.[93] These cases are based on the proposition that a shackling order violates a defendant's right to due process because it undermines the presumption of innocence.[94] This presumption no longer applies during the penalty phase of a capital trial. Indeed, a jury sitting at a penalty phase recently found the defendant guilty of first degree murder during the guilt phase of the trial. As a result, the constitutional foundation for the right to be free from shackles or other restraint no longer exists, and we accord greater significance to public safety concerns.[95] Where the defendant has already lost the presumption of innocence, it is within the sound discretion of the trial court to determine the safety measures necessary to insure the security of the courtroom and its occupants.[96] These safety measures may include shackling a defendant in appropriate circumstances.

By holding that shackling at the penalty phase does not inherently violate the due process rights of a defendant, we do not hold that shackling is necessary or appropriate in all capital sentencing proceedings. The mere fact that a jury convicted a defendant of first degree murder is not a sufficient basis for a decision to shackle him during the penalty phase. The trial court should look at the particular

91. 475 U.S. 560, 568–69, 106 S.Ct. 1340, 1345–46 (1986).

92. 823 F.2d 1439, 1450–52 (11th Cir.1987).

93. *See Holbrook,* 475 U.S. at 561–62, 106 S.Ct. at 1341–42; *Estelle v. Williams,* 425 U.S. 501, 503–04, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126, *reh'g denied,* 426 U.S. 954, 96 S.Ct. 3182, 49 L.Ed.2d 1194 (1976); *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353, *reh'g denied,* 398 U.S. 915, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970). *Elledge v. Dugger* also relies almost exclusively on cases in which the shackling issue was raised in the guilt phase of the trial. 823 F.2d at 1454 & n. 5 (Edmondson, J., dissenting in part).

94. *See, e.g., Allen,* 397 U.S. at 344, 90 S.Ct. at 1061.

95. *Duckett v. State,* 104 Nev. 6, 752 P.2d 752, 755 (1988). A jury may expect that a person it has just found guilty of murder will be restrained in some fashion. *Cf. Holbrook,* 475 U.S. at 571, 106 S.Ct. at 1347; *Elledge,* 823 F.2d at 1454 (Edmondson, J., dissenting in part).

96. *Duckett,* 752 P.2d at 755; *Bello v. State,* 547 So.2d 914, 918 (Fla.1989).

facts of the case and the conduct of the proceedings and should balance the need for safety and security in the courtroom against the potential for prejudice.[97]

In this case, the trial court had before it a large quantity of information regarding defendant's violent past and uncontrollable temper. Specifically, the court had previously heard testimony by an Indiana police officer that it took four security officers to restrain defendant when he became angry at a photographer in an Indiana courtroom. Defendant's own experts testified that his temper was triggered when he perceived that he was being labeled retarded or insane. The psychological testimony presented during the remainder of the penalty phase was therefore likely to trigger his temper.

Defendant argues that because he had not exhibited any signs of violent outbursts during the present trial, there was no reason to believe that restraints were necessary. A trial judge is not required to wait until an outburst actually occurs before determining proper security measures for the courtroom. Given the evidence concerning the likelihood of a violent outburst during the upcoming testimony and the potential severity of such an outburst should one occur, we do not believe that the trial judge was required to wait for a manifestation of danger. The trial court took reasonable precautions against a violent outburst by defendant.

Further, defendant has shown no prejudice resulting from the shackling. Aside from showing that some jurors briefly viewed the shackles, defendant has offered no evidence of the effect of the shackles upon the jurors or of the likelihood that the shackles had a bearing on the verdict. A defendant is not necessarily prejudiced when jurors briefly view him wearing shackles.[98] The trial court took steps to minimize the effects of the shackles by placing them underneath defendant's coat and by having those present remain seated while the court and the jurors entered the room. Therefore, the effect of the shackles did not likely prejudice defendant.

Defendant argues that the shackles deprived him of his Sixth Amendment right to attend his trial because he was forced to remain absent rather than have the jurors view him in shackles. This argument fails for two reasons. First, we have already determined that the shackles were appropriate under the circumstances and did not cause undue prejudice to him. Second, it appears from the record that defendant's departure from the courtroom was voluntary and only tangentially related to the shackles placed on him. Therefore, defendant's choice to absent himself during the trial does not show that the shackling order compromised his Sixth Amendment rights.

On the day following the court's shackling order, defense counsel requested the court to poll the jury concerning any press exposure they may have had regarding the shackling or the trial. The court asked defense counsel what coverage there had been and what coverage counsel contended was prejudicial. Defendant cited no particular press items as prejudicial and brought no items into court concerning press coverage of the trial. Therefore, the trial court declined to poll the jurors without evidence of prejudicial press to which they could have been exposed.

To establish that his trial might have been prejudiced by midtrial publicity, defendant must establish that the publicity was inherently prejudicial.[99] Not every

97. *See Duckett,* 752 P.2d at 755. *Duckett* upheld the use of shackles on a defendant during his penalty phase hearing although the only rationale for the restraints was the murder conviction for which he was being sentenced. We believe that the conviction alone should not be sufficient evidence of violence to sustain shackling a defendant during the penalty phase, but that the trial court should look at the circumstances of the proceeding as a whole.

98. *Gates v. Zant,* 863 F.2d 1492, 1501 (11th Cir.), *cert. denied,* 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989).

99. *State v. Clark,* 675 P.2d 557, 560 (Utah 1983); *State v. Velasquez,* 672 P.2d 1254, 1263–64 (Utah 1983).

item of media coverage prejudices a trial.[100] The trial court is not required to poll the jurors as to their obedience to the daily admonition to avoid press coverage unless the potential media exposure concerning the trial would prejudice the defendant's case.[101] The trial judge did not err in requiring defendant to show possible prejudice before polling the jurors.

## XIII. PRESENTATION OF AN ADDITIONAL AGGRAVATING CIRCUMSTANCE AT THE PENALTY PHASE

During the penalty phase, the prosecution asked the jury to consider an additional aggravating circumstance that it had not considered during the guilt phase of the trial. This circumstance was that the murder was committed in an especially cruel, heinous, or atrocious manner as defined in Utah Code Ann. § 76–5–202(1)(q). Defendant contends that the court should have required the State to present this circumstance at the guilt phase of the trial or forfeit its use.

Nothing in the Utah death penalty statutes requires that the State present all statutorily defined aggravating circumstances during the guilt phase. In fact, the death-sentencing statute, section 76–3–207(2), provides that the aggravating circumstances presented in the penalty phase "shall include those as outlined in 76–5–202." This sentence clearly contemplates that factors not presented at the guilt phase may be presented during the penalty phase. We have previously held that all aggravating evidence not unfairly prejudicial to the accused may be presented during the penalty phase of a capital proceeding.[102] The legislature has determined that the factors defined in section 76–5–202 are aggravating factors and warrant consideration by the jury in imposing the death penalty.[103] Therefore, the jury may properly consider these factors in the penalty phase even when the factors were not introduced during the guilt phase of the trial.

Defendant argues that the consideration of additional aggravating factors violated the Eighth and Fourteenth Amendments because it failed to properly channel the jury's discretion and to narrow the class of offenders eligible for the death penalty. In *Lowenfield v. Phelps,*[104] the Supreme Court held that the narrowing function required by the Eighth Amendment may occur at either the guilt or the penalty stage of a capital trial.[105] Utah's scheme is similar to that upheld in *Lowenfield;* it narrows the class of offenders subject to the death penalty during the guilt phase of the trial.[106] Once the initial narrowing of the class occurs at the guilt phase, the addition of the aggravating circumstance at the penalty phase does not distort the narrowing function required by the Eighth Amendment.

## XIV. ADMISSION OF PRO SE ANSWER FROM CIVIL CASE

As its last piece of evidence in the penalty phase hearing, the State introduced a portion of defendant's pro se answer to a civil complaint filed against him by Mars' sister. The court did not advise the jury concerning who had filed the complaint or the remedy sought. The court simply told the jurors that the answer responded to a civil complaint filed in Salt Lake County and that they need not concern themselves with the nature of the case or the omitted portions of the answer. Defendant object-

**100.** *Clark,* 675 P.2d at 560.

**101.** *Id.*

**102.** *State v. Lafferty,* 749 P.2d 1239, 1259 (Utah 1988); *see also State v. Gardner,* 789 P.2d 273, 285–86 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990).

**103.** *See, e.g., State v. Tillman,* 750 P.2d 546, 571 (Utah 1987).

**104.** 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 *reh'g denied,* 485 U.S. 944, 108 S.Ct. 1126, 99 L.Ed.2d 286 (1988).

**105.** *Id.* at 244–46, 108 S.Ct. at 554.

**106.** *See id.* Utah Code Ann. § 76–5–202 limits the class of offenders subject to the death penalty by requiring that at least one of several enumerated aggravating factors be proven at the guilt phase for conviction of a capital homicide.

ed to the admission of the answer under the Utah Rules of Evidence and under the federal constitution.

Defendant first claims that the answer should be excluded under Utah Rule of Evidence 403 because its prejudicial effect outweighs its probative value as evidence in the penalty hearing. Defendant cites *State v. Maurer*,[107] which reversed Maurer's conviction based on the introduction of a letter from Maurer to the victim's father.[108]

*Maurer*, however, is readily distinguishable from the present case. The state introduced Maurer's letter to the victim's father during the guilt phase of a second degree murder trial to establish Maurer's intent in killing his victim. Portions of the letter established Maurer's guilt of the crime. However, other portions of the letter were irrelevant and highly inflammatory.[109] These portions of the letter raised concerns because they encouraged the jury to base their determination of guilt or innocence upon Maurer's character and lack of remorse in committing the crime. Therefore, the letter was prejudicial because it directed the jury's attention to matters it was prohibited from considering.[110]

Unlike the guilt phase of a trial, the sentencing phase revolves around the character and background of a defendant.[111] An examination into a defendant's character is mandatory in a capital sentencing proceeding.[112] A jury may legitimately consider a defendant's character, future dangerousness, lack of remorse, and retribution in the penalty phase hearing. The pro se answer to the complaint revealed defendant's attitude concerning the crime, his future dangerousness, and his character.[113] Therefore, it was highly relevant to the proceedings at hand and not unfairly prejudicial to defendant.

Defendant also contends that the answer allowed the jury to consider improper victim impact evidence in violation of the Eighth Amendment. Defendant cites *Booth v. Maryland*[114] for the proposition that a state may not introduce a victim impact statement at the penalty phase of a capital trial to establish the impact of the crime on the victim's family.[115]

*Booth* was recently overruled by the Supreme Court in *Payne v. Tennessee*.[116] In *Payne*, the Court held that the Eighth Amendment does not necessarily bar admission of evidence concerning the human cost of a defendant's crime.[117] In so holding, the Court reaffirmed the view that justice is due to the accuser as well as to the accused.[118] Therefore, under *Payne*, the admission of the pro se answer does not violate defendant's constitutional rights.[119]

**107.** 770 P.2d 981 (Utah 1989).

**108.** *Id.* at 987.

**109.** *Id.* at 983.

**110.** *Id.*

**111.** Utah Code Ann. § 76-3-207(2).

**112.** *See Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978).

**113.** In his pro se answer, Young set forth seven reasons why he killed Mars, including an admission that he wanted her money, truck, and credit cards. He also stated repeatedly that he did not care that he had killed her.

**114.** 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987).

**115.** *Id.* at 502–03, 107 S.Ct. 2529, 96 L.Ed.2d 440.

**116.** — U.S. ——, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, *reh'g denied,* 112 S.Ct. 28 (1991).

**117.** *Id.* — U.S. at ——, 111 S.Ct. at 2609.

**118.** *Id.* (citing *Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934)).

**119.** By following the holding in *Payne,* we do not necessarily hold that the pro se answer at issue in this case would constitute victim impact evidence. The only evidence concerning the victim's family in the answer is a brief mention of the word *sister,* implying that the victim had a sister. We do not believe that this alone constitutes victim impact evidence concerning the effect of the crime on the victim's family.

We reject defendant's other arguments concerning the admission of the pro se answer. We note that defendant has no right to counsel in a civil case, and the State did not compel defendant to respond to the civil complaint or elicit the statements he made in his response. His Fifth and Sixth Amendment claims regarding the pro se answer are therefore meritless.

## XV. DEFENDANT'S REQUEST FOR ALLOCUTION

During the penalty phase of defendant's trial, he requested permission to address the jury on two separate occasions. The first occasion occurred on the third day of the penalty phase hearing. The trial court advised defendant against testifying and requested that he consult with his attorneys regarding his decision. The court also informed him that it was not the appropriate time for him to testify. Defendant agreed to think about his decision and to wait until the appropriate time if he desired to testify.

Defendant again asked to address the jury on the fourth day of the penalty phase hearing. After the defense indicated that it would call no more witnesses to the stand, defendant requested permission to read a statement to the jury. The prosecution objected, arguing that no precedent allowed a defendant to make an unsworn, uncontested statement to the jury in a capital trial. The trial court asked defense counsel to provide statutory or constitutional authority for the right to make such a statement. Counsel requested time to research the issue, and the trial court granted a recess. The next morning, counsel presented arguments regarding the allocution right. After hearing the arguments, the court denied the motion.

Thereafter, the defense rested, counsel made closing arguments, and the court sent the jury to deliberate. After the jury returned its verdict, the court set a sentencing date of July 11, 1989. On that date, defense counsel made several motions that the trial court denied.[120] The court then asked defendant if he had anything to say before it formally imposed sentence. Defendant stated that he wished to stay in Utah, where he could maintain contact with counsel while his appeal was pending. Defense counsel then argued that defendant had the right to return to Indiana prior to imposition of the death sentence and that defendant's waiver of that right was against their advice and raised questions concerning his competency. After this argument, the court again asked defendant if he wished to say anything. Defendant objected to his attorneys' characterization of him as "a fruitcake." The court then asked defendant which mode of execution he preferred and imposed a sentence of death by lethal injection.

### A. *Federal Constitutional Issues*

The United States Supreme Court has addressed the right of allocution in several cases. In *Green v. United States,*[121] the defendant asked the Court to vacate his sentence because the trial judge did not ask him whether he had anything to say prior to sentencing. The defendant alleged that the failure to elicit his comments violated Federal Rule of Criminal Procedure 32(a).[122] Though the Court delved at length into the history and value of the allocution procedure, it based its decision upon violation of the federal rule. The Court described the importance of the right, stating:

> The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence,

120. Defense counsel moved to arrest the judgment of guilt and substitute a GAMI verdict, to arrest the sentence of death because defendant was mentally ill, and to merge the theft charge with the first degree murder charge.

121. 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961).

122. Federal rule 32(a) provides in pertinent part, "Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment...." This rule is identical to Utah Rule of Criminal Procedure 22(a), which was formerly codified at Utah Code Ann. § 77-35-22(a).

speak for himself. We are buttressed in this conclusion by the fact that the Rule explicitly affords the defendant two rights: "to make a statement in his own behalf," and "to present any information in mitigation of punishment." We therefore reject the Government's contention that merely affording defendant's counsel the opportunity to speak fulfills the dual role of Rule 32(a).[123]

The Court determined that the trial court's question "Did you want to say something?" could have been directed to the defendant, and without further evidence that the defendant was not addressed, the defendant's claim failed.[124]

In *Hill v. United States*,[125] the Court upheld a sentence issued in violation of rule 32(a) against a collateral attack. The case arose from a petition to vacate Mr. Hill's sentence under section 2255 of 28 U.S.C., which provides that a prisoner may file a motion to "vacate, set aside or correct" a sentence upon the ground "that the sentence was imposed in violation of the Constitution or laws of the United States" or that the sentence "is otherwise subject to collateral attack."[126] After noting that the relief afforded by section 2255 was no more extensive than that available by habeas corpus, the Court held that the violation of rule 32(a) in pronouncing the petitioner's sentence was "not of itself an error of the character or magnitude cognizable under a writ of habeas corpus."[127] In so holding, the Court noted that the sentencing judge did not violate the defendant's constitutional rights merely because he did not ask the defendant if he had anything to say prior to sentencing.[128] The Court expressly declined to determine whether a defendant's affirmative request to speak would raise a constitutional issue if that request were denied.[129]

In *McGautha v. California*,[130] petitioner Crampton argued that Ohio's single procedure for determining guilt and penalty issues in a death penalty case deprived him of his right to allocution on penalty issues because he could not address the jury without suffering adverse consequences in the determination of his guilt.[131] Crampton did not specifically request permission to address the jury with regard to punishment, but chose to remain silent due to possible harm to his case on guilt issues. The Court acknowledged the question left unanswered in *Hill*, but noted that Crampton had not asked to speak. The Court did not resolve the issue of whether a defendant who wishes to make a statement prior to sentencing can constitutionally be denied that opportunity.[132]

The *McGautha* Court noted that the allocution right traditionally allowed one to speak to the judge prior to the pronouncement of sentence and that Ohio statutes provided for this procedure after the jury had brought in its verdict.[133] The Court held that a state may constitutionally require a defendant facing the death penalty to choose between addressing the jury on punishment issues, thereby subjecting himself to cross-examination, or remaining silent on both guilt and punishment issues. Relying on *Hill v. United States*, the Court held that Ohio was not "required to provide an opportunity for petitioner to speak to the jury free from any adverse consequences on the issue of guilt."[134]

123. *Green*, 365 U.S. at 304, 81 S.Ct. at 655 (quoting Fed.R.Crim.P. 32(a)).

124. *Id.*

125. 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 *reh'g denied*, 369 U.S. 808, 82 S.Ct. 640, 7 L.Ed.2d 556 (1962).

126. 28 U.S.C. § 2255.

127. *Hill*, 368 U.S. at 428, 82 S.Ct. at 471.

128. *Id.*

129. *Id.* at 429, 82 S.Ct. at 471–72.

130. 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *reh'g denied*, 406 U.S. 978, 92 S.Ct. 2407, 32 L.Ed.2d 677 (1972).

131. *Id.* 402 U.S. at 217–20, 91 S.Ct. at 1472–74.

132. *Id.* at 219 & n. 23, 91 S.Ct. at 1473 & n. 23.

133. *Id.* at 220, 91 S.Ct. at 1474.

134. *Id.*

Although both *Hill* and *McGautha* recognize that the Supreme Court has not yet resolved the question presented by defendant, the decision in *McGautha* gives some guidance concerning the scope and importance of the allocution right. The Court's conclusion that the allocution right does not require testimony free from adverse consequences on the issue of a defendant's guilt implies that the right is not absolute and does not require testimony without cross-examination. Also, *McGautha* tacitly approved Ohio's procedure allowing allocution to the sentencing judge and not to the jury prior to its determination of sentence.[135]

Although the United States Supreme Court has not specifically answered the question of whether allocution is a constitutionally protected right, the federal courts of appeals have generally determined that the right to allocution is not a constitutionally protected right.[136] Most other jurisdictions that recognize the right of allocution consider it to be statutory in nature.[137] Apparently, only one state, Rhode Island, has held that allocution is a constitutional right. In so holding, Rhode Island relied on provisions of its state constitution rather than the federal constitution.[138] Cases in other jurisdictions have rejected similar constitutional provisions as a basis for recognizing the right of allocution as it existed at common law.[139]

Utah courts have also examined the constitutionality of the right of allocution. In *State v. Kelbach*,[140] the defendant contended that Utah's unitary procedure for determining guilt and sentence denied him his right of allocution because he was forced to choose between his right to address the jury regarding punishment and his right against self-incrimination.[141] We rejected the defendant's argument that the allocution right rose to a constitutional level requiring protection equivalent to the right against self-incrimination.[142] We held that the trial court did not err when it failed to ask the defendant for a statement prior to his sentencing or to afford him an opportunity to address punishment issues.[143]

In *State v. McClendon*,[144] this court again addressed the requirement that a defendant be allowed to speak prior to sentencing. McClendon claimed that the trial judge had not asked him whether he had any cause why judgment should not be pronounced against him, as required by former Utah Code Ann. § 77–35–9. Like rule 22(a), section 77–35–9 required a judge to ask a defendant if he or she wished to make a statement. We held that the trial judge substantially complied with the statutory requirement of section 77–35–9 when he asked if the defendant or his attorney had anything to say.[145] The opinion did not

135. *Id.*

136. *See United States v. Fleming*, 849 F.2d 568 (11th Cir.1988); *United States v. De La Paz*, 698 F.2d 695, 697 (5th Cir.1983); *Katz v. King*, 627 F.2d 568, 576 (1st Cir.1980); *Lunz v. Henderson*, 533 F.2d 1322 (2d Cir.), *cert. denied*, 429 U.S. 849, 97 S.Ct. 136, 50 L.Ed.2d 122 (1976); *Segura v. Patterson*, 402 F.2d 249, 252 (10th Cir.1968), *rev'd on other grounds*, 403 U.S. 946, 91 S.Ct. 2280, 29 L.Ed.2d 856 (1971).

137. *See infra* note 177 and accompanying text.

138. Article I, section 10 of the Rhode Island Constitution grants accused persons the "liberty to speak for themselves." This clause has been interpreted by the Rhode Island courts to require that an accused have the opportunity to address the sentencing judge prior to pronouncement of sentence on all issues "germane and of possible assistance in the determination of the sentence to be imposed." *Leonardo v. State*, 444 A.2d 876, 878 (R.I.1982); *see also State v. Nicoletti*, 471 A.2d 613, 618 (R.I.1984); *Robalewski v. Superior Court*, 97 R.I. 357, 197 A.2d 751, 753 (1964).

139. *See, e.g., State v. Carr*, 374 A.2d 1107, 1115–17 (Conn.1977), and cases cited therein.

140. 23 Utah 2d 231, 461 P.2d 297 (1969), *vacated in part*, 408 U.S. 935, 92 S.Ct. 2858, 33 L.Ed.2d 751 (1972).

141. *Id.* at 299. Utah's current two-phase procedure for determining first a defendant's guilt and then the sentence was adopted by the state legislature in 1973. Utah Code Ann. § 76–3–207 (enacted 1973 Utah Laws ch. 196, § 76–3–207).

142. *Id.*

143. *Id.*

144. 611 P.2d 728 (Utah 1980).

145. *Id.* at 729.

address whether the right was statutory in nature or constitutional and did not specifically refer to the separate right set forth in rule 22.

In *State v. Lorrah,*[146] the defendant argued that he was denied a "due process right of allocution."[147] However, we rejected his contention without analysis.[148] This passing reference was not intended to give the allocution right constitutional recognition. Following the precedents set by the United States Supreme Court and the examples of other states that recognize the right as devolving from statute, we hold that the allocution right is not a constitutional one, but merely a statutory right governed by Utah Rule of Criminal Procedure 22(a).

Defendant also claims that the trial judge's refusal to permit him to exercise his right to allocute to the jury violated the Eighth Amendment's prohibition against cruel and unusual punishment because it prevented him from presenting relevant mitigating evidence to the jury. The Supreme Court has held in *Lockett v. Ohio*[149] and *Eddings v. Oklahoma*[150] that a state may not preclude the consideration of any relevant evidence a defendant wishes to present in mitigation.[151] Defendant contends that by denying his request to allocute, the court denied him the right to present evidence of his situation, his abilities and limitations, and his humanity. The State contends that this "evidence" is cumulative and of only marginal relevance.

The claim that the denial of a defendant's right to allocution violates the Eighth Amendment appears to be an issue of first impression. The nature of defendant's request may provide the answer to this claim. Defendant did not request to testify to the jury, but to present an unsworn statement without the burden of cross-examination. Many courts have previously held that an unsworn statement does not constitute "evidence" at all, but is merely a formality held over from the days when a criminal defendant was incompetent to testify in his criminal trial.[152]

Further, short of the unsworn statement, the court gave defendant every opportunity to present evidence in mitigation of his penalty. The defense presented three days of testimony regarding mitigation. This testimony provided the jury with a clear picture of defendant's life history and the difficulties he had faced. The court did not preclude defendant from presenting further evidence in mitigation at the time he requested allocution. The court offered to let defendant take the stand and testify as to the mitigating evidence in his statement. As a result, defendant had the opportunity to present and have considered all relevant evidence he proposed to offer in his allocution, including evidence of his limitations and of his humanity.

The Supreme Court has held that the right to testify may be conditioned on the right of the prosecution to cross-examine the defendant.[153] In *McGautha,* the Court held that a defendant who wished to speak to the jury concerning his sentencing must subject himself to cross-examination even if it prejudices his defense in the guilt determination.[154] The requirements of *Lockett* and *Eddings* allowing a defendant to present evidence in mitigation of the death penalty are not without limits. Both *Lockett* and *Eddings* require that the evi-

**146.** 761 P.2d 1388 (Utah 1988).

**147.** *Id.* at 1389.

**148.** *Id.*

**149.** 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

**150.** 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

**151.** *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964; *Eddings,* 455 U.S. at 114, 102 S.Ct. at 876–77.

**152.** *See, e.g., Ferguson v. Georgia,* 365 U.S. 570, 587–91, 81 S.Ct. 756, 765–68, 5 L.Ed.2d 783 (1961), and cases cited therein.

**153.** *See, e.g., McGautha,* 402 U.S. at 215, 91 S.Ct. at 1471; *Brown v. Walker,* 161 U.S. 591, 597–98, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896); *State v. Anderson,* 495 P.2d 804, 806 (Utah 1972); *State v. Younglove,* 17 Utah 2d 268, 409 P.2d 125, 126–27 (Utah 1965).

**154.** *McGautha,* 402 U.S. at 215–17, 91 S.Ct. at 1471–72.

dence presented relate to the issue of the appropriateness of a defendant's penalty.[155] In *Eddings,* the evidence presented in mitigation was subject to cross-examination, foundational requirements, and prosecutorial scrutiny of witness credibility.[156] Our own case of *State v. Gardner*[157] supports the notion that mitigating evidence must relate to the proceedings at hand. In *Gardner,* the defense sought to introduce evidence that the victim and his friends opposed capital punishment.[158] We held that this evidence was not relevant to the penalty phase hearing.[159]

Defendant's request for allocution without prosecutorial scrutiny far exceeds the scope of mitigating evidence required by *Lockett, Eddings,* and *Gardner.* Therefore, we conclude that the court's limitation on defendant's ability to present mitigating evidence did not violate the Due Process Clause or the Eighth Amendment.

### B. *State Constitutional Issues*

Defendant has cited article I, section 9 of the Utah Constitution as additional support for his claim that the trial court unconstitutionally denied his request to make a statement. Section 9 is similar to the Eighth Amendment's prohibition against cruel and unusual punishment.[160]

Defendant cites no authority for the argument that Utah's constitution provides an independent basis for his claims and makes no separate argument regarding the effect of section 9 on his claim that he has a constitutional right to allocution. The Utah Constitution's language, while different from that of the Eighth Amendment, does not prohibit cross-examination of a defendant or have any apparent connection to the specific procedure of allocution claimed by the defendant. Absent a well-briefed argument showing such a connection, we hold that Utah's constitutional equivalent of the Eighth Amendment provides no independent basis for guaranteeing a defendant a right of allocution.[161]

We have also examined whether the trial judge's denial of the request for allocution violated defendant's right of self-representation. Article I, section 12 of the Utah Constitution guarantees that "[i]n criminal prosecutions the accused shall have the right to appear and defend in person and by counsel."[162] We have previously construed this right to require that an accused have the choice to represent himself or herself in criminal cases.[163] We have not yet analyzed article I, section 12 in terms of the right of allocution. Other state courts have declined to extend similar constitutional provisions to include such a right.[164] Generally, other states have held

**155.** *Eddings,* 455 U.S. at 113–15, 102 S.Ct. at 876–77; *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964–65.

**156.** *See generally Eddings,* 455 U.S. at 105–08, 102 S.Ct. at 871–74.

**157.** 789 P.2d 273 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990).

**158.** *Id.* at 286.

**159.** *Id.*

**160.** Utah Const. art. I, § 9. This section reads, "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons imprisoned shall not be treated with unnecessary rigor."

**161.** *See State v. Webb,* 779 P.2d 1108, 1111 n. 4 (Utah 1989); *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988).

**162.** Utah Const. art. I, § 12.

**163.** *See, e.g., Lafferty,* 749 P.2d at 1247–49; *State v. Penderville,* 2 Utah 2d 281, 272 P.2d 195, 199 (Utah 1954).

**164.** For example, article I, section 8 of the Connecticut Constitution states that "the accused shall have a right to be heard by himself and by counsel." The Supreme Court of Connecticut has held that this provision was not violated where a trial court refused to allow a defendant to address the court personally prior to pronouncing sentence upon him. This provision seems to speak even more clearly to a right to personally speak to a sentencing body than to a right of self-representation, and yet the Supreme Court of Connecticut found that the allocution right was not implicated by the provision. *State v. Carr,* 172 Conn. 458, 374 A.2d 1107, 1115 (1977). Other examples of similar state interpretations of their constitutions may be found in Annotation, *Right of defendant in criminal case to conduct defense in person, or to participate with counsel,* 77 A.L.R.2d 1233, 1241 § 4 (1967), and later case service.

that a constitutional provision guaranteeing the right "to defend in person and by counsel" merely recognizes the right of self-representation, not a separate allocution right.[165] These courts have held that under the constitutional or statutory provisions involved or the particular circumstances present, an accused assisted by counsel had no absolute right to address the jury.[166]

Even if we interpret defendant's request to implicate the right to self-representation under article I, section 12, that right is not absolute and may be denied if a defendant fails to properly invoke it prior to trial and in a clear and unequivocal manner. We have long recognized that article I, section 12 explicitly grants defendants the right to self-representation.[167] However, the right to self-representation under article I, section 12 has never been absolute. In the case of *State v. Penderville*,[168] we held that while a defendant has a right to represent himself in criminal cases, that right may be subject to limitations.[169] In discussing those limitations, we stated:

> It is generally, if not universally held that the accused in a criminal proceeding who is sui juris and not mentally incompetent has the right to conduct his own defense without the aid of counsel. An accused may not, however, having once elected to proceed with the aid of counsel for purposes of delay or to obstruct the proceeding against him advance successfully an insincere claim of his right to defend in person.[170]

Generally, the right to self-representation has been subject to limits as to the time and manner in which it may be invoked. An accused who wishes to represent himself or herself must indicate this desire to the court. The accused must ordinarily make the request or application prior to trial, framed in unequivocal terms and accompanied by a valid waiver of counsel.[171] Additionally, the trial court must determine whether the accused has the ability to intelligently waive the right to counsel and represent him- or herself. In this case, defendant did not equivocally or timely make a request to represent himself.

Finally, the denial of allocution did not constitute reversible error. Not all errors involving constitutional rights require reversal.[172] For us to hold a constitutional error harmless, it must be harmless beyond a reasonable doubt.[173] In other words, the side which benefited by the error (the prosecution) must show beyond a reasonable doubt that the error did not contribute to the verdict (or sentence) obtained.[174] Even under this strict standard, the State can show that the denial of allocution was harmless.

The prosecution presented many aggravating circumstances. Defendant had

165. *People v. Richardson,* 4 N.Y.2d 224, 226–27, 173 N.Y.S.2d 587, 588–89, 149 N.E.2d 875, 876, *cert. denied,* 357 U.S. 943, 78 S.Ct. 1395, 2 L.Ed.2d 1557 (1958); *see also State v. Louviere,* 169 La. 109, 124 So. 188, 192 (1929); *State v. Brine,* 160 Me. 401, 205 A.2d 12, 13 (1964); *State v. Velanti,* 331 S.W.2d 542, 546 (Mo.1960); *Rehfeld v. State,* 102 Ohio St. 431, 131 N.E. 712, 714 (1921); *Foster v. State,* 148 Tex.Crim. 372, 187 S.W.2d 575, 576 (Tex.1945); *State v. Saari,* 152 Vt. 510, 568 A.2d 344, 350–51 (1989).

166. 21A Am.Jur.2d *Criminal Law* § 767 (1981).

167. *Lafferty,* 749 P.2d at 1247–49; *State v. Ruple,* 631 P.2d 874, 875 (Utah 1981). The federal Constitution also guarantees the right to self-representation under the Sixth and Fourteenth Amendments. *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975).

168. 2 Utah 2d 281, 272 P.2d 195 (Utah 1954).

169. *Id.* at 199.

170. *Id.* (citations omitted).

171. 21A Am.Jur.2d *Criminal Law* § 769 (1981).

172. *Arizona v. Fulminante,* — U.S. —, — —, ———, 111 S.Ct. 1246, 1253–54, 1261–66, 113 L.Ed.2d 302, 317–18, 327–33, *reh'g denied,* — U.S. —, 111 S.Ct. 2067, 114 L.Ed.2d 472 (1991); *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, *reh'g denied,* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); *State v. Tuttle,* 780 P.2d 1203, 1213 (Utah 1989).

173. *Chapman,* 386 U.S. at 23–24, 87 S.Ct. at 827; *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1965).

174. *Chapman,* 386 U.S. at 24–25, 87 S.Ct. at 828–29; *Fahy,* 375 U.S. at 86–87, 84 S.Ct. at 230–31.

killed twice prior to the present homicide. He killed in the course of a rape or attempted rape. He killed for personal or pecuniary gain. The killing took place over a long period of time and involved excessive physical pain to the victim. Defendant showed no remorse regarding the killing and indicated that he would kill again. In addition to the overwhelming evidence of aggravation, the jury heard several days of testimony in mitigation of the penalty. The mitigating evidence went to defendant's mental and emotional defects and to his poor upbringing. Defendant adequately presented his evidence of mitigation without use of his personal statement. The statement he offered to give was cumulative; it did not provide any evidence not brought out at trial. With the evidence already presented, it was not likely to influence the result. Further, defendant's "right" to present his statement to the jury was not prohibited, merely limited by the requirement that he subject himself to cross-examination. The impact of this statement on a jury would be minimal at best, and certainly less so than the sworn testimony defendant declined to make.

### C. *Statutory Interpretation*

Utah Rule of Criminal Procedure 22 governs a defendant's right of allocution in Utah. That rule states, "Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment...."[175]

This statute does not particularly address the rights of a defendant in death penalty cases. The death penalty hearing procedure is governed by Utah Code Ann. § 76-3-207, which specifies the order for presenting evidence in the proceeding. This procedure does not provide specifically for a right of allocution and does not provide a procedure for a defendant to allocute to the jury.[176]

The majority of state and federal courts have determined that allocution is a statutory right that is governed by the statutes defining the right.[177] States with similar death penalty statutes and similar allocution statutes have held that the opportunity to address the sentencing judge after the jury verdict of death but before sentence is pronounced satisfies the statutory right of

**175.** Utah R.Crim.P. 22(a). This rule was previously codified at Utah Code Ann. § 77-35-22(a).

**176.** Section 76-3-207(2) provides:

> In these sentencing proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence. The state's attorney and the defendant shall be permitted to present argument for or against sentence of death.

**177.** The following cases have recognized the right of allocution as derived from statute or from the common law. *State v. Allie,* 147 Ariz. 320, 710 P.2d 430, 435 (1985) (Ariz.R.Crim.P. 26.10(b)(1)); *Beed v. State,* 271 Ark. 526, 609 S.W.2d 898, 913 (1980); *People v. Garcia,* 752 P.2d 570, 575-77 (Colo.1988) (Colo.R.Crim.P. 32(b)); *State v. Carr,* 374 A.2d 1107, 1115-17 (Conn.1977) (Conn. Practice Book § 2330(2)); *Putman v. State,* 308 S.E.2d 145, 152 (Ga.1983), *cert. denied,* 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984); *State v. Goodrich,* 546 P.2d 1180, 1187 (Idaho 1976) (I.C.R. 32(a)); *State v. Christensen,* 201 N.W.2d 457, 459-60 (Iowa 1972) (I.C.A. § 789.6); *State v. Engberg,* 194 Kan. 520, 400 P.2d 701, 705-06 (1965) (K.S.A. 62-1510), *cert. denied,* 383 U.S. 921, 86 S.Ct. 899, 15 L.Ed.2d 676 (1966); *Commonwealth v. Whitford,* 16 Mass.App. 448, 452 N.E.2d 262, 266 (1983) (Mass.R.Crim.P. 28(b)); *People v. Howell,* 168 Mich.App. 227, 423 N.W.2d 629, 633-34 (1988) (M.C.R. 6.101(G)(2)); *State v. Hanson,* 304 Minn. 415, 231 N.W.2d 104, 105 (1975) (631.20); *Johnson v. State,* 461 So.2d 1288, 1292 (Miss.1984) (no absolute right of allocution recognized); *State v. Scott,* 621 S.W.2d 915, 918 (Mo.1981); *State v. Richter,* 221 Neb. 487, 378 N.W.2d 175, 181-82 (Neb.1985) (Rev.Stat. § 39-669.07); *State v. Rose,* 112 N.J. 454, 548 A.2d 1058, 1107 (1988) (R 3:21-4(b)); *Tomlinson v. State,* 98 N.M. 213, 215, 647 P.2d 415, 417 (1982) (N.M.S.A. § 31-18-15.1); *People v. Green,* 54 N.Y.2d 878, 444 N.Y.S.2d 908, 429 N.E.2d 415, 416 (Ct.App.1981) (C.P.L. 380.50); *State v. McRae,* 70 N.C.App. 779, 320 S.E.2d 914, 915 (1984) (G.S. 15A-1334); *State v. Gotsis,* 13 Ohio App.3d 282, 13 OBR 346, 469 N.E.2d 548, 554 (Ohio Ct.App.1984); *State v. Mak,* 105 Wash.2d 692, 718 P.2d 407, 430, *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).

allocution.[178] These states have not recognized an allocution right before the jury retires to determine the verdict. This follows the common law practice of allocution, where the defendant addressed the judge prior to sentencing but after the jury returned a verdict of death.[179]

The process of allocuting to a sentencing judge, as opposed to the sentencing jury in a death penalty case, also comports more closely with the language of Utah's statute. Although both the jury and the court "impose" sentence, under Utah's death penalty statute the language of rule 22(a) appears to be directed to the procedure of the court, not to the presentation to the jury. Other authorities support the proposition that the judge imposes sentence, although the jury may make the decision as to what penalty shall be given:

> A "judgment" is the adjudication by a court, based upon the verdict of a jury, upon the plea of a defendant, or upon its own finding following a nonjury trial, that the defendant is guilty or not guilty; a "sentence" is the pronouncement by a court of the penalty imposed upon the defendant after a judgment of guilty. A judgment of guilty becomes final when sentence is pronounced.[180]

Hence, statements the defendant made before the trial court imposed the death sentence satisfied the language and purpose of rule 22(a).

Even if we determine that the trial court erred by refusing Young's request to allocute to the jury, the error would not require a new penalty phase. Only those errors that are harmful or prejudicial to the outcome of a trial or penalty phase provide grounds for granting a new hearing or overturning a conviction.[181] We have held that "the standard for dealing with nonconstitutional error is that [the court] will not reverse a conviction unless the error is substantial and prejudicial in the sense that there is a reasonable likelihood that in its absence there would have been a more favorable result for the defendant." [182] We have determined above that the denial of defendant's allocution is harmless under the higher standard for constitutional error.[183] Therefore, any error is also harmless under a statutory harmless error standard.

**178.** *See, e.g., Collins v. State,* 261 Ark. 195, 548 S.W.2d 106, 120 (1977); *State v. Roe,* 1987 WL 16174 (Ohio Ct.App.1987); *O'Dell v. Commonwealth,* 234 Va. 672, 364 S.E.2d 491, 508–09, *cert. denied,* 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 154 (1988); *Bassett v. Commonwealth,* 222 Va. 844, 284 S.E.2d 844, 853–54 (1981), *cert. denied,* 456 U.S. 938, 102 S.Ct. 1996, 72 L.Ed.2d 458 (1982); *State v. Mak,* 718 P.2d at 430. Other states hold that there is no allocution right to the judge or to the jury in death penalty cases. *See, e.g., People v. Gaines,* 88 Ill.2d 342, 58 Ill.Dec. 795, 813, 430 N.E.2d 1046, 1064 (1982). In *Gaines,* the Illinois Supreme Court held that the allocution right granted in Illinois' Rules of Criminal Procedure did not apply to death penalty hearings, which were a creature of statute and followed statutory procedures. The court noted that the Illinois legislature had previously amended the allocution statute to specify that its procedures did not apply to death penalty hearings. *Id.* at 1064–65; *see also People v. Robbins,* 45 Cal.3d 867, 248 Cal.Rptr. 172, 185–186, 755 P.2d 355, 369 & n. 10 (1988); *Commonwealth v. Abu-Jamal,* 521 Pa. 188, 555 A.2d 846, 857–58 (1989). *But see People v. Davis,* 794 P.2d 159, 192 (Colo.1990) (right to address jury found within rule 32(a)); *Hunt v. State,* 321 Md. 387, 583 A.2d 218, 241 (1990) (right to address jury afforded by statute).

**179.** Allocution at common law referred to the inquiry which the court made of the defendant, upon a return of a guilty verdict in a capital case, whether the defendant had any reason to offer why judgment should not be entered against him. The purpose of the allocution was not to afford an opportunity to present mitigating evidence or to plead for leniency but rather to disclose certain special circumstances, such as benefit of clergy, which precluded execution of the sentence. *People v. Gaines,* 430 N.E.2d at 1062; *see also Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961); Note, *Procedural Due Process at Judicial Sentencing for Felony,* 81 Harv.L.Rev. 821, 832–33 (1968).

**180.** Charles E. Torcia, *Wharton's Criminal Procedure* § 609 & n. 2 (12th ed. 1976).

**181.** *See, e.g., State v. Dibello,* 780 P.2d 1221, 1230 (Utah 1989).

**182.** *State v. Johnson,* 771 P.2d 1071, 1073 (Utah 1989); *State v. Lafferty,* 749 P.2d 1239, 1255 (Utah 1988) (death penalty case).

**183.** *See* § XV(B), *supra.*

## XVI. REBUTTAL BY PROSECUTION DURING PENALTY PHASE

Defendant argues that the trial court erred in allowing the prosecution to present rebuttal argument at the penalty phase hearing following the closing arguments of the defense. Defendant bases his claim on the language of Utah's death penalty sentencing statute, Utah Code Ann. § 76-3-207. This section outlines the nature of the capital sentencing proceeding and the evidence that may be presented there. It provides in pertinent part, "The state's attorney and the defendant shall be permitted to present argument for or against sentence of death."[184] Defendant contends that this language does not allow for rebuttal argument by the prosecution.

In addition to section 76-3-207, the capital sentencing procedure is also subject to the Utah Rules of Criminal Procedure. Rule 1(b) defines the scope of these rules and states that they "shall govern the procedure in all criminal cases in the courts of this state except juvenile cases."[185] Rule 17(g)(7) governs criminal trial procedures. This rule provides that a cause will be submitted to the jury after opening argument by the prosecution, argument by the defense, and a closing response by the prosecution. By virtue of rule 1, this section applies to the penalty phase of defendant's trial. Therefore, although section 76-3-207 provides that both parties may argue their respective positions on the death penalty issue, the manner in which the arguments proceed is governed by the rules of criminal procedure. Under these rules, the trial court correctly allowed the prosecution its closing response.

## XVII. PENALTY PHASE INSTRUCTIONS

Defendant bases several claims of error on the trial court's selection of instructions given to the jury in the penalty phase. We address these claims separately below.

### A. *Instruction on Mercy or Sympathy*

Defendant first objects to the trial court's refusal to give his proffered instructions concerning the use of mercy or sympathy in reaching the jury's verdict. Defendant submitted proposed instruction number 5, which would have instructed the jury that mercy or sympathy could guide their decision in the penalty phase.[186] The trial court refused to give this instruction and instead gave one requiring the jury to make its decision based upon the evidence produced in the penalty phase, without resort to sympathy or emotion. Defendant claims that the combination of the judge's instruction regarding antisympathy and his refusal to give the requested sympathy instruction caused the jury to disregard the evidence produced in mitigation during the penalty phase. Defendant claims that this violated his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and under article I, section 9 of the Utah Constitution.

184. Utah Code Ann. § 76-3-207(2).

185. Utah R.Crim.P. 1(b).

186. Defendant's proffered instruction reads:

> In the guilt phase of this case, you were instructed that you should not base your verdict on various irrelevant matters, including sympathy.
>
> You are now instructed that sympathy *does* play a legitimate part in the determination of whether a defendant shall suffer death or serve a life sentence in prison.
>
> If after consideration of all the circumstances, you feel sympathy for the defendant that is based on the evidence you have heard, and based on such sympathy you are inclined to extend mercy to the defendant, the law enables you to act upon such sympathy and fix the penalty at life imprisonment.

(Emphasis in original.) Defendant also proffered proposed penalty instruction number 6, which reads in part:

> Each of you must make an individual decision about whether David Young receives the death penalty or a sentence of life imprisonment.... If any one or more of you conclude that the State has not met its burden on any one of the three legal requirements, or if any one or more of you conclude that the evidence demands mercy, then the penalty will be fixed at life imprisonment.

The court gave the instruction in substance, but refused to use the language of the instruction regarding mercy.

Defendant bases his claim on *Penry v. Lynaugh,*[187] *Lockett v. Ohio,*[188] and *Eddings v. Oklahoma,*[189] all of which vacated the death penalty sentences of the respective defendants because the sentencing procedures used did not allow the sentencing bodies to hear and fully consider the mitigating evidence offered. Defendant argues that these cases require a jury to consider sympathy for the defendant during the penalty phase and to consider any mercy or sympathy arising from the mitigating evidence in reaching their verdict.

Defendant's reliance on these cases is misplaced. The United States Supreme Court has specifically rejected the argument that these cases require a jury to consider sympathy in reaching its verdict. In *Saffle v. Parks,*[190] the Court explained that these decisions did not require mercy and did not prohibit an antisympathy instruction during the penalty phase.[191] Because *Saffle* arose on a petition for habeas corpus, the Court declined to create a "new rule" concerning sympathy that was not present in the former cases.[192] The Court further rejected petitioner Park's reasoning that an antisympathy instruction violated his rights because it barred the jurors from considering his mitigating evidence. It distinguished between allowing a jury to consider mitigating evidence and guiding jurors as to how they should consider the evidence. The Court upheld an antisympathy instruction because reliable, accurate, and nonarbitrary sentencing necessarily requires a " 'moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.' "[193] We follow the reasoning and holding of *Saffle* and hold that the federal constitution does not prohibit an antisympathy instruction, nor does it require an instruction that the jurors may be guided by mercy or sympathy.

Defendant also argues that the Utah Constitution requires the trial court to instruct the jury that it may be swayed by mercy or sympathy. He argues that the instruction is required by our holdings in *State v. Wood*[194] and *State v. Holland.*[195] These cases require a jury to impose a life sentence unless the prosecution has proved beyond a reasonable doubt that death is justified and appropriate under all the circumstances.[196] Defendant claims that the emphasis placed on human dignity and the high value of human life in the *Holland* and *Wood* opinions requires an instruction promoting mercy or sympathy in capital sentencing proceedings.

Nothing in the *Wood* or *Holland* opinion or in Utah law requires the instruction proposed by defendant. The right of a defendant to present and have the jurors consider mitigating evidence does not entitle the defendant to make a general appeal to the jury's sympathy or emotions.[197] The purpose of the capital sentencing proceeding is to channel the jury's discretion regarding the sentence to avoid arbitrary and capricious results in application of the death penalty.[198] An instruction that asks the jury to determine

**187.** 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**188.** 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

**189.** 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

**190.** 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

**191.** *Id.* at 489–90, 110 S.Ct. at 1260–61.

**192.** *Id.*

**193.** *Id.* at 490 (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)).

**194.** 648 P.2d 71 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

**195.** 777 P.2d 1019 (Utah 1989).

**196.** *Holland,* 777 P.2d at 1026–27; *Wood,* 648 P.2d at 83–84.

**197.** *See State v. Moen,* 786 P.2d 111, 138 (Or. 1990).

**198.** *See Saffle,* 494 U.S. at 493, 110 S.Ct. at 1262–63; *Gregg v. Georgia,* 428 U.S. 153, 189–95, 96 S.Ct. 2909, 2932–35, 49 L.Ed.2d 859 (1976); *California v. Brown,* 479 U.S. 538, 544, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring).

the sentence based upon emotions or sympathy encourages arbitrary application of the death penalty, not the channeled discretion contemplated by the death-sentencing procedure.[199] The careful effort in the sentencing proceeding to focus on evidence concerning the defendant's background, character, circumstances, and the nature of the crime committed is wasted if the jury is instructed to make a purely emotional decision instead of a reasoned response to the evidence presented.[200] Consideration of a defendant's mitigating evidence does not require the application of emotions or prejudice. We have previously disapproved of attempts to appeal to a jury's raw emotions rather than focusing on the evidence in a capital case.[201] We continue to adhere to the principle that the capital sentencing determination is not the place for an arbitrary decision based on emotion or prejudice.

Moreover, the instructions given did not prohibit the jury from considering defendant's mitigating evidence. The instructions as a whole requested the jury to weigh the aggravating and mitigating evidence and to consider the nature and circumstances of the crime and defendant's character. The antisympathy instruction told the jurors to base their decision on the evidence presented and not on "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." This instruction accurately channeled the jury's discretion to the aggravating and the mitigating evidence presented to it and ensured that it would base its decision on that evidence, not on emotion or caprice.

### B. *Instruction on the Wood Test's Second Prong*

Defendant contends that the jury was not adequately instructed concerning its duty under the second prong of *State v. Wood.*[202] This prong requires the jury to determine that the prosecution has proved beyond a reasonable doubt that death is the only appropriate penalty under all the circumstances.[203] The trial court gave two instructions concerning the *Wood* test. Instruction 6 stated the *Wood* standard. It told the jurors that they must find, beyond a reasonable doubt, both that the aggravating factors outweigh the mitigating factors and that death is the only appropriate penalty. Instruction 7 explained the weighing process the jury must employ in applying the *Wood* test. Defendant claims that instruction 7 blurs the distinction between the two prongs of the *Wood* test and encourages the jurors to apply only the first part of the test.

*State v. Wood* established the requirement that a jury make two separate findings prior to imposing a sentence of death.[204] First, a jury must find beyond a reasonable doubt that the aggravating circumstances presented in the penalty phase outweigh the mitigating circumstances. Second, a jury must find beyond a reasonable doubt, after considering all aspects of the case, including the aggravating and mitigating circumstances presented, that the imposition of the death penalty is justified and appropriate in the circumstances.[205] In *State v. Holland,*[206] we emphasized the importance of both prongs of the *Wood* test. We noted that employing the first prong alone could produce an unduly broad application of the death penalty and could result in a mere numerical counting of the aggravating and mitigating circumstances in each case.[207] The second prong of the *Wood* test serves the important function of allowing the jurors to look

**199.** *See Brown,* 479 U.S. at 545, 107 S.Ct. at 841 (O'Connor, J., concurring).

**200.** *See id.* at 544–45, 107 S.Ct. at 840–41 (O'Connor, J., concurring); *Moen,* 786 P.2d at 139.

**201.** *See State v. Lafferty,* 749 P.2d 1239, 1256–57 (Utah 1988).

**202.** 648 P.2d 71 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

**203.** *Id.* at 83.

**204.** *Id.*

**205.** *Id.* at 83–84.

**206.** 777 P.2d 1019 (Utah 1989).

**207.** *Id.* at 1028.

at the totality of the case in light of their societal values and personal experiences.[208]

It is well established that the trial court must instruct the jury on the law applicable to the facts of the case before it.[209] However, the language employed in *Holland* concerning the second prong of the *Wood* test need not be mechanically applied in every case. In determining whether the trial judge properly instructed the jury regarding the *Wood* test, we examine the totality of the instructions given to the jury to assess whether those instructions adequately conveyed the law applicable to the case.[210]

Defendant primarily objects to the last paragraph of penalty phase instruction 7.[211] Though not a model of clarity, this paragraph correctly analyzes the process for weighing aggravating and mitigating circumstances and the need for the jurors to assess those circumstances in the second portion of the *Wood* test. Further, instruction 7 was not the only instruction given concerning the prongs of the test. Instruction 6 clearly delineated both prongs of the *Wood* test and instructed the jury to carefully consider both steps in its deliberating process.[212] Also, the trial court gave instruction 8, which emphasized the need for finding beyond a reasonable doubt that both prongs of the test had been met.[213] Therefore, as a the instructions given adequately informed the jury of its duty and guided the jury in its deliberation as to each prong of the *Wood* test.

Additionally, defendant argues that the instructions given should have informed the jury that it could consider any lingering doubts it had as to defendant's guilt. The Supreme Court rejected this argument in *Franklin v. Lynaugh.*[214] We agree with the Court's reasoning and holding in that decision and adopt it here. The penalty phase focuses on an assessment of the defendant's character after he has been found guilty beyond a reasonable doubt.[215] Defendant was not entitled to an instruction regarding lingering or residual doubts given to the jury during the penalty phase of his case.

### C. *Incorporation of Guilt Phase Instructions*

Defendant contends that incorporating the guilt phase instructions into the penalty phase produced several erroneous instructions. In addition to his claims concerning the antisympathy instruction discussed above and his claims concerning the reason-

**208.** *Id.*

**209.** *State v. Potter,* 627 P.2d 75, 78 (Utah 1981).

**210.** *See, e.g., State v. Johnson,* 774 P.2d 1141, 1146 (Utah 1989); *State v. Miller,* 727 P.2d 203, 206 (Utah 1986); *State v. Sessions,* 645 P.2d 643, 647 (Utah 1982).

**211.** This paragraph reads:

> Thus, any one mitigating factor, standing alone, could outweigh a number or all of the aggravating circumstances in the case to support a decision that death is not the appropriate sentence. However, one aggravating factor, standing alone, could outweigh a number or all mitigating factors in the case to support a decision that death is the only appropriate and justified sentence in this case.

**212.** After delineating the first prong of the *Wood* test, instruction 6 states, "If you find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, then you must *further* be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and the only appropriate and justified sentence in this case." (Emphasis added.)

**213.** Instruction 8 reads:

> In this, the penalty phase of the trial, all presumptions, independent of evidence, are in favor of the imposition of a sentence of life imprisonment. The burden is upon the State to prove that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and further, the State must prove that the imposition of the penalty of death is the only appropriate and justified penalty, again by a standard of proof of beyond a reasonable doubt. If a reasonable doubt exists as to whether or not the aggravating circumstances outweigh the mitigating circumstances, or whether the imposition of the death penalty is the only appropriate and justified penalty, then the defendant is entitled to a verdict imposing a life sentence.

**214.** 487 U.S. 164, 172–73, 108 S.Ct. 2320, 2326–27, 101 L.Ed.2d 155 (1988).

**215.** *See generally Holland,* 777 P.2d at 1027–28; *Wood,* 648 P.2d at 84.

able doubt instructions that are discussed below, he claims that the incorporation of the guilt phase instructions tended to confuse the jury and to misdirect its attention to the evidence produced in the guilt phase as opposed to that of the penalty phase.

Defendant's argument fails for two reasons. First, we have previously held that the State may use the aggravating circumstances found at the guilt phase to support its case during the penalty phase.[216] Second, defendant has failed to explain how the instructions confused the jury when their applicability was facially apparent. Although defendant lists a number of instructions from the guilt phase that were arguably not applicable to the penalty phase, he does not explain why these instructions would confuse the jury. We find no error in the court's incorporation of the guilt phase instructions.

### D. *Reasonable Doubt Instructions*

Defendant claims that the guilt phase instructions concerning reasonable doubt violated his right to due process. In addition, he claims that penalty phase instruction 8 incorrectly stated the standard of proof beyond a reasonable doubt. We have previously discussed defendant's claims concerning the guilt phase reasonable doubt instructions in section IX of this opinion and rely on our analysis there. Defendant's rights were adequately protected by the instructions given. The instruction given in the penalty phase essentially mirrored those instructions given in the guilt phase.[217] The penalty phase reasonable doubt instruction adequately stated the standard for proof beyond a reasonable doubt and adequately safeguarded defendant's due process rights.

## XVIII. PENALTY PHASE VERDICT FORMS

At the conclusion of the penalty phase, the court gave the jury two verdict forms. One indicated that the jurors had reached a unanimous verdict finding death; the other indicated that they were unable to reach a unanimous verdict of death. Defendant claims that the jurors should have been given an additional verdict form that allowed them to register a unanimous finding of life. Defendant argues that the absence of this form focused the jury deliberations on death, as opposed to life, and created a presumption that the sentence of death would be imposed unless one of the jurors voted against it.

Life imprisonment, not the death penalty, is the presumed sentence in a capital homicide case.[218] The court instructed the jury that the presumed sentence was life imprisonment unless each juror was persuaded beyond a reasonable doubt that death was the only appropriate and justified penalty.[219] The trial court correctly informed the jury of the presumption of life in the sentencing phase. We fail to see how the verdict form requested would have removed any presumption of death. On the contrary, such a verdict form may have confused the jurors and created the impression that they must vote unanimously for life to impose that penalty.[220] The trial court correctly refused to provide the third verdict form.

216. *State v. Gardner,* 789 P.2d 273, 280 (Utah 1989) (citing *Lowenfield v. Phelps,* 484 U.S. 231, 241, 108 S.Ct. 546, 552–53, 98 L.Ed.2d 568 (1988)), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990).

217. The portions of penalty phase instruction 8 to which defendant objects are nearly identical to the portions of the guilt phase reasonable doubt instructions that are also challenged. Defendant has not objected to the general provisions of the penalty phase instruction concerning the presumption in favor of a life sentence. Therefore, we consider his objections to be identical to those raised concerning the guilt phase instructions.

218. *See State v. Holland,* 777 P.2d 1019, 1027 (Utah 1989); *State v. Wood,* 648 P.2d 71, 83 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

219. The jury was given at least two instructions stating that the presumption in the penalty phase was for a life sentence and that the appropriateness of a death sentence must be proven beyond a reasonable doubt.

220. *See generally Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (striking down scheme which required jury to unanimously find at least one mitigating factor or sentence would be presumed death).

## XIX. MERGING OF THEFT CONVICTION

Defendant claims that his conviction for theft should merge with his murder conviction because theft is a lesser included offense of first degree murder under the aggravating circumstance that the murder was committed for personal or pecuniary gain. A defendant cannot be convicted of both first degree murder and a lesser included offense of that crime.[221] We have determined that one crime is a lesser included offense of another "where the two crimes are 'such that the greater cannot be committed without necessarily having committed the lesser.' "[222] This court examined the relationship between lesser included offenses and the aggravating circumstances under the first degree murder statute in the case of *State v. Shaffer*.[223] Although we held in *Shaffer* that the defendant's conviction of robbery merged with his conviction of murder under aggravating circumstance (h) in Utah Code Ann. § 76–5–202, we stated that a defendant could be convicted of a crime that might also serve as the basis for an aggravating circumstance if the prosecution did not rely on that crime for proof of the aggravating circumstance.[224]

In determining whether the State relied on proof of the theft for its proof of the aggravating circumstance, it becomes necessary to examine what was actually proved at trial.[225] The jury convicted defendant of theft of a motor vehicle. The jury also convicted him under the aggravating circumstances in subsections (d) (rape), (h) (prior felony), and (f) (pecuniary or other personal gain). Evidence at trial was sufficient to prove aggravating factors (d) and (h) and also sufficient to prove that in addition to the victim's motor vehicle, defendant took her credit cards, her purse, and her money.[226] This additional evidence independently supports a finding of murder for gain under subsection (f). The crime of murder in the first degree under subsection (f) could have been proved absent the theft conviction. The trial court correctly determined that the theft conviction should not merge with the first degree murder conviction.

## XX. CUMULATIVE ERROR

Defendant claims that the cumulative effect of errors during the guilt and penalty phases of his trial require a new penalty hearing. The doctrine of cumulative error allows for a new trial when standing alone, no error is severe enough to warrant a new trial, but when considered together, the errors denied the defendant a fair trial.[227] This court ascribes to the doctrine of cumulative error, but we do not believe that the doctrine warrants a new trial or penalty hearing in this case. Although defendant has claimed many errors on appeal, we have determined that the majority of his claims do not constitute error; the remainder are merely harmless error. We have examined the effect of the harmless errors and determine that the cumulation of these errors did not result in a fundamentally unfair trial.[228] Therefore, the doctrine of

221. Utah Code Ann. § 76–1–402(3).

222. *State v. Hill*, 674 P.2d 96, 97 (Utah 1983) (quoting *State v. Baker*, 671 P.2d 152, 156 (Utah 1983)).

223. 725 P.2d 1301 (Utah 1986).

224. *Id.* at 1314 n. 3.

225. *Hill*, 674 P.2d at 97.

226. The evidence, including defendant's own statements in his confession and in the pro se answer introduced in the penalty phase, also indicated that he killed the victim in order to prevent her from identifying him and to aid him in leaving the state. This evidence could be used to support a finding of "other personal gain" under subsection (f). While we have not defined "other personal gain," it seems clear that the purposes of escape and prevention of identification would fit within the plain meaning of those terms.

227. *State v. Ellis*, 748 P.2d 188, 191 (Utah 1987); *State v. Rammel*, 721 P.2d 498, 501–02 (Utah 1986).

228. *See generally State v. Bishop*, 753 P.2d 439, 499–500 (Utah 1988) (Zimmerman, J., concurring) (discussing harmlessness of several errors in light of confession and other evidence of guilt and gruesomeness of crime).

cumulative error does not afford defendant relief.[229]

We have duly reviewed defendant's other claims of error raised in the context of the points above and find them to be without merit.[230]

Associate Chief Justice Howe concurs in this opinion, and we would affirm the conviction and sentence. However, a majority of the court, in the opinions that follow, reverse and remand for a new trial.

HOWE, Associate C.J., concurs.

DURHAM, *Justice*:

I dissent from parts II, IV, X, XII, XV, and XVII.A of the lead opinion. I dissent in part from part VI of the lead opinion. I concur in the result reached in part VIII of the lead opinion but dissent from its rationale. The first three parts of this opinion address issues arising from the penalty phase of Young's trial. The next two parts address issues arising from the guilt phase of the trial. The ensuing two parts discuss jury selection issues. The final part analyzes the constitutionality of Utah's statutory scheme for narrowing the class of defendants eligible for the death penalty.

## I. SHACKLING OF DEFENDANT DURING PENALTY PHASE

(lead opinion part XII)

Young argues that the trial court violated his rights under the Eighth and Fourteenth Amendments when it required him to remain in shackles in the presence of the jury during the penalty phase. I concur with the lead opinion that "it is within the sound discretion of the trial court to determine the safety measures *necessary* to insure the security of the courtroom and its occupants. These safety measures may include shackling a defendant *in appropriate circumstances.*" (Emphasis added.) The problem in this case is the manifest lack of the requisite necessity. Young's unwarranted shackling amounted to an impermissible comment on the evidence and violated his due process rights by creating unacceptable prejudice.

Because of the inherently prejudicial impact of appearing shackled before the jury, courtroom shackling is permitted only "as a last resort." *See Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). In all the cases I have examined, reviewing courts have required a showing of necessity before tolerating a trial court's decision to shackle. *See, e.g., Spain v. Rushen,* 883 F.2d 712, 728 (9th Cir.1989), *cert. denied,* 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); *Elledge v. Dugger,* 823 F.2d 1439, 1452 (11th Cir. 1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988); *Tyars v. Finner,* 709 F.2d 1274, 1284–85 (9th Cir.1983); *People v. Duran,* 16 Cal.3d 282, 290, 127 Cal.Rptr. 618, 623, 545 P.2d 1322, 1327 (1976); *Bello v. State,* 547 So.2d 914, 918 (Fla.1989).[1] Thus, I agree with the Ninth Circuit that "a trial judge may ... impose restraints only when 'confronted with disruptive, contumacious, [and] stubbornly defiant defendants.' ... Shackling ... must be limited to cases urgently demanding that action." *Tyars,* 709 F.2d at 1284 (quoting *Allen,* 397 U.S. at 343, 90 S.Ct. at 1060–61).

Furthermore, before a court may shackle a disruptive defendant, it must first "pursue less restrictive alternatives." *Spain,* 883 F.2d at 721; *see also Tyars,* 709 F.2d at 1284. Lesser restraints could include increasing courtroom security personnel,

229. *See, e.g., State v. Gardner,* 789 P.2d 273, 288 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990); *Bishop,* 753 P.2d at 489; *Rammel,* 721 P.2d at 498, 501–02.

230. *State v. Carter,* 776 P.2d 886, 896 (Utah 1989).

1. Even *Duckett v. State,* 104 Nev. 6, 752 P.2d 752, 755 (1988), upon which the lead opinion relies, admits that physical restraints at sentencing may not be imposed absent necessity. Furthermore, although *Duckett* upheld a sentencing-stage shackling order, it did not, as the lead opinion suggests, hold that the constitutional right to be free of shackles did not exist at sentencing; it held only that the constitutional right to be free of prison garb, established in *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), did not exist at sentencing.

warning the defendant of the consequences of disruptive behavior, such as the possibility of contempt or removing the defendant from the courtroom. *See Spain,* 883 F.2d at 726. This last alternative, however, also is an abuse of discretion if it is not limited to cases urgently demanding such action. Notably, even removal is inappropriate unless the defendant first "has been warned by the judge that he will be removed if he continues his disruptive behavior" and the defendant thereafter persists in "disorderly, disruptive, and disrespectful" conduct. *Allen,* 397 U.S. at 343, 90 S.Ct. at 1060–61. Young received no warning, presumably because he had not engaged in any disruptive behavior.

It is true, as the lead opinion indicates, that most of the cases discussed above arose from shackling during the trial of a defendant's guilt, where the chief concern was the potential prejudice to the defendant's presumption of innocence. Nevertheless, the United States Supreme Court described shackling's potential prejudice in words showing a concern with more than just its effect on the presumption of innocence:

> [T]he sight of shackles ... might have a significant effect on the jury's *feelings* about the defendant, [and] the use of this technique is something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. Moreover, ... [the defendant's] ability to communicate with counsel is greatly reduced.

*Allen,* 397 U.S. at 344, 90 S.Ct. at 1061 (emphasis added). Accordingly, the Eleventh Circuit concluded in *Elledge v. Dugger* that "the Supreme Court has not bottomed the prohibition against shackling on presumption of innocence alone.... [T]here seems to be no reason to restrict the principles to the guilt-innocence phase of the trial." 823 F.2d at 1451. In fact, the prejudice from shackling may be greater at the sentencing phase; a capital sentencing jury is assessing the defendant's dangerousness and risk of future violence and "might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision." *Id.* at 1450. Shackling conveys a message about the court's view of the defendant's dangerousness, a message that potentially prejudices whatever issue the jury is considering, whether guilt or sentence. I therefore believe that shackling at the penalty phase, like shackling at the guilt phase, must be justified by a showing of necessity. *See Bello v. State,* 547 So.2d 914, 918 (Fla. 1989).

This case lacks any of the "disorderly, disruptive, and disrespectful" behavior necessary for shackling or removal from the courtroom.[2] The record shows that Young had at all times comported himself appropriately and did nothing during the trial to justify either shackling or removal. On the contrary, unsettling testimony caused him to cry quietly or to leave the courtroom voluntarily. On the morning of the third day, the judge asked Young whether he wanted to stay for that day's testimony, indicating that it would include "things that may be distressing and upsetting to you." Young responded, "I'm going to stay. If I feel uncomfortable, I'll leave. How is that?" He had already excused himself from the courtroom for part of the first day and for the entire second day because he was uncomfortable listening to some of the testimony about his mental capacities. Yet, in the face of Young's demonstrated ability and intention to comport himself properly and to excuse himself from the courtroom when needed, the court required the use of a waist chain and handcuffs as a condition of Young's presence during much of the sentencing hearing.

The trial court's shackling decision was not motivated by any actual or threatened misconduct, but solely by the court's own assessment of Young's character and a

2. In contrast, the defendant in *Elledge* had made threats upon the court, 823 F.2d at 1450, and the defendant in *Spain* had repeatedly disrupted the pretrial proceedings, 883 F.2d at 719. Nevertheless, the reviewing courts in both cases deemed those shackling orders unwarranted. 823 F.2d at 1452; 883 F.2d at 728.

laudable but misplaced desire to minimize risk. Unfortunately, the very absence of courtroom misconduct that would justify shackles might have caused the jury to speculate improperly about why shackles nevertheless were suddenly in use. Additionally, shackling impermissibly conveyed to the jury the trial court's own view of Young's dangerousness. It amounted to an inappropriate assessment by the court of the credibility and weight to be given to testimony by an Indiana police officer on the second day of sentencing about Young's demeanor during a past incident. The officer testified that Young once got angry when a television crew attempted to film him in court and that it took four officers to restrain him. Given that Young had been in the presence of the jury for part of the first day of sentencing without shackles, the jury could have interpreted the appearance of shackles on the third day as an expression of the court's uncritical acceptance of the officer's testimony.

In these circumstances, shackling was an abuse of discretion that introduced intolerable prejudice into the sentencing phase, thereby violating Young's Fourteenth and Eighth Amendment rights to carefully channelled and reliable capital sentencing. *See Mills v. Maryland,* 486 U.S. 367, 383–84, 108 S.Ct. 1860, 1869–70, 100 L.Ed.2d 384 (1988); *McCleskey v. Kemp,* 481 U.S. 279, 303–04, 107 S.Ct. 1756, 1773–74, 95 L.Ed.2d 262 (1987); *Gardner v. Florida,* 430 U.S. 349, 358–59, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976). It also forced Young to compromise his Sixth Amendment right to be present at the sentencing phase, for as the trial court acknowledged, Young based his decision to leave the courtroom for the third day of sentencing at least partially, if not wholly, on the shackling order. I cannot conclude that this was constitutional harmless error, particularly given the inherent difficulty, discussed more fully in the section on Young's statutory right to allocution (part II.A), of reweighing on appeal the subjective moral judgment made by a capital sentencing jury.[3]

## II. DEFENDANT'S REQUEST FOR ALLOCUTION DURING THE PENALTY PHASE

(lead opinion part XV)

During his penalty hearing, defendant specifically asked the court to give him an opportunity to address the jurors before their deliberations. The lead opinion concludes that even if the trial court erred in denying this request, the error was harmless beyond a reasonable doubt. I cannot agree, and I am dismayed by the lead opinion's cavalier dismissal of the potential impact of defendant's own statement on a capital sentencing jury. I conclude not only that Young had both a statutory right and a constitutional right to allocution, but also that the court's denial of these rights was harmful error under any standard. Furthermore, the trial court's failure to allow Young to speak briefly to the jury likely compounded the prejudice created by the shackling order. The order conveyed to the jury the court's assessment of Young's character and dangerousness; the denial of allocution prevented Young from presenting his personal view of his circumstances and character.

### A. *Statutory Error*

Historically, the common law right of allocution provided capital defendants—who were incompetent to testify and not entitled to counsel—an opportunity to plead for their lives, and until the defendant had a chance to speak, the court could not properly pronounce sentence. *See Ball v. United States,* 140 U.S. 118, 129–31, 11 S.Ct. 761, 765–66, 35 L.Ed. 377 (1891). Perhaps because of the fairness of this practice, the common law eventually extended the right to all criminal defendants. Today, despite modern innovations in criminal procedure that allow defendants to testify and to have the assistance of counsel, the ancient common law right of allocution exists as a right by statute or rule in most

3. Young has raised no state constitutional challenge to his shackling.

states, including Utah, as well as in the federal system. *See* Utah R.Crim.P. 22(a); Fed.R.Crim.P. 32(a)(1)(C).

Notably, the high courts of many states with statutes preserving the practice of allocution have insisted that the right be held inviolate. In this case, the lead opinion, although correctly asserting that "[m]ost other jurisdictions that recognize the right of allocution consider it to be statutory [rather than constitutional] in nature," ignores the fact that in recent years these courts have resisted all requests to assess the harmlessness of a denial of allocution and instead have used a per se practice of requiring a new penalty hearing. For example, the Colorado Supreme Court concluded that failure to grant allocution "renders [the sentence] invalid" and explained that the defendant had a "right of allocution" prior to sentencing "which cannot be withheld from him." *People v. Emig,* 177 Colo. 174, 493 P.2d 368, 369–70 (1972). The Alaska Supreme Court stated, "[T]here is no substitute for the impact on sentencing which a defendant's own words might have if he chooses to make a statement." *Mohn v. State,* 584 P.2d 40, 44 (Alaska 1978). The New Mexico Supreme Court concluded that "failure to [give the defendant an opportunity to speak before sentencing] renders the sentence invalid." *Tomlinson v. State,* 98 N.M. 213, 215, 647 P.2d 415, 417 (1982). The Rhode Island Supreme Court stated that violation of the right to allocution would "require this court to remand the case for resentencing." *State v. Nicoletti,* 471 A.2d 613, 618 (R.I. 1984). Similarly, the United States Supreme Court in its memorandum opinion in *Van Hook v. United States,* 365 U.S. 609, 81 S.Ct. 823, 5 L.Ed.2d 821 (1961), apparently held that on direct appeal a defendant who was not offered an opportunity to make a statement prior to sentencing was entitled to resentencing. *See also Hill v. United States,* 368 U.S. 424, 429 n. 6, 82 S.Ct. 468, 472, 7 L.Ed.2d 417 (1962).

The above decisions, all invoking a per se rule of resentencing when a trial court has denied a defendant's statutory right of allocution, demonstrate that allocution continues to play a unique and important role in criminal sentencing, despite innovations in criminal procedure that permit defendants to testify and to have counsel. As the United States Supreme Court has stated, "None of these modern innovations lessens the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation." *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961). Although most of the above cases involved noncapital sentencing, their rationale is only strengthened in a capital case. The nature of capital sentencing, particularly the constitutional requirement that a convicted capital defendant have an unrestricted opportunity to present mitigating evidence, *see, e.g., Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978); *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); *State v. Wood,* 648 P.2d 71, 86 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982), leads me to conclude that if a trial court has denied allocution erroneously, this error typically will create more prejudice to a capital defendant than to a noncapital defendant. As it was originally, allocution today is of the utmost importance in permitting defendants to plead for their lives.

The State has conceded that Utah Code Ann. § 77–35–22 (now Utah R.Crim.P. 22(a)), which provides that "before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment," required the court to allow Young to speak to the jury before it retired to deliberate his sentence. Having conceded the statutory error, the State argues only that it was harmless error not meriting a new sentencing trial. I disagree and conclude that it is at least reversible error, if not error per se, under our statutory harmless error standard.

The lead opinion has failed to acknowledge the State's concession of statutory error. Understandably, once the lead opin-

ion has determined that even under a constitutional error standard, the denial of allocution to Young was harmless beyond a reasonable doubt, those joining in it would be free to ignore whether statutory error occurred. Instead, however, they decide, sua sponte and despite the State's concession, that in fact no statutory error occurred here because the trial court satisfied section 77–35–22 when it permitted Young to address the trial judge after sentencing. Particularly in light of this court's recent opinion in *State v. Andrews,* 843 P.2d 1027, 1028 (Utah 1992), concluding that "[i]n substance and effect, the verdict of the jury is the sentence," the lead opinion's conclusion today is unsupportable. The right of allocution contemplates permitting a convicted defendant to speak prior to the fixing of sentence in order to provide the defendant a chance to present a plea in mitigation. *See, e.g., Green,* 365 U.S. at 304, 81 S.Ct. at 655. In capital prosecutions in Utah, as in most states, the jury actually determines the defendant's sentence, and the judge has no discretion to modify the verdict on sentencing. *See Andrews,* 843 P.2d at 1028. Therefore, if a jury determines sentence and a statute has established a capital defendant's right of allocution, the defendant must have the opportunity to make this plea to the jury. Allocution in a capital sentencing trial after the jury has returned its verdict on sentencing is a meaningless formality, "no more than an empty gesture." *Tomlinson,* 647 P.2d at 417; *see* J. Thomas Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation,* 15 N.M.L.Rev. 41, 56–60 (1985) [hereinafter J. Thomas Sullivan].

Furthermore, allocution in precisely the form Young requested, not the lead opinion's "postverdict allocution," comports most closely with Utah's death penalty statute. After stating that at sentencing the parties may present evidence of any fact either in aggravation or mitigation of the penalty, the statute provides, "The state's attorney and the defendant shall be permitted to present argument for or against sentence of death." Utah Code Ann. § 76–3–207(2). If the defendant has no personal entitlement to argue to the jury, one would expect the statute to permit "the state's attorney and the defendant's attorney" to present argument or, in the alternative to permit "the state and the defendant" to present argument. Therefore, one obvious implication of the literal language in Utah's death penalty statute is that it permits *the defendant personally* to address the sentencer as part of Utah's extensive sentencing procedure.

In footnote 179, the lead opinion quotes a case asserting that allocution in its original common law form had nothing to do with "afford[ing] an opportunity to present mitigating evidence or to plead for leniency." In fact, for centuries allocution has served exactly this role, and Utah now expressly preserves this role in its allocution rule, which states, "Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment." Utah R.Crim.P. 22(a). Because by statute allocution is a right to introduce a mitigating statement and because capital defendants are entitled to present to the sentencing jury any mitigating information, courts must permit allocution at the sentencing phase, when requested, rather than postverdict. *Accord People v. Davis,* 794 P.2d 159, 191–92 (Colo.1990) (interpreting allocution statute identical to Utah's rule as establishing right of capital defendant to make statement to sentencing jury), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991).

Thus, the only question I believe this court should address regarding the statutory error claim is whether the error is reversible or harmless. We have stated that statutory error is reversible "when a reasonable likelihood exists that absent the error, the result would have been more favorable to the defendant." *State v. Dibello,* 780 P.2d 1221, 1230 (Utah 1989). When the error occurs in a penalty trial in which the jury voted unanimously for death, this can only mean that there must be a reasonable likelihood that one of the

twelve jurors would not have voted for death had the error not occurred. We also have explained that this "reasonable likelihood" standard is met when, as a result of the error, our confidence in the outcome is undermined. *Id.*

The State bases its harmless error contention on two points: (1) the "overwhelming evidence of aggravation"; and (2) the fact that Young's proffered statement "did not add anything to the evidence presented through other witnesses." For both of these reasons, the State suggests that Young cannot meet the "reasonable likelihood" standard. The lead opinion similarly concludes, after one paragraph of discussion, that given the "many aggravating circumstances" and defendant's presentation of "days of testimony in mitigation," Young's allocution statement "was not likely to influence the result" and its potential impact upon a jury was "minimal at best." The application of this calculus in a capital sentencing proceeding is astonishing.

It is simply inconceivable, given the nature of our process for imposing capital punishment, that a defendant's personal statement would not add anything to the jury's understanding and view of his character, his crime, and his life. As many of the cases cited above adequately express, "there is no substitute" for a defendant's personal statement. *Mohn,* 584 P.2d at 44. "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green,* 365 U.S. at 304, 81 S.Ct. at 655. The verbal content of the statement could be completely duplicative of evidence otherwise introduced, and yet the statement would not be cumulative, because it would convey to the jury intangible personal qualities of the defendant that the jury can experience and assess in no other way.

Furthermore, in this case the content of the proffered statement was not duplicative of evidence already introduced. It included Young's recognition that he had made a mistake. The lead opinion asserts that Young showed no remorse. In fact, however, the proffered statement did contain an implicit plea for forgiveness, and had Young personally made the statement, the jury, rather than this court, would have been left to evaluate the existence and depth of his remorse. The statement also included his assessment of his ability to work and contribute to the community. It included an expression of his desire to "start a new life." None of these elements could have been communicated by anyone other than Young himself.

Finally, because the death penalty is inherently different from any other punishment, modern capital punishment jurisprudence forcefully establishes that the sentencing jury must consider the unique personality and circumstances of every capital defendant. This court has echoed the United States Supreme Court's requirements that a capital sentencer must consider all factors in mitigation, including "any aspect of a defendant's character ... that the defendant proffers," *Wood,* 648 P.2d at 86 (quoting *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965), and that the sentencer must make an individualized determination of the appropriateness of death for the particular defendant, *id.*

The lead opinion argues that to communicate these factors to the sentencing jury, Young simply needed to take the witness stand and testify under oath and subject himself to cross-examination. It even suggests that this alternative would have produced greater impact on the jury than an unsworn statement. Yet the lead opinion also acknowledges that the trial court itself advised Young against testifying, because of the high risk of adverse impact from impeachment on cross-examination. A capital defendant should have the right to make a plea for mercy free from this adverse impact. "[T]he accused making a plea for mercy does not intend to advance or to dispute facts, but instead uses the plea to ask for lenience or understanding in the sentencer's decision. If the accused does not stray from this subject matter in his statement, the plea made does not justify traditional impeachment." J. Thomas Sullivan at 63. Therefore, if Young did

have a statutory right to allocution, as the State concedes, then the fact that he could have introduced his statement by taking the witness stand is irrelevant in determining whether denial of his right was harmless.

The State's only remaining argument is that allocution would have been unavailing to Young because of the "overwhelming" evidence of aggravation. Given the nature of capital sentencing, very few circumstances would allow a reviewing court to properly conclude that aggravating evidence "overwhelms" mitigating factors. In capital trials, we ask the sentencing jury to make a subjective moral evaluation of the "worth" of the defendant and of the defendant's character. As this court stated in *Wood,* "The ultimate purpose in the penalty phase is not one of factfinding, but ... *is a matter of judgment.*" 648 P.2d at 84. As a result, an "inherent lack of predictability" characterizes the jury's assessment of the appropriate sentence. *McCleskey v. Kemp,* 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987). When an extended penalty trial has been held, presenting substantial issues in both aggravation and mitigation, a reviewing court should undertake to reweigh the jury's subjective assessment only with extreme caution.

Many others have recognized that the role played by a capital sentencing jury is unlike the role of any other jury. For instance, the United States Supreme Court explained the "fundamental difference" as follows:

> In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted.... [T]he jury ... is free to consider a myriad of factors to determine whether death is the appropriate punishment.

*California v. Ramos,* 463 U.S. 992, 1008, 103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171 (1983). Justice Powell also articulated this distinction:

> Underlying the question of guilt or innocence is an objective truth: the defendant, in fact, did or did not commit the acts constituting the crime charged. From the time an accused is first suspected to the time the decision on guilt or innocence is made, our criminal justice system is designed to enable the trier of fact to discover that truth according to the law. But triers of fact can err, and an innocent person can be pronounced guilty. In contrast, the law provides only limited standards for assessing the validity of a sentencing decision. The sentencer's function is not to discover a fact, but to mete out just deserts as he sees them. Absent a mandatory sentence, there is no objective measure by which the sentencer's decision can be deemed correct or erroneous if it is duly made within the authority conferred by the legislature.

*Bullington v. Missouri,* 451 U.S. 430, 450, 101 S.Ct. 1852, 1864, 68 L.Ed.2d 270 (1981) (Powell, J., dissenting). And Justice Marshall wrote:

> Unlike the determination of guilt or innocence, which turns largely on an evaluation of objective facts, the question whether death is the appropriate sentence requires a profoundly moral evaluation of the defendant's character and crime.... Even in the face of overwhelming aggravating evidence, the sentencer has discretion to act with leniency and refuse to impose the death sentence.... [P]redicting the reaction of a sentencer to a proceeding untainted by constitutional error on the basis of a cold record is a dangerously speculative enterprise.

*Satterwhite v. Texas,* 486 U.S. 249, 261–62, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988) (Marshall, J. dissenting).

In Young's case, the denial of allocution had no impact on any factual determinations; instead, it directly affected only the jury's exercise of moral judgment. This judgment inherently requires a subjective rather than an objective weighing; therefore, it is a judgment that, like a credibility determination, belongs uniquely to the trier

of fact. As we explained in *State v. Holland,* 777 P.2d 1019 (Utah 1989), capital sentencing factors "are not, in truth, weighable.... These factors have largely subjective value and therefore vary in their 'weight' or persuasiveness for or against the death penalty with each judge or juror according to his or her own background and prior experiences." *Id.* at 1028. I do not understand how we as a reviewing court can conclude that there is no reasonable likelihood that defendant's personal plea for mercy would have affected this personal moral judgment. Almost every case presents a reasonable likelihood that "[a] previously held opinion regarding the appropriate sentence may well be modified after listening to ... defendant's statements in mitigation of punishment." *Kent v. State,* 287 Md. 389, 412 A.2d 1236, 1239 (1980), *quoted in Harris v. State,* 306 Md. 344, 509 A.2d 120, 127 (1986). Furthermore, in *State v. Wood,* 648 P.2d 71 (Utah 1981) (per curiam), we held that to impose the death penalty, a capital sentencing jury must both "be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and ... must further be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances." *Id.* Even if this court could properly accept the State's claim that aggravation entirely overwhelms mitigation, we nevertheless could not reliably conclude under the second part of the *Wood* analysis that a statement of allocution would create no reasonable likelihood of a different outcome.

One aspect of the speculation inherent in the lead opinion's approach particularly troubles me. This case includes considerable evidence about defendant's cognitive disabilities and long-standing brain damage. It is entirely possible, although we have no way of knowing, that something in his expression, language, or patterns of speech might have caused some jurors to reassess that evidence. At the very least, the jurors would have had the opportunity to be confronted by him as a person, with a personal voice and a personal story, before making the decision to permit life or impose death. "The right of a defendant to address the sentencing court in person may well be of inestimable impact.... A defendant's own statement may provide a most valuable insight into his character at a time of great value to the sentencing court." *In re Stevens,* 144 Vt. 250, 478 A.2d 212, 217 (1984).

The only other state court that has considered the precise issue facing us today concluded that a capital defendant "who timely asserts his right to allocute and provides an acceptable proffer *must* be afforded a fair opportunity to exercise this right. If the right so asserted is denied by the court, as here, the sentence *must* be vacated and a new sentencing proceeding conducted." *Harris,* 509 A.2d at 127 (emphasis added). Similarly, in the previously cited noncapital sentencing decisions of other states and the United States Supreme Court, the courts have not attempted to determine the harmlessness of the error, but have created a per se requirement of a new penalty hearing when allocution has been denied. *See Van Hook,* 365 U.S. at 609, 81 S.Ct. at 823; *Mohn,* 584 P.2d at 44; *Emig,* 493 P.2d at 369–70; *Tomlinson,* 647 P.2d at 417; *Nicoletti,* 471 A.2d at 618; *see also Ashe v. State,* 586 F.2d 334, 336 (4th Cir.1978), *cert. denied,* 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979).

This court should adopt a per se rule requiring that when a capital defendant has requested and been denied allocution, the verdict must be vacated and a new penalty hearing conducted. We should not second-guess the unique balancing performed by capital sentencing jurors. Furthermore, I believe that this is the first time this court has applied a statutory harmless error analysis to the wrongful exclusion (as opposed to the wrongful inclusion) of information at a capital sentencing trial. The trial court's refusal to permit Young to make his brief statement kept from the jury an entire category of mitigating evidence. Any inquiry into the harmlessness of this type of error is an exercise in "unguided speculation." *Holloway v. Arkansas,* 435 U.S. 475, 491, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978).

Even without a per se rule, I would hold in this case that had Young been permitted to speak to the jury, a different outcome was reasonably likely. My confidence in the result has been seriously undermined.

B. *Constitutional Error*

Contrary to the lead opinion's conclusion, failure to afford defendant an opportunity for allocution rises to the level of a violation of both the federal and state constitutions.

**1. Federal Constitutional Requirements**

The United States Supreme Court has held that a trial court's failure to ask whether the defendant would like to make a statement prior to sentencing was not constitutional error and hence not reversible in a collateral appeal. *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). But the Court has never addressed whether denying allocution to a defendant who has affirmatively requested it is constitutional error. *See McGautha v. California,* 402 U.S. 183, 218 n. 22, 91 S.Ct. 1454, 1473 n. 22, 28 L.Ed.2d 711 (1971); *Hill,* 368 U.S. at 429, 82 S.Ct. at 472. Although the lead opinion states that "the federal courts of appeals have generally determined that the right to allocution is not a constitutionally protected right," none of the lead opinion's cited cases addresses the issue that both *McGautha* and *Hill* explicitly left unresolved. The one federal appellate court that has squarely considered whether there is a constitutional right to allocution when the defendant requests it concluded that "it is a denial of due process not to grant the defendant's request." *Ashe v. State,* 586 F.2d 334, 336 (4th Cir.1978), *cert. denied,* 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979).

Because "death is different," the state imposes capital punishment only after following the strictest legal and constitutional safeguards. The United States Supreme Court has protected Eighth Amendment rights to be free from cruel and unusual punishment by requiring that capital punishment be imposed only by means of carefully channelled discretion and individualized determination regarding every defendant. Further, defendants are entitled to present any mitigating factor to the sentencing body. *See, e.g., Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 875–76, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978); *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 303–05, 96 S.Ct. 2978, 2990–92, 49 L.Ed.2d 944 (1976); *State v. Wood,* 648 P.2d 71, 86 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). The Court has also protected Fourteenth Amendment due process rights in capital cases by requiring an "especially vigilant concern for procedural fairness." *Strickland v. Washington,* 466 U.S. 668, 704, 104 S.Ct. 2052, 2073, 80 L.Ed.2d 674 (1984) (Brennan, J., concurring in part and dissenting in part).

As I have argued above, allocution can provide significant mitigating information. As I also have discussed above, the United States Supreme Court has never decided whether denial of allocution when specifically requested is a due process violation. Nor has the Court decided in the post-*Furman* era whether denial of allocution to a capital defendant violates the Court's rigorous Eighth Amendment capital sentencing safeguards. In light of the Court's silence on these issues and given the Court's concern in other contexts for reliability, procedural fairness, and preserving the opportunity to present any mitigating information, I conclude that the denial of Young's requested allocution violated his federal rights. Foreclosing the jury's opportunity to hear Young's personal statement prevented the jury from making the individualized sentencing determination required by the Eighth Amendment. Given that Utah mandates, by statute, an opportunity for allocution, its refusal in a capital trial violates the Fourteenth Amendment's requirement of procedural fairness. Our reference in *State v. Lorrah,* 761 P.2d 1388, 1390 (Utah 1988), to a "defendant's due process right of allocution" may have been without analysis, as the lead opinion points out, but it was correct.

**2. State Constitutional Requirements**

The lead opinion relies on several older cases, such as *State v. Kelbach,* 23 Utah 2d 231, 461 P.2d 297 (Utah 1969), *vacated in part,* 408 U.S. 935, 92 S.Ct. 2858, 33 L.Ed.2d 751 (1972), for the proposition that we have examined and presumably settled the issue of the constitutional status of the right to allocution. I submit that the law of capital punishment has changed so dramatically in the past twenty years that previous analysis is unhelpful and not controlling. Furthermore, this court has never, to my knowledge, undertaken a state constitutional analysis of the issue.

Article I, section 12 of the Utah Constitution states, "In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel [and] to testify in his own behalf...." This provision, in my view, plainly entitles a criminal defendant to stand before judge and jury and examine witnesses, present motions, make opening and closing arguments, and do anything else that licensed legal counsel is allowed to do. The conjunctive language entitles a defendant to do any and all of this whether or not the defendant is also assisted by counsel. The fact that the defendant's right to testify is separately enumerated makes clear that the right to "appear and defend" is an additional entitlement to address the judge and jury. I also believe that it would be a failure of justice to suggest that these rights should, in a capital trial, apply only to the guilt phase and not to the penalty phase. Further, the provision of Utah Code Ann. § 76-3-207, discussed above, stating that at the penalty phase, the "state's attorney and the defendant" may present argument reinforces this reading.

In this case, the State has already argued that defendant's proffered statement introduced no new evidence. If so, the State would have no grounds for objecting to it as closing argument. Had Young chosen self-representation, his closing argument would have provided the forum for his statement as a matter of course. The fact that Young had counsel at trial should not have prevented him from making the closing argument or sharing the closing argument with counsel. I believe article I, section 12 guaranteed Young the right to make his statement. Additionally, although a capital defendant's right to make closing argument at the penalty phase may not be equivalent to the right to allocution, I would conclude that because of the similarity between the rights, the protections of article I, section 12, as well as the due process clause of article I, section 7, encompass the right of a capital defendant to speak to the sentencing jury.

**3. Constitutional Harmless Error**

Because I believe a constitutional error has occurred, the burden shifts to the State to show that the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828-29, 17 L.Ed.2d 705 (1967); *State v. Tuttle,* 780 P.2d 1203, 1213 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990). Precluding the jury from considering a defendant's character and proffered mitigation "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). For reasons apparent in the preceding discussion (part II.A) of Young's statutory right to allocution, the State has not proved beyond a reasonable doubt that the statement was cumulative or irrelevant. Furthermore, the State has not shown that absent the error, it is "unlikely beyond a reasonable doubt that the result would have been different." *Tuttle,* 780 P.2d at 1213. The error kept significant information from the sentencer, namely, what the defendant had to say for himself and the manner in which he would have said it. Therefore, Young should have been allowed to present his brief statement to the jury. The sentence should be vacated, and a new sentencing trial held.

## III. INSTRUCTION ON MERCY OR SYMPATHY

(lead opinion part XVII.A)

Young claims that mercy or sympathy *based on the mitigating evidence presented at the penalty phase* may play a legitimate role in the deliberations of a capital sentencing jury. From this premise, he articulates two constitutional violations: First, he claims that by instructing the jurors to disregard their sympathetic or merciful responses to the mitigation, the trial court violated his rights under the federal and state constitutions. Second, Young claims that the trial court's refusal to give his requested sympathy instruction also violated his constitutional rights. These claims go to the heart of contemporary capital punishment jurisprudence and require a careful analysis of the precedents of this court and of the United States Supreme Court.

Historically, the death penalty was mandatory for defendants convicted of a capital offense. Prior to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), however, most states gave their capital sentencing juries unguided discretion to decide whether to impose the death penalty. *See McGautha v. California,* 402 U.S. 183, 199–202, 91 S.Ct. 1454, 1463–64, 28 L.Ed.2d 711 (1971). As *McGautha* explained, the purpose of providing juries with this discretion was to permit them to be merciful. *Id.* at 200–01, 91 S.Ct. at 1463–65. The *McGautha* Court refused to accept the claim that because such a system lacked any principled basis for selecting those defendants who would receive death rather than mercy, it was unconstitutional. The Court said, "To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty ... [is] beyond present human ability." *Id.* at 204, 91 S.Ct. at 1465–66.

I acknowledge that the Court's decision one year later in *Furman* overruled *McGautha. Furman* found that state statutes that gave juries unguided discretion to impose the death penalty were unconstitutional. 408 U.S. at 239, 92 S.Ct. at 2727. Significantly, however, *Furman* did not suggest that state statutes giving juries unguided discretion to *refuse* to impose the death penalty were unconstitutional, nor did it challenge *McGautha* 's reaffirmation of earlier Supreme Court cases establishing that mercy could be extended freely. *See McGautha,* 402 U.S. at 200–01, 91 S.Ct. at 1463–64. Thereafter, states sought to do exactly what *McGautha* had considered "beyond human ability": to establish criteria upon which the jury properly could choose to impose the death penalty.

When these revised death penalty schemes reached the United States Supreme Court four years after *Furman,* it upheld those that in its view established rational standards for selecting defendants who would receive capital punishment. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (statute permitted death penalty only upon finding at least one of ten statutory aggravating factors); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (statute permitted death penalty only upon finding sufficient aggravation from statutory list of eight aggravating factors); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (statute permitted death penalty only for five specified types of intentional killings). In contrast, the Court struck down a mandatory death sentence statute that stripped the jury of its ability to extend mercy, explaining that it did not permit consideration of the "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality). In *Gregg,* Justice White recognized the role of mercy in capital sentencing: "The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute." 428 U.S. at 222, 96 S.Ct. at 2947–48. (White, J., concurring). Two years later, the Court held that the sentencing jury must "not be precluded from

considering *as a mitigating factor,* any aspect of a defendant's character or record." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (emphasis in original).

I am compelled to conclude that as of 1978, the majority of justices on the United States Supreme Court believed that mercy and compassion were central to capital sentencing. The unmistakable meaning of the line of cases beginning with *Furman* was that while a jury could decide to *impose* death only by following carefully channelled procedures designed to minimize the arbitrariness of those cases in which death actually was imposed, the jury could *decline* to impose a death sentence for any reason—merciful, compassionate, sympathetic, or otherwise. *See Gregg,* 428 U.S. at 199, 203. The Court reinforced this position in *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982), and again in *Caldwell v. Mississippi,* 472 U.S. 320, 330–31, 105 S.Ct. 2633, 2640–41, 86 L.Ed.2d 231 (1985). In *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), although the Court upheld an instruction prohibiting the jury from being influenced by "*mere* sympathy," it plainly preserved a place for sympathetic responses *to evidence presented at the sentencing phase,* stating that a reasonable juror would interpret the challenged instruction "as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." *Id.* at 542, 107 S.Ct. at 840.

Particularly after *Brown,* it is disingenuous to suggest that the watershed cases in this country's modern capital punishment jurisprudence did not intend at least to preserve a sacred place for sympathetic and merciful responses to a defendant's mitigating evidence.[4] Nevertheless, in rejecting Young's claim that a jury instruction that interferes with a juror's ability to respond sympathetically or mercifully to the mitigating evidence violated his rights, today's lead opinion ignores this history and instead focuses solely on the opinion in the habeas corpus case of *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). Those joining the lead opinion appear erroneously to believe that *Parks* has disposed of the federal constitutional issue. Admittedly, dicta in *Parks* suggest that the Court is contemplating a retreat from its prior cases, including *Brown.* But contrary to the lead opinion's assertion, the *Parks* opinion did not reject on its merits the constitutional claim now before us. Like Young, Parks had sought a rule that an antisympathy instruction that precluded the jury from fully considering his mitigating evidence violated the Constitution. The Court held that because the principle urged by Parks was not "dictated by our prior cases" and therefore would require the creation of a "new rule of constitutional law," then following the mandate of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), Parks could not benefit from such a rule in a collateral attack. *Parks,* 494 U.S. at 486, 110 S.Ct. at 1258–59. The Court therefore did not decide whether, as a question of first impression, the Constitution required such a rule. The holding in *Parks* is only that no such rule clearly existed under the Court's previous interpretations of the Eighth and Fourteenth Amendments. *Id.* at 489, 110 S.Ct. at 1260–61.

The United States Supreme Court's refusal to interpret its prior cases as compelling the rule urged by Parks, and its view of contrary state court rulings as "well-considered precedents," *see id.* at 486, 110 S.Ct. at 1258–59, undoubtedly casts doubt on the strength of Young's federal constitutional argument. Yet until the Supreme Court actually considers the merits of the claim, I deem it this court's obligation to determine for itself what the federal consti-

4. I am aware that the United States Supreme Court seems to be making exactly this suggestion in *Saffle v. Parks,* discussed below. I can only hope that the Supreme Court's apparent readiness to undertake an unacknowledged yet complete retrenchment from *Brown* is as transitory as was the *McGautha* Court's unwillingness to require that death penalty statutes provide specific guidelines for determining who could be put to death. And I emphasize that the retrenchment has not yet occurred, as I explain later.

tution requires regarding this issue of first impression. The philosophy underlying this country's approach to capital punishment in the past two decades includes a recognition that sympathetic responses by the sentencer to sentencing evidence are entirely appropriate. As the Supreme Court has stated, "The right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless *the sentencer* was also permitted to give effects to its consideration." *Penry,* 492 U.S. at 321, 109 S.Ct. at 2948 (emphasis added). The Court has also said, "The sentencer ... may determine the weight to be given relevant mitigating evidence." *Eddings,* 455 U.S. at 114–15, 102 S.Ct. at 877. I am at a loss to understand how these principles can be squared with an instruction that tells sentencing juries to accord no weight to any sympathetic or compassionate feelings that evidence may produce. The Tenth Circuit arrived at precisely this conclusion when it reached the merits of the claim in the *Parks* case, *Parks v. Brown,* 860 F.2d 1545, 1554–56 (10th Cir. 1988), *rev'd sub nom. Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), as has the California Supreme Court, *see, e.g., People v. Wade,* 43 Cal.3d 366, 233 Cal.Rptr. 48, 59, 729 P.2d 239, 250 (1987), *vacated by* 44 Cal.3d 975, 244 Cal. Rptr. 905, 750 P.2d 794 (1988); *People v. Lanphear,* 36 Cal.3d 163, 203 Cal.Rptr. 122, 124, 680 P.2d 1081, 1083 (1984).

In an apparent attempt to reconcile these principles, the lead opinion quotes dictum from *Parks* for the proposition that individualized, nonarbitrary capital sentencing requires a "moral inquiry," not an "emotional response." [5] It is specious, however, to suggest that sympathy, mercy, pity, or compassion does not constitute part of a "moral" response to evidence in aggravation and mitigation. A moral weighing is not an objective weighing; while it should not be based on *raw* emotion, it does require each juror to respond in human terms to the sentencing evidence in assessing the unique humanity of the defendant. It is not possible for jurors properly to conduct this exercise without reference to their feelings. Yet this is precisely what an antisympathy instruction asks jurors to attempt.

Ironically, the lead opinion today affirms the antisympathy instruction while relying on the United States Supreme Court's recent decision in *Payne v. Tennessee,* holding that "justice due to the accuser" supports the use of victim impact evidence at the penalty phase. 501 U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The inevitable (and, I am sure, intended) effect of victim impact evidence is to arouse a sentencer's natural human feelings, and the *Payne* standard now permits juries to consider the "emotional impact" of the crime on the victim's family. *See id.* 501 U.S. at ——, ——, 111 S.Ct. at 2604, 2609, 115 L.Ed.2d 720. *Payne* observed that prohibiting the use of victim impact evidence "deprives the State of the full moral force of its evidence." *Id.* 501 U.S. at ——, 111 S.Ct. at 2608, 115 L.Ed.2d 720. Of course, this "full moral force" arises in part precisely because of the emotional response the victim evidence produces, both in terms of sympathy for the victims and disgust, outrage, and a desire for vengeance directed toward the defendant. The lead opinion today would permit the state to benefit from the full moral force of its evidence while denying the same benefit to defendant. This result is doubly ironic given the heightened obligation our criminal justice system has to protect the rights of defendants. Accordingly, I conclude that federal constitutional safeguards should prohibit antisympathy instructions that deny the propriety of a sentencer's compassionate responses to a defendant's mitigating evidence.

I also believe that Utah law compels us to prohibit antisympathy instructions that mislead the jury. I reach this conclusion in part because of the high regard that this

5. The quoted language originated in Justice O'Connor's concurring opinion in *California v. Brown.* Her concurrence clearly implied that an improper antisympathy instruction could mislead jurors into ignoring the full import of the mitigating evidence. 479 U.S. at 545–46, 107 S.Ct. at 841–42.

state places "on the value of all human life and the humanity of every human being." *State v. Holland,* 777 P.2d 1019, 1028 (Utah 1989). I also base this conclusion on prior cases in which we have implicitly approved the persuasive federal constitutional analysis in the line of cases from *Gregg* through *Eddings. See, e.g., Holland,* 777 P.2d at 1028; *State v. Lafferty,* 749 P.2d 1239, 1259 (Utah 1988). Because the principles contained in this line of cases reflect the protections this court ought also to afford to capital defendants, I would explicitly incorporate those principles today, regardless of the apparent retrenchment from them by the current United States Supreme Court, as guidance for interpreting the cruel and unusual punishment clause of the Utah Constitution.

Furthermore, I reach this conclusion because of our familiar pronouncements in *State v. Wood,* 648 P.2d 71 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982), regarding the requirements of the Utah death penalty statute. We wrote:

> [T]he sentencing authority must decide ... how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors.... [To impose death,] upon consideration of all the circumstances relating to this defendant and this crime the sentencing authority must be convinced beyond a reasonable doubt that the death penalty should be imposed.

*Id.* at 83–84. We expounded upon the *Wood* standard in *Holland,* explaining that in Utah the factors a capital sentencer weighs "are not, in truth, weighable.... These factors have largely subjective value and therefore vary in their 'weight' or persuasiveness for or against the death penalty with each judge or juror according to his or her own background and prior experiences." 777 P.2d at 1028. Consequently, I conclude that trial courts usurp the sentencing jury's role when they instruct the jury to avoid sympathy in the sentencing phase of a capital trial. This state's profound respect for each person's humanity and the obligation of the sentencer to bring her or his own background and human experience to bear in assessing the persuasiveness of every aspect of the defendant's mitigation render it error to prohibit the influence of sympathy in weighing penalty options.

Having concluded that this court should not countenance jury instructions that may preclude the sentencer from considering whatever sympathy the mitigating evidence produces, I examine the propriety of the particular instructions given in this case. This inquiry requires determining "what a reasonable juror could have understood the charge as meaning." *California v. Brown,* 479 U.S. at 541, 107 S.Ct. at 839. When reviewing potential error in capital sentencing instructions, appellate courts must remand for resentencing unless they "can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground." *Mills v. Maryland,* 486 U.S. 367, 377, 108 S.Ct. 1860, 1866–67, 100 L.Ed.2d 384 (1988).

At the guilt stage, the trial court instructed the jurors that they must deliberate "uninfluenced by pity for the defendant or by passion or prejudice against him.... The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." This instruction has been referred to in this case as the antisympathy instruction. Clearly such an instruction was proper at the guilt stage. At the sentencing stage, however, the trial court instructed the jury that instructions from the guilt stage continued to "apply in this penalty phase." As at the guilt stage, the jurors had written copies of all the instructions with them in the jury room during their sentencing deliberations. As a result, a reasonable juror easily could and would have concluded that it would be inappropriate to feel pity for, or to empathize or sympathize with, defendant when determining whether the death sentence should be imposed. Jurors disposed toward death, for example, could legitimately use the antisympathy instruction to disparage the judgment of holdout jurors. Thus, the instruction was improper.

In *California v. Brown,* the United States Supreme Court upheld an antisympathy instruction containing language identical to part of the antisympathy instruction in this case. The instruction at issue in *Brown* told the jury not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." 479 U.S. at 542, 107 S.Ct. at 840. I do not understand nor do I find persuasive the analysis by which the *Brown* majority concluded, contrary to the California Supreme Court, that reasonable California jurors would not have misunderstood this instruction as interfering with their consideration of mitigating evidence. Furthermore, although the antisympathy instruction in Young's sentencing hearing contained the same language, it also included a demand not found in the language reviewed in *Brown* that the jury be "uninfluenced by pity for the defendant." This additional element changes the context in which we must interpret the charge. The *Brown* majority concluded that, taken as a whole, the instruction only prohibited the jury from being influenced by "*mere* sympathy." *Id.* This interpretation is baffling because in addition to its obvious and sensible consequence—that jurors properly may be influenced by sympathy "rooted in the aggravating and mitigating evidence," *id.*—it similarly suggests that jurors also may properly be influenced by, for example, conjecture rooted in the evidence, prejudice rooted in the evidence, or public opinion rooted in the evidence, and must only avoid the influence of "mere" conjecture, "mere" prejudice, and "mere" public opinion. This is a construction to which I cannot subscribe. The adjective "mere" must be read as applying only to "sentiment," the first term in the list, in order for the subsequent terms to make sense. *See id.* at 549, 107 S.Ct. at 843 (Brennan, J., dissenting). The Court also concluded, however, that it was "highly unlikely that any reasonable juror would almost perversely single out the word 'sympathy' from the other nouns." *Id.* at 542, 107 S.Ct. at 840.

Regardless of whether this conclusion was correct in *Brown,* the presence in this case of an additional sentence instructing the jurors to avoid pity for defendant presents us with a different question and makes it highly likely that a conscientious juror in fact would notice the word "sympathy" in the list of otherwise impermissible factors. Accordingly, I refuse to view *California v. Brown* as dispositive of the federal constitutional issue or persuasive regarding the state statutory and constitutional issues relating to the propriety of the antisympathy instruction before us. There is a substantial possibility that the jury may have reached its verdict on improperly limited grounds; a fortiori, there is a consequent risk that Young's death penalty was imposed in spite of factors that may have called for a less severe penalty. "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965. It is also incompatible with article I, section 9 of the Utah Constitution, and we should so hold.

A capital sentencing jury makes a moral determination, not a factual one. Although the determination must be fact based, the evaluation of those facts may and should involve emotional responses of anger, retribution, sympathy, and mercy. In contrast, these responses should not influence the determination of guilt. Jury instructions must not confuse these two roles. The original purpose of requiring a separate penalty phase in capital trials was to avoid arbitrary sentencing decisions based solely on raw emotion, not to strip sentencing of all human feeling. We expect sentencing juries to express the "conscience of the community":

> [O]ne of the most important functions any jury can perform in making such a selection [between life and death] is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society."

*Witherspoon v. Illinois,* 391 U.S. 510, 519 & n. 15, 88 S.Ct. 1770, 1775 & n. 15, 20

L.Ed.2d 776 (1968) (citations omitted); *see Woodson v. North Carolina,* 428 U.S. at 295, 96 S.Ct. at 2986–87. A conscience without room for sympathy and pity in meting out punishment is an ailing conscience indeed.

Accordingly, I agree with Young's challenge to the extent it alleges error in the use at the penalty phase of the otherwise proper antisympathy instruction of the guilt phase. Furthermore, I am persuaded by the reasoning in Justice Stewart's opinion concluding that juries should be affirmatively instructed regarding the proper function of sympathy (or mercy) in the penalty phase. I therefore join in that conclusion.

## IV. GUILTY AND MENTALLY ILL INSTRUCTION AND VERDICT

(lead opinion part X)

The lead opinion erroneously infers that rule 21.5 of the Utah Rules of Criminal Procedure requires a defendant to assert a defense of not guilty by reason of insanity as a condition precedent for the availability of a guilty and mentally ill (GAMI) instruction and verdict. The language and history of the rule do not support this conclusion. Rule 21.5 reads in pertinent part:

> (2)(a) If a defendant at trial asserts a defense of "not guilty by reason of insanity," the court shall instruct the jury that it may find the defendant guilty, not guilty by reason of insanity, guilty and mentally ill, guilty of a lesser offense, or guilty of a lesser offense due to mental illness but not an illness which would warrant full exoneration.

The foregoing language specifies what instructions the trial court must give about available verdicts *when* a defense of "not guilty by reason of insanity" (NGBRI) has been asserted. It does not preclude the availability of any of those verdict options when the specific NGBRI defense has not been asserted. The availability of instructions and related verdicts supported by the evidence is absolutely contemplated by rule 21(a):

> The verdict of the jury shall be either "guilty" or "not guilty," "not guilty by reason of insanity," "guilty and mentally ill," or "not guilty of the crime charged but guilty of a lesser included offense," or "not guilty of the crime charged but guilty of a lesser included offense and mentally ill" provided that when the defense of mental illness has been asserted and the defendant is acquitted on the ground that he was insane at the time of the commission of the offense charged, the verdict shall be "not guilty by reason of insanity."

Utah's Insanity Defense Act, which introduced the option of a GAMI verdict, was adopted in 1983 as part of a nationwide movement to "reform" the insanity defense. *See* R.D. Mackay, *Post-Hinckley Insanity in the U.S.A.,* 1988 Crim.L.Rev. 88, 88–90 [hereinafter R.D. Mackay]; Christopher Slobogin, *The Guilty But Mentally Ill Verdict: An Idea Whose Time Should Not Have Come,* 53 Geo. Wash.L.Rev. 494, 494–96 (1985). Utah was one of only three states to abolish the traditional insanity defense, Utah Code Ann. § 76-2-305 (1978) (repealed 1983), by limiting the mental illness defense to conditions that negate the mens rea necessary for conviction of the crime. R.D. Mackay at 90. Although our rules still refer to "not guilty by reason of insanity" pleas and verdicts, section 76-2-305 as reenacted makes it clear that the defense is limited to an absence of mens rea:

> (1) It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness is not otherwise a defense.
>
> (2) The defense defined in this section includes the defenses known as "insanity" and "diminished mental capacity."

Utah Code Ann. § 76-2-305 (1992).

Thus, in Utah a defendant found NGBRI is, in effect, not guilty because he or she did not possess the mental state required to commit the offense charged. There is no assessment of a defendant's capacity to appreciate the wrongfulness of

his or her conduct or to conform his or her behavior to the requirements of law. A good deal of critical commentary has been directed at this approach, *see, e.g.,* R.D. Mackay at 92, but the legislature has maintained it through recent revisions of the statute.

The concept of GAMI was introduced as part of the 1983 revision eliminating the traditional insanity defense:

> "Guilty and mentally ill" is a deliberate variation of the "guilty *but* mentally ill" provision adopted by some states. The [Utah] legislative committee thought that the words "guilty but mentally ill" implied a causal connection between the mental illness and the crime. That implied connection, however, is inappropriate under the Utah statute because "guilty and mentally ill" *focuses on the defendant's state of mind at the time of sentencing, regardless of his state of mind at the time of the crime.* Interview with Ronald N. Boyce, member of Legislature's Task Force Committee, Salt Lake City, Utah (Sept. 9, 1983).

*Utah Legislative Survey—1983,* 1984 Utah L.Rev. 115, 156 n. 265 (citations omitted) (emphasis added).

Thus, as we said in *State v. DePlonty,* 749 P.2d 621, 626 (Utah 1987), "A judgment of guilty and mentally ill does not serve to exonerate or excuse the defendant; rather, the offender found guilty and mentally ill is held accountable for his criminal conduct, yet because of his mental illness, may need specialized treatment." We went on to state:

> A defendant who suffers from a mental disease or defect and, therefore is mentally ill as defined by Utah Code Ann. § 76–2–305 and is found to possess the state of mind necessary to commit the crime charged, despite his illness, should be found guilty and mentally ill as provided by the Act.

*Id.* at 627.

During Young's trial, the prosecutor objected to the admission of any evidence regarding defendant's mental illness. He stated, "[T]here are only two areas in which mental health opinions can be entered into evidence, one is on a plea of insanity, and two is intent to rely on diminished capacity, neither of which is present before the court." Because the GAMI verdict does not relate to the defendant's state of mind at the time of the crime, this position is wrong. The statute contemplates that evidence of mental illness not amounting to insanity or diminished capacity (now consisting of a "no mens rea due to mental illness" defense) is relevant to sentencing considerations. In this case, the evidence had additional relevance to rebut inferences regarding Young's mental state raised by some of his own prior statements to the police and in the pro se answer he filed in the wrongful death case brought by the victim's family.

The trial judge thus properly admitted the testimony of a neuro-psychologist who had examined Young and concluded that he suffers from "an organic brain syndrome personality syndrome. What that really means is that he has diffuse brain damage.... [T]here's a history of repeated head injuries as a child, some recent head injuries as an adult, in addition to numerous developmental problems that are noted in his medical record." The psychologist opined that Young has a "mental disease or defect" that places him between the first and fifth percentile "when it comes to ... most areas of cognition [thinking, problem solving, reasoning, being able to employ good judgment, being able to learn from one's mistakes], specifically his memory."

■ Subsequent to the testimony summarized above, defense counsel requested an instruction and verdict form on "guilty and mentally ill." The prosecution objected, arguing that the statutory structure was such that a GAMI verdict was a form of a "lesser and included" verdict relative to the plea of not guilty by reason of insanity, which defendant had not asserted. Again, the prosecution's position is inconsistent with the GAMI verdict's focus on sentencing rather than on mens rea. Defense counsel clarified the issue by acknowledging error in the original version of the proposed instruction (which referred to defendant's mental illness at the time of

the commission of the offense) and by moving to amend the instruction "to state the jury should consider whether the defendant was guilty and mentally ill at the time of the trial. Because in our view, ... the guilty and mentally ill provisions of the statute are directed toward the issue of sentencing more than the issue of guilt or innocence." The trial judge erroneously denied the motion and refused to give the instruction.

It may be true, as the trial judge observed, that the GAMI verdict does not "fit" our capital sentencing scheme very well because we separate the guilt and penalty phases. Nevertheless, the statute and rules do not exclude its use in a capital case. In practice, it is usually the state, rather than the defendant, that wants the perceived benefits of the availability of the GAMI verdict as an alternative to a verdict of NGBRI. Rule 21.5 accommodates the state's position by *mandating* a GAMI instruction and verdict whenever the defendant has relied on a mental illness defense. The rule does not, however, preclude the defendant from benefitting, for different reasons, from the GAMI option when a mental illness defense has not been used. If the legislature had chosen the "guilty *but* mentally ill" version, which may imply a causal connection between the mental illness in question and the commission of the crime, the state's position would be stronger, since the use of a mental illness defense would seem to be a necessary predicate for letting the jury assess the defendant's mental health as of the time the crime was committed. Because in Utah the GAMI verdict is relevant solely for sentencing, neither logic nor the statute or rules dictate that the defendant assert a mental illness defense to the crime in order to receive whatever benefit the GAMI verdict may afford.

In practical effect, the average criminal defendant in a noncapital case tried to a jury is unlikely to perceive much benefit in asking for a GAMI verdict in the absence of a mental illness defense.[6] There is no more real guarantee of mental health assessment and treatment for a defendant found GAMI than for one found guilty who then raises his or her mental illness as an issue at sentencing. Both classes of defendants are eligible for testing and alternative incarceration in mental facilities; the only difference is that the assessment process is automatically triggered for the GAMI defendant, whereas the ordinary "guilty" defendant will have to raise mental illness sua sponte and perhaps carry some additional burden in producing evidence.

In a capital case like the present one, significant psychological advantage may inure to a defendant who can argue to the jury in the guilt phase that a GAMI verdict is justified. Although the law provides that a defendant found GAMI may be sentenced to any punishment lawful for one found simply guilty, including death, a capital defendant who has been officially labelled "mentally ill" by the fact finder has possibly achieved a tactical advantage as the penalty phase begins, because the jury has found a significant mitigating factor. This tactical advantage, of course, may do no more than counterbalance the similar advantage enjoyed by the state, which has already accomplished a jury finding of at least one aggravating circumstance, but it may be an advantage nonetheless. As discussed above, there is no basis in the statute, our rules, or logic to deny any defendant an instruction on GAMI where the evidence supports it. Furthermore, fundamental fairness requires that such an instruction be available to a capital defendant, for whom sentencing considerations are paramount once a verdict of guilty has been reached.

For the foregoing reasons, I would hold that the trial judge committed reversible error in refusing to instruct the jury that a GAMI verdict was an available option. There can be no question of harmless

6. The availability of a GAMI verdict, like a guilty *but* mentally ill verdict, may serve to elicit more guilty *pleas*. *See* Ira Mickenberg, *A Pleasant Surprise: The Guilty But Mentally Ill Verdict Has Both Succeeded in its Own Right and Successfully Preserved the Traditional Role of the Insanity Defense,* 55 U.Cin.L.Rev. 943, 989 (1987).

error when the court's decision deprived the defendant of the possibility of a jury finding that he was mentally ill. The impact that such a verdict would have had on the jury's penalty deliberations is, of course, incalculable, but as I have discussed more fully in the section on Young's statutory right to allocution (part II.A above), given the subjective quality of the moral judgment made by a capital sentencing jury, it cannot be argued that such a fact would be insignificant, especially as applied in the second phase of the *Wood* analysis. *See State v. Wood,* 648 P.2d at 71..

## V. ADMISSION OF EVIDENCE DURING GUILT PHASE

(lead opinion part VIII)

I concur in the result the lead opinion reaches on these issues. However, I disagree with its reason for upholding the trial court's refusal to permit Young's attorney to cross-examine witness Angela Johnson regarding the victim's prior sexual activity. The lead opinion asserts that evidence of the victim's prior sexual activity was irrelevant because Young "admitted raping the victim" and "did not seriously dispute the issue of consent." Yet a careful appraisal of Young's entire confession, in light of his obvious mental and emotional deficiencies and the physical evidence, reveals striking ambiguities in the evidence about the nature of defendant's sexual contact with the victim. Furthermore, in opening argument Young's counsel acknowledged the rape confession but stated that when the jury looked beyond the words themselves they would be troubled about Young's actual motivation and extent of control. Young's attorneys therefore may have had legitimate reasons to contest the issue of consent. The impact of Johnson's testimony in resolving these ambiguities might have been altered if the court had permitted defendant to rebut her claims of the victim's "high standards."

Nevertheless, in my view the trial court acted within its discretion in refusing this line of questioning for two reasons. First, although Young argues that Johnson suggested in direct testimony that the victim "would not voluntarily engage in sexual relations," in fact the witness never made or implied this claim on direct examination by the prosecution; only in response to defense cross-examination did the witness claim that the victim "had very high standards" and was not promiscuous and would not become "romantically involved with someone." On direct examination, the witness testified regarding only her appraisal of the victim's romantic interest *in this particular defendant.*[7] Second, the proffered testimony would have addressed the victim's relationship with her brother-in-law. Because the direct examination testimony related only to the witness's assessment of the victim's specific interest in Young, testimony about the victim's relationship with her brother-in-law would have had little relevance. I accordingly concur in the result on this point.

## VI. DEATH QUALIFICATION OF THE JURY

(lead opinion part IV)

Young appeals from the trial court's denial of his pretrial "Motion to Preclude Death Qualification of the Jury Venire." The United States Supreme Court has held that the practice of "death qualification," or excluding from capital juries an entire class of potential jurors who share attitudes in opposition to the death penalty, does not violate the federal constitution. *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). As the lead opinion acknowledges, however, this court has not previously analyzed whether death qualification violates the Utah Constitution. The lead opinion then summarily concludes that prior decisions of this court analyzing death qualification under the federal constitution suffice to support the

7. I note, however, that because the prosecution did not elicit testimony about the victim's general sexual behavior (and suggested as much to the trial court in opposing defendant's proffered cross-examination), I view with great disfavor the prosecution's use of this testimony in its closing argument at the penalty phase.

holding that death qualification also comports with the Utah Constitution. Because I believe both that our prior analyses were flawed and that we should not tether the meaning of the Utah Constitution to the construction the United States Supreme Court gives the federal constitution, I would give the Utah constitutional issue full and independent treatment.

To defend its decision, the lead opinion relies on the rationale we articulated in *State v. Moore,* 697 P.2d 233 (Utah 1985), one of our previous analyses of death qualification. I believe we erred in both aspects of our *Moore* rationale and that the lead opinion today repeats the same two errors. In *Moore,* we faced the claim that by excluding from the jury all potential jurors who at the penalty phase could never vote to impose the death penalty (*Witherspoon*-excludables, or "WEs"),[8] death qualification produced a jury disposed to convict at the guilt phase. In the face of then-existing empirical support for this claim, we responded that even if the claim were true, Utah counterbalanced this effect at least in part by also excluding from capital juries those individuals who would always vote to impose the death penalty upon a defendant convicted of first degree murder (automatic death penalty jurors, or "ADPs"). *Id.* at 237. Our first error was in making a factual assumption (about the counterbalancing effect of ADPs) without the benefit of any empirical evidence. In fact, developments in empirical research since *Moore* continue to show a statistically significant likelihood that death qualification frequently will produce conviction-prone juries *regardless* of any counterbalancing effect of excluding ADPs. Contrary to this research, the lead opinion persists in the opposite assumption. In subsections A, B, and C, below, I discuss the empirical evidence in detail.

The second error in the *Moore* opinion was our assertion that legislative policy provided an additional reason for upholding Utah's death-qualification process. We stated that "the Legislature has established capital punishment as one of the options in a first degree murder case. Clearly the legislative policy would be undermined if jurors were allowed to sit who by conscience could never impose the death penalty." *Id.* I submit that we missed the point. Those challenging the death-qualifi-

8. In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court held that in capital cases, the prosecution could not challenge for cause jurors merely scrupled against or hesitant to impose the death penalty. *Id.* at 522, 88 S.Ct. at 1777. The opinion did not disturb the right of the prosecution to challenge two categories of jurors: those whose "reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt" and those who "could never vote to impose the death penalty." *Id.* at 513–14, 522 n. 21, 88 S.Ct. at 1772–73, 1777 n. 21. Those jurors still removable for cause after *Witherspoon* have come to be known as "*Witherspoon*-excludables." *See, e.g., McCree,* 476 U.S. at 167 n. 1, 106 S.Ct. at 1761 n. 1. The two categories often are distinguished by referring to jurors in the first category as "nullifiers." *Id.* at 172, 106 S.Ct. at 1764. In light of *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the second category now includes all those jurors whose attitudes about capital punishment "would prevent or substantially impair the performance of [the juror's] duties as a juror." *Id.* at 424, 105 S.Ct. at 852.

This opinion uses the term "*Witherspoon*-excludable," or WE, to refer only to the second category. Critics of the use of death-qualified juries at the guilt phase of capital trials condemn only the exclusion of this second category of WEs. Individuals in this category are perfectly able to serve as fair and impartial jurors in the guilt phase, yet are excluded from the guilt phase because of their inability later to serve at the penalty phase. It is this practice that I conclude violates capital defendants' constitutional rights.

I would continue to permit, however, the exclusion from all phases of capital trials those jurors in the first category. To this end, I would also permit *carefully limited* questioning, designed to identify these nullifiers. Nullifiers are by definition unable to fulfill their obligation as jurors to make an impartial decision at either the guilt or penalty phase, and therefore, their exclusion from all stages of a capital trial is proper. But in light of the discussion in subsection C below, I stress that courts must identify nullifiers with a minimum of inquiry concerning their attitudes toward the death penalty. Justice Marshall and others have suggested the ease with which courts can do this. *See McCree,* 476 U.S. at 203, 106 S.Ct. at 1780–81; *Grigsby v. Mabry,* 569 F.Supp. 1273, 1310 (E.D.Ark.1983); Bruce J. Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis,* 81 Mich.L.Rev. 1 (1982).

cation process, including Young, do not argue that they have a right to present themselves for *sentencing* before a jury that is not death qualified; rather, they claim a right to have their *guilt or innocence* determined by a jury not death qualified.[9] Properly analyzed, the question in this case is whether under Utah's capital punishment scheme (which explicitly contemplates the use of a separate sentencing jury in some circumstances, *see* Utah Code Ann. § 76-3-207(1)), Young and all capital defendants have a constitutional right to a separate sentencing jury. This issue simply does not implicate the policy concern we expressed in *Moore.* The lead opinion similarly strikes far from the mark when it writes of the "significant state interest in seating jurors willing to abide by the law and follow their oath as jurors." Although the stated interest undoubtedly is significant, use of separate juries would in no way compromise this interest.

The one plausible significant interest the state does have in death qualifying a capital jury prior to commencing the guilt phase is an interest in avoiding the judicial inefficiency of empaneling two juries. But as I indicate in subsection D below, the state could minimize this inefficiency in several ways, and the remaining state interest—marginal improvements in judicial efficiency—cannot legitimately be called "significant" when compared to the constitutional rights at risk.

Accordingly, I believe the death-qualification issue merits full consideration. I first discuss the potential biasing effect of excluding certain fair and impartial jurors—WEs—from guilt phase juries solely because of their attitudes toward capital punishment. I then examine the complete failure of the accompanying exclusion of ADPs to counterbalance this effect. Finally, I discuss the prejudicial impact of the *process* of death qualification itself on those jurors who survive the process.

### A. *Exclusion of WEs*

None of our prior opinions regarding death qualification actually address the empirical data establishing the conviction-prone nature of the class of jurors whose attitudes make them "death qualified." Even in *Moore,* we merely posited that this data "may well be correct" and then rejected the claim on other grounds. 697 P.2d at 237. Therefore, I deem it appropriate to summarize briefly the accumulated evidence, which now includes over a dozen additional studies not before us in *Moore.*[10]

9. If defendant Moore in fact asserted a right to be *sentenced* by a nondeath-qualified jury, then in the instant case we face a new issue. If, however, Moore did not assert such a right, our legislative policy argument in *Moore* missed the mark.

10. For recent studies supporting the claim that death-qualified juries may be conviction-prone, see Claudia L. Cowan et al., *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation,* 8 Law & Hum.Behav. 53 (1984); Robert Fitzgerald & Phoebe C. Ellsworth, *Due Process vs. Crime Control: Death Qualification and Jury Attitudes,* 8 Law & Hum.Behav. 31 (1984); Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process,* 8 Law & Hum.Behav. 121 (1984); Irwin A. Horowitz & David G. Seguin, *The Effects of Bifurcation and Death Qualification on Assignment of Penalty in Capital Crimes,* 16 J. Applied Soc.Psychol. 165 (1986); Joseph B. Kadane, *After Hovey: A Note on Taking Account of the Automatic Death Penalty Jurors,* 8 Law & Hum.Behav. 115 (1984); James Luginbuhl & Kathi Middendorf, *Death Penalty Beliefs and Jurors' Responses to Aggravating and Mitigating Circumstances in Capital Trials,* 12 Law & Hum.Behav. 263 (1988); Marilyn D. McShane et al., *Eligibility for Jury Service in Capital Trials: A Question of Potential Exclusion and Bias,* Texas Bar J., April 1987, at 365; Gary Moran & John C. Comfort, *Neither "Tentative" nor "Fragmentary": Verdict Preference of Impaneled Felony Jurors as a Function of Attitude Toward Capital Punishment,* 71 J. Applied Psychol. 146 (1986); Michael L. Neises & Ronald C. Dillehay, *Death Qualification and Conviction Proneness: Witt and Witherspoon Compared,* 5 Behav. Sci. & the L. 479 (1987); Rick Seltzer et al., *The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example,* 29 How.L.J. 571 (1986); David G. Seguin & Irwin A. Horowitz, *The Effects of "Death Qualification" on Juror and Jury Decisioning: An Analysis from Three Perspectives,* 8 L. & Psychol.Rev. 49 (1984); William C. Thompson et al., *Death Penalty Attitudes and Conviction Proneness: The Translation of Attitudes Into Verdicts,* 8 L. & Hum.Behav. 95 (1984). *But see* Rogers Elliott & Robert J. Robinson, *Death Penalty Attitudes and the Tendency to Convict or Acquit,* 15 L. & Hum.Behav. 389 (1991); J.L. Bernard & W.O. Dwyer, *Witherspoon v. Illinois:*

For over twenty-five years, empiricists have studied the correlation between an individual's disposition to impose capital punishment and that individual's attitudes toward criminal defendants and the criminal justice system. As Justice Marshall observed, "The chief strength of [these studies] lies in the essential unanimity of the results obtained by researchers using diverse subjects and varied methodologies." *Lockhart v. McCree,* 476 U.S. 162, 189, 106 S.Ct. 1758, 1773, 90 L.Ed.2d 137 (1986) (Marshall, J., dissenting). Describing these results, Justice Marshall wrote:

> The data strongly suggest that death qualification excludes a significantly large subset—at least 11% to 17%—of potential jurors who could be impartial during the guilt phase of trial. Among the members of this excludable class are a disproportionate number of blacks and women.
>
> The perspectives on the criminal justice system of jurors who survive death qualification are systematically different from those of the excluded jurors. Death-qualified jurors are, for example, more likely to believe that a defendant's failure to testify is indicative of his guilt, more hostile to the insanity defense, more mistrustful of defense attorneys, and less concerned about the danger of erroneous convictions. This pro-prosecution bias is reflected in the greater readiness of death-qualified jurors to convict or to convict on more serious charges. And, finally, the very process of death qualification—which focuses attention on the death penalty before the trial has even begun—has been found to predispose the jurors that survive it to believe that the defendant is guilty.

*Id.* at 187–88, 106 S.Ct. at 1772–73 (Marshall, J., dissenting) (citations omitted). In essence, some two dozen studies suggest that jurors who withstand death qualification tend to be significantly less solicitous of a defendant's due process rights and significantly more eager to convict. As one report stated, "From a social scientist's viewpoint the empirical question [whether death-qualified juries are biased against the defendant on the issue of guilt] has been conclusively answered." Rick Seltzer et al., *The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example,* 29 How.L.J. 571, 581 (1986).

As Justice Marshall also suggested, "The true impact of death qualification on the fairness of a trial is likely even more devastating than the studies show." *McCree,* 476 U.S. at 190, 106 S.Ct. at 1774 (Marshall, J., dissenting). This is so, Justice Marshall explained, for two reasons: First, under *Wainwright v. Witt,*[11] courts may actually exclude for cause a broader class of persons than most of the studies assumed would be excluded under *Witherspoon.*

*The Court Was Right,* 8 L. & Psychol.Rev. 105 (1984).

For earlier studies supporting the claim that death-qualified juries may be conviction-prone, see Virginia R. Boehm, *Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias,* 1968 Wis. L.Rev. 734; Edward J. Bronson, *On the Conviction Proneness and Representativeness of the Death–Qualified Jury: An Empirical Study of Colorado Veniremen,* 42 U.Colo.L.Rev. 1 (1970); Edward J. Bronson, *Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California,* 3 Woodrow Wilson L.J. 11 (1980); Faye Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law,* 5 Harv.C.R.—C.L.L.Rev. 53 (1970); Louis Harris & Assocs., *Study No. 2016* (1971), *in* Welsh S. White, *The Constitutional Invalidity of Convictions Imposed by Death Qualified Juries,* 58 Cornell L.Rev. 1176, 1185–86 (1973); George L. Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process,* 84 Harv.L.Rev. 567 (1971); *see also* M.J. Lerner, *The Belief in a Just World,* New York: Plenum, 1981 *and* Z. Rubin & L.A. Peplau, *Who Believes in a Just World?,* 31 J.Soc.Issues 65 (1975), *cited in* Luginbuhl & Middendorf, *supra;* W.C. Wilson, *Belief in Capital Punishment and Jury Performance* (unpubl. manuscript, University of Texas, 1964) *and* H. Zeisel, *Some Data on Juror Attitudes Toward Capital Punishment,* Center for Studies in Criminal Justice, University of Chicago Law School (monograph 1968), *cited in Witherspoon,* 391 U.S. at 516 n. 10; unpubl. studies summarized in *Grigsby v. Mabry,* 569 F.Supp. 1273, 1298–1308 (E.D.Ark. 1983).

11. For an explanation of *Witt's* modification of *Witherspoon,* see *supra* note 8.

Second, the prosecution's exercise of peremptory challenges to excuse additional jurors not suitably committed to capital punishment will exclude greater numbers of those individuals statistically likely to possess heightened sensitivity to due process protections. *Id.* at 190–92, 106 S.Ct. at 1773–75 (Marshall, J., dissenting).

After extensively reviewing the evidence, at least three lower federal courts had concluded prior to *Lockett* that death qualification creates an unjustifiable risk of empaneling a conviction-prone jury. *See Grigsby v. Mabry,* 758 F.2d 226, 237 (8th Cir.1985), *rev'd sub nom. Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Keeten v. Garrison,* 578 F.Supp. 1164, 1167 (W.D.N.C.1984), *rev'd,* 742 F.2d 129 (4th Cir.1984); *Grigsby v. Mabry,* 569 F.Supp. 1273 (E.D.Ark.1983), *aff'd,* 758 F.2d 226 (8th Cir.1985), *rev'd sub nom. Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Unfortunately, despite Justice Marshall's lucid dissent in *McCree,* the majority of the Supreme Court in that case dismissed the studies, holding that even if the empirical conclusions were correct, the resulting conviction-prone nature of the death-qualified jury did not violate the federal constitution. 476 U.S. at 173, 106 S.Ct. at 1764–65.[12] The Court explained:

> [T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

*Id.* at 184, 106 S.Ct. at 1770–71.

*McCree* has settled the federal claim for now, but I do not find *McCree* persuasive with respect to the Utah constitutional issue. Nor am I the first state jurist to believe that state constitutions may still prohibit death qualification of the guilt phase jury. In a 1987 New Jersey Supreme Court case, Justice Handler would have held that death qualification violated state constitutional guarantees of a fair and impartial jury. *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 348 (1987) (Handler, J., dissenting). Justice Handler reviewed the empirical evidence regarding the conviction-prone nature of these juries and then pointedly challenged his colleagues: "The question, ultimately, is whether the state's putative interest in 'neutrality' on the issue of penalty may be vindicated at the expense of the defendant's interest in a fair trial if both interests may be accommodated by using different procedures." *Id.* at 347–48. One of his colleagues, although not ready to hold that death qualification violated the state constitution, insisted that "in the exercise of our judicial supervision over the criminal justice system in New Jersey," the New Jersey court should prohibit death qualification because it "is inconsistent with New Jersey's traditional sense of fairness and justice." *Id.* at 295 (O'Hern, J., concurring in the result). One year later, Justice Handler added: "While no one insists that procedure can be made perfect, in no other context has this Court accepted the proposition that mere prosecutorial convenience—or *any* state interest—justifies procedures that render the jury 'somewhat more "conviction prone."' " *State v. Bey,* 112 N.J. 123, 548 A.2d 887, 923 (1988) (Handler, J., dissenting) (quoting *McCree,* 476 U.S. at 173, 106 S.Ct. at 1764–65). Justice Handler continues to become more adamant as the evidence accumulates. *See State v. Marshall,* 123 N.J. 1, 586 A.2d 85, 199–204 (1991) (Handler, J., dissenting); *State v. Hunt,* 115 N.J. 330, 558 A.2d 1259, 1289–97 (1989) (Handler, J., dissenting).

We must examine closely the cost of ignoring the implications of the empirical data. In *Witherspoon,* the United States

12. Although the Supreme Court's opinion also included several pages of dicta challenging some of the empirical conclusions, 476 U.S. at 168–73, 106 S.Ct. at 1762, Justice Marshall's dissent more than responded to these challenges, *id.* at 189–92, 106 S.Ct. at 1773–75, and many other commentators have echoed Justice Marshall's criticism. *See, e.g.,* Ian T. Moar, *Death Qualified Juries in Capital Cases: The Supreme Court's Decision in Lockhart v. McCree,* 19 Colum.Hum.Rts.L.Rev. 369, 387–93 (1988); William C. Thompson, *Death Qualification After Wainwright v. Witt and Lockhart v. McCree,* 13 L. & Hum.Behav. 185, 194–204 (1989).

Supreme Court, restating the obvious, wrote that "a State may not entrust the determination of whether a [defendant] is innocent or guilty to a tribunal 'organized to convict.'" 391 U.S. at 521, 88 S.Ct. at 1776 (quoting *Fay v. New York,* 332 U.S. 261, 294, 67 S.Ct. 1613, 1630, 91 L.Ed. 2043 (1947)). Yet the lead opinion in this case allows precisely this result. Young has made a prima facie showing that bias probably will result from death qualifying the guilt phase jury. Until the State rebuts this showing, we must conclude that by excluding an entire class of impartial jurors from ever participating in guilt determination in capital trials (and thereby restricting the class of jurors eligible for capital jury service to a group who, to a statistically significant degree, demonstrate attitudes accurately labeled "conviction-prone"), the State has violated Young's right to an impartial jury, without a compelling reason for doing so. Given the data, requiring defendants to endure death qualification disadvantages them in an unconstitutional manner. Even if the data turn out in the future to be flawed, abandoning death qualification for guilt phase jurors would in no way disadvantage the state, while it would still protect a capital defendant's rights. We therefore distort justice when we insist that capital defendants establish their empirical claim more convincingly before we will dispense with death qualification. *See* Stephen Gillers, *Proving the Prejudice of Death-Qualified Juries After Adams v. Texas,* 47 U.Pitt.L.Rev. 219, 240–42 (1985).

B. *Exclusion of ADPs*

To the best of my knowledge, no empirical data support the proposition, first propounded in *Hovey v. Superior Court,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 170–71 & n. 110, 616 P.2d 1301, 1343 & n. 110 (1980), and then adopted by this court in *Moore,* that excluding ADPs from death-qualified juries actually counterbalances the risk that a death-qualified jury will be conviction-prone. Rather, recent analyses suggest that these juries still will be conviction-prone. Empirically, we thus face a different set of facts than we did in *Moore.* Before discussing the empirical findings, however, I first note my apprehension, based on a review of the jury voir dire in this case, that when empaneling a capital jury, Utah trial courts do not always engage in the proper counterbalancing of excluding ADPs that the *Moore* opinion assumed they would.

The lead opinion cites *State v. Schreuder,* 726 P.2d 1215, 1225–26 (Utah 1986), to support the proposition that "[t]he Utah practice of death qualification excludes not only those jurors who would never vote to impose the death penalty, but also those jurors who would always vote to impose the death penalty upon a finding of first degree murder." Unfortunately, in this case I believe the trial court did not satisfy *Schreuder*'s requirement that it "also ask prospective jurors if they would automatically vote for the death penalty upon a conviction of first degree murder."[13] *Id.* In questioning the general panel, the trial court did seek to identify WEs, asking for a show of hands from "any of you who are so unalterably opposed to the imposition of the death penalty that you could not under any set of circumstances ... return a verdict imposing the death penalty." But when questioning the general panel, the court did not ask the correlative question of whether any of them would automatical-

13. Both *Schreuder,* 726 P.2d at 1225, and *Moore,* 697 P.2d at 237, claim that we established this requirement in *State v. Norton,* 675 P.2d 577 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds by State v. Hansen,* 734 P.2d 421 (Utah 1986). In fact, *Norton* held only that *when a defendant requested it,* the court had to inquire whether any prospective jurors would feel compelled to vote to impose a death sentence upon all persons convicted of murder. 675 P.2d at 589. *Norton* thus prefigured the United States Supreme Court's opinion in *Morgan v. Illinois,* — U.S. —, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The more rigorous demands articulated in *Schreuder* and *Moore,* however, reflect our evolving recognition that when death qualifying a jury, the trial court *must* level the playing field from the outset for both the state and the defendant and must ensure that it remains level throughout the death-qualification process. My review of the voir dire in this case suggests that this obligation needs further clarification.

ly vote for death upon conviction. Instead, all questioning designed to identify ADPs came in the sequestered voir dire of each individual juror that followed.

Moreover, explicit ADP questioning usually came from defense counsel,[14] not the court. This was so despite both the trial court's obligation to examine all jurors uniformly on their ADP status and its consistent practice of supplementing the WE questioning of the general panel with additional WE questioning in the individual voir dire.[15] Furthermore, to the extent the trial court did engage in ADP questioning in the individual voir dire, its questioning was inconsistent. For example, when questioning juror Cole, the court did not inquire whether Cole would automatically vote for the death penalty upon conviction of first degree murder. When examining juror Bauman, the court did not make this inquiry until it sought to clarify a question posed by defense counsel. The court then said, "[The question] is whether or not you would feel that because there had been a homicide, and because it had been intentional, just that alone would make you feel that there must be the death penalty?" Of course, intentional homicides may be other than first degree, so even this "clarification" did not address the proper issue. When questioning juror Petrogeorge, the court explicitly asked, "If the facts and law of this case told you that the appropriate penalty to impose was life imprisonment as opposed to the death penalty, ... would you be able to vote for life imprisonment?" The court asked juror Radon a similar question. These questions come closer to the required inquiry, although by prefacing the question with a statement of what the facts and law suggest, the court substantially undermined the ability of the question to reveal a juror's potential biases.

To empanel a capital jury properly under our *Moore* and *Schreuder* standards, I believe that when the trial court poses a question to the general panel designed to identify WEs, the court also should ask the general panel an ADP question. A proper question (perhaps after explaining the intentional, aggravated nature of first degree murder) would be along the following lines: "Are there any of you who, because of your beliefs in favor of the death penalty, would always vote to impose capital punishment upon every defendant convicted of an intentional, aggravated murder?" More importantly, whether or not the court asks these questions of the general panel, the court should *always* make this inquiry in the individual voir dire. Furthermore, the court should preface its ADP questions with no more and no less of an explanation of capital sentencing than it uses to preface its WE questions.

In this case, I am disturbed both by the trial court's failure to ask an ADP question of the general panel as a counterpoint to its WE question and by its failure to ask a uniform ADP question in the individual voir dire of all jurors. I must conclude that the counterbalancing of excluding ADPs, which we presumed in *Schreuder* and *Moore* to be occurring, is not in fact always taking place.

Even assuming, however, that the Utah trial courts are properly excluding ADPs from capital juries, the data from several recent studies demonstrate a statistically significant likelihood that death qualification frequently will prejudice juries against the defendant. As one scholar stated, these studies show that when ADPs as well as WEs are excluded, nonetheless, "the procedure of death qualification biases the jury pool against the defense." Joseph B.

14. This questioning process, designed to establish or rebut an ADP challenge for cause, typically involved both sets of attorneys in an extensive, complex, and frequently suggestive line of questioning. This type of adversarial endeavor creates precisely the process problem I discuss in subsection C.

15. As part of its initial follow-up to the WE inquiry, during the individual voir dire the trial court appears to have usually asked each juror a question along the lines of, "Would you say you're in favor of the death penalty, somewhat in favor of the death penalty, somewhat opposed to the death penalty, or strongly opposed to the death penalty?" Because a juror could be merely somewhat in favor of the death penalty and yet want to impose it automatically on all those convicted of capital murder, this question is not an adequate ADP question.

Kadane, *After Hovey: A Note on Taking Account of the Automatic Death Penalty Jurors,* 8 L. & Hum.Behav. 115, 119 (1984). The federal district court in *Grigsby v. Mabry* reviewed several ADP studies, concluding that even after excluding ADPs "the guilt-proneness of the resulting jury remains." 569 F.Supp. at 1305–08; *cf. People v. Middleton,* 244 Cal.Rptr. 378, 391 n. 14, 392 (Cal.Ct.App.1988) (describing results of four ADP studies but holding ADP question "still open" in California). I therefore conclude that we erred when we presumed in *Moore* that excluding ADPs adequately counterbalanced the apparent conviction-proneness of death-qualified juries.

To counter persistent skepticism of these empirical results, I note only that even ignoring these findings, no empirical or intuitive basis exists for concluding that excluding ADPs will resurrect the defendant's right to a jury drawn from a pool that constitutes a representative cross-section of the community. A criminal defendant is entitled to trial by a jury of "equals and neighbors, indifferently chosen." *Duncan v. Louisiana,* 391 U.S. 145, 152, 88 S.Ct. 1444, 1449, 20 L.Ed.2d 491 (1968) (quoting 4 W. Blackstone, *Commentaries on the Laws of England,* 349–50 (Cooley ed. 1899)); *accord Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). A jury from which ADPs and WEs have been excluded is not indifferently chosen. ADPs and WEs are excluded on the basis of characteristics that bear no relationship to their ability to participate impartially in the trial of a defendant's guilt, and their exclusion compromises the representative quality of the jury. As we said in *State v. Ball,* excluding all jurors of an identifiable group " 'upsets the demographic balance of the venire [and] frustrates the primary purpose of the representative cross-section requirement. That purpose ... is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences.' " 685 P.2d 1055, 1059 (Utah 1984) (quoting *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 902–03, 583 P.2d 748, 761 (1978)). I am confident that this court would not uphold the exclusion of all college graduates or all jurors over forty years of age, and yet the lead opinion's decision today continues to exclude all ADP jurors as well as all WE jurors from *ever* sitting on a capital jury. Therefore, whether or not the empirical data show that excluding ADPs fails to mitigate the risk that the death-qualified jury will be conviction-prone, the practice only further erodes a criminal defendant's right to a representative jury.[16]

### C. *Effects of Death-Qualification Process on Qualified Jurors*

One year after *Moore,* I wrote the opinion of this court in a case rejecting the related argument, brought under the Utah Constitution, that regardless of the effect of *excluding* a particular type of juror, the *questioning* involved in the process of death qualification itself inevitably directs the empaneled jury's attention prematurely to the penalty phase, thereby eroding the defendant's presumption of innocence. *See State v. Shaffer,* 725 P.2d 1301, 1309–12 (Utah 1986). In *Shaffer,* we dismissed "the only major study that examines the effects of the death-qualification questioning on jurors" because of the "limited value to a single empirical study," *id.* at 1311, and because "the side effects of death-qualification voir dire could be minimized by individual sequestered voir dire," *id.* at 1312. As in *Moore,* we again made a factual assumption (about the impact of sequestered voir dire) without the benefit of any empirical support and in the face of uncontradicted, albeit limited, empirical data that demonstrated prejudicial side effects. Because of this unsupported assumption, I would revisit the *Shaffer* opinion today in response to Young's argument: I would consider the

16. That ADPs and WEs are in fact in the pool is irrelevant, given that they can never sit on a capital jury. Although the point of the fair cross-section requirement is not to ensure that each petit jury contains a representative sample of the community, it is to ensure at least the *possibility* that a petit jury could be representative. Death qualification eliminates this possibility.

combined effect on the conviction-proneness of death-qualified juries of voir dire questioning itself and the exclusion from the jury of WEs and ADPs.

The original study before us in *Shaffer*, now published, confirmed what is intuitively plausible: the process of death qualification, despite any admonitions from the court to the contrary, may lead jurors who survive it to expect to convict the defendant and to assume that the "real" issue will pertain to the penalty. *See* Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death–Qualification Process,* 8 L. & Hum.Behav. 121 (1984). In a separate report, Haney went on to consider the cumulative impact of this process effect in addition to the prejudice created by excluding potential jurors. He concluded that the process of subjecting death-qualified jurors to exhaustive questioning prior to trial about the circumstances under which they would sentence a convicted murderer to death compounds the conviction-proneness already created by excluding jurors not death qualified. *See* Craig Haney, *Examining Death Qualification: Further Analysis of the Process Effect,* 8 L. & Hum.Behav. 133, 151 (1984).

Furthermore, despite what I said for the court in *Shaffer*, neither intuitive nor empirical reason suggests that sequestered voir dire can or will eliminate or minimize this danger. In fact, it seems equally plausible that sequestered voir dire will increase the risk, because unsequestered voir dire may best assure that the jurors will have the opportunity to internalize the hypothetical character of the death-qualification questioning. In unsequestered questioning, jurors will hear the cautionary instruction regarding the defendant's presumption of innocence numerous times, as it is repeated with each juror, while sequestered jurors will hear it only once or twice. Sequestered jurors also will lack an opportunity to contemplate this instruction and the purpose of the death-qualification process generally over an extended and comparatively relaxed period while they watch the court examine other individuals.

D. *Conclusion*

Given the dual forms of conviction-proneness that death qualification causes, both from the impact of the process on those jurors who survive it and from the exclusion of an entire class of potential jurors, I would hold that death qualification prior to the guilt phase violates the Utah Constitution, article I, sections 7, 10, and 12. As the United States Supreme Court has indicated, "States are free to provide greater protections in their criminal justice system than the Federal Constitution requires." *California v. Ramos,* 463 U.S. 992, 1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983). I believe that death qualifying the jury prior to the guilt phase of a capital trial violates a defendant's right to "trial by an impartial jury," as guaranteed by article I, section 12 and as reinforced by article I, section 10, which requires that "[i]n capital cases the right of trial by jury shall remain inviolate." I also believe the practice violates the guarantee of article I, section 7 of the Utah Constitution that "[n]o person shall be deprived of life ... without due process of law." Given Young's prima facie showing of the systemic jury bias inherent in our current use of a unitary death-qualified jury for guilt determination, safeguarding his constitutional rights demands that in capital cases such as his we use a bifurcated jury process that employs a nondeath-qualified jury at the guilt phase. Utah already bifurcates most other aspects of the guilt and penalty phases of a capital trial, and there is no compelling justification for failing to take the additional step of employing separate juries to ensure the fairness of Utah's capital proceedings.

In capital cases, the lengthiest portion of jury voir dire by far pertains to the process of death qualifying the jury, and bifurcation would permit trial courts to reserve this exhausting procedure until needed at the sentencing phase.[17] The need to em-

17. I also note that in the current system the defense must choose between naming all its potential witnesses at the voir dire prior to the guilt phase, including those it may call only for

panel a second jury for sentencing might somewhat lengthen total trial time in those cases in which the defendant is convicted of first degree murder, but in cases of acquittal on the capital charge, avoiding the process of death qualification would substantially shorten total trial time. Many commentators and jurists have discussed the feasibility of administering a dual jury system of some sort. Possible means of employing a nondeath-qualified jury at the guilt phase include (1) seating at sentencing an entirely new death-qualified jury and then using stipulated summaries of the guilt phase testimony in order to avoid repeating the trial before the sentencing jury; (2) seating extra alternates at the guilt phase and then death qualifying the guilt jury when it reaches the penalty phase, replacing ADPs and WEs with qualified alternate jurors; (3) seating a separate death-qualified jury prior to the guilt phase to attend but not participate in the guilt phase and then to undertake sentencing if needed. *See Lockhart v. McCree,* 476 U.S. 162, 205, 106 S.Ct. 1758, 1781–82, 90 L.Ed.2d 137 (1986) (Marshall, J., dissenting); *Grigsby v. Mabry,* 758 F.2d 226, 243 (8th Cir.1985); Robert M. Berry, *Remedies to the Dilemma of Death–Qualified Juries,* 8 U.Ark. Little Rock L.J. 479 (1986); Donald P. Knudsen, Comment, *Inequities and Abuses of Death Qualification: Causes and Cures,* 32 S.D.L.Rev. 281, 292–98 (1987).

## VII. DEFENDANT'S CHALLENGES FOR CAUSE

(lead opinion part VI)

Young has appealed the trial court's refusal to grant four of his for-cause challenges of potential jurors. Regarding three of these jurors, I agree with the lead opinion that a "review of the entire voir dire record indicates that the trial court did not err in refusing to dismiss the challenged jurors for cause." However, after a review of the record of the voir dire of juror Cole, I conclude that the trial court did commit clear error in failing to dismiss him.

In addition to Cole's statements that the death penalty "is like atonement for the [defendant]," that it was less punishment than life in prison, and that he "strongly" favored the death penalty, Cole gave what I consider absolutely disqualifying answers to two voir dire questions from defense counsel, as follows:

Q. Let's assume we have an intentional, somewhat malicious homicide. Would you be willing, or able, I think you'd probably be willing, but would you be able in all honesty to consider any information, good information about the person to persuade you that something other than death was appropriate?

A. No.

Q. So in your view, once you've made that threshold determination that this is a—what you've described as a malicious, intentional, planned intentional type of homicide, you wouldn't be able to consider life?

A. No.

In the context of the entire voir dire record, these responses demonstrate this juror's inability to weigh mitigating and aggravating circumstances pertaining to a defendant convicted of capital murder. Therefore, the court should have excused Cole for cause. *See State v. Norton,* 675 P.2d 577, 589 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds by State v. Hansen,* 734 P.2d 421 (Utah 1986).

The State attempted to rehabilitate this juror, as follows:

Q. Let me ask just one more question. You've expressed some fairly strong opinions regarding the death penalty when you feel it would be appropriate. If you came to the situation where you subjectively felt the death

mitigating testimony at the sentencing phase, or risk having an undisclosed witness disqualified at the sentencing phase if it turns out that an empaneled juror has some prior relationship with that witness. After objecting to this dilemma, Young chose to risk losing his mitigating witnesses rather than naming them all prior to the guilt phase. Using separate juries would eliminate this problem as well.

penalty was necessary, or appropriate, and at the same time you felt intellectually that the court's instructions led you to doubt that under the court's instructions it should be a death penalty, what would your decision be?

A. You said the court's instructions that it should be a death penalty?

Q. It should not be a death penalty, but you felt it subjectively should.

A. Like I say, a law is a law, and the man sitting on the bench is the head honcho. I really feel that I'd have to go with the judgment of the Judge.

This colloquy failed to rehabilitate juror Cole for several reasons. First, it created a false dichotomy between the juror's "subjective" and "intellectual" feelings regarding the appropriate penalty. Even when following correct instructions, a sentencing juror makes a subjective determination, as we made clear in *State v. Wood,* 648 P.2d 71, 84 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). The proper dichotomy would have been between a decision made "because of a personal belief that all homicides should be punishable by death" and one "based on the result of the comparison [of aggravating and mitigating factors]," *id.* at 79; a juror acts subjectively, however, in making either of these decisions.

Furthermore, the question as posed suggested to Cole that the State was asking what he as a juror would do if the court had concluded that the sentence "should not be a death penalty." Although the question may not have meant to suggest this, Cole's response indicates that he interpreted the question precisely this way, as though it were positing that the court had already expressed some "judgment" of its own about the proper penalty. Although in sentencing proceedings a court would never indicate its view of the proper judgment, lay jurors who, as a result of poor voir dire questions, misunderstand this will of course answer that they would follow the court's instructions if the court has indicated the proper judgment.

Finally, as we have said, "A statement made by a prospective juror that he intends to be fair and impartial loses its meaning in light of other testimony or facts that suggest a bias." *State v. Hewitt,* 689 P.2d 22, 26 (Utah 1984); *cf. Morgan v. Illinois,* — U.S. —, —, 112 S.Ct. 2222, 2233, 119 L.Ed.2d 492 (1992) (holding that general questions on voir dire about fairness and impartiality do not satisfy defendant's right to identify ADP jurors, because "a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so"). The voir dire of juror Cole as a whole establishes that Cole was not a qualified capital juror. Accordingly, I conclude that the trial court abused its discretion in denying Young's challenge of juror Cole.

Although other aspects of this voir dire disturb me, as I have suggested in part VI.B above, I have not found any other specific instances in which the trial court abused its discretion in refusing defendant's challenges for cause of individual jurors.[18]

## VIII. CONSTITUTIONALITY OF UTAH'S STATUTORY AGGRAVATING CIRCUMSTANCES SCHEME

(lead opinion part II)

Young filed a pretrial "Motion to Declare the Death Penalty Statute Unconstitutional

18. Nor do I find that the trial court abused its discretion in granting the State's challenge for cause regarding juror Hoffman. The lead opinion accurately indicates that one legitimate interpretation of her voir dire testimony, particularly if confirmed by her demeanor, was that her emotional condition may have made it difficult for her to perform her duties as a juror, especially in a lengthy capital trial. Applying a deferential standard of review, I also vote to affirm the trial court. It dismays me, however, that the lead opinion supports this conclusion by reciting rather benign excerpts from the voir dire transcripts. In my experience, an inability to recall the previous page of a book or the location of one's sunglasses simply does not indicate an unusual memory problem sufficient to disqualify one for legal reasoning. We do the law a disservice by reciting these isolated passages as grounds for dismissal for cause.

on Its Face," in which he argued that the extensive list of aggravating factors in the Utah statute fails to narrow the class of offenders eligible for the death penalty, thereby violating the state and federal constitutions. That motion was denied, and defendant has raised the issue on appeal. The lead opinion dismisses the issue without analysis, asserting that the court has previously considered such challenges. That assertion is incorrect. An examination of each of our death penalty cases since 1983, when Utah's capital murder statute, Utah Code Ann. § 76–5–202(1), was significantly amended, discloses that we have never addressed the question defendant now raises. I conclude that the current Utah scheme of statutory aggravating circumstances fails to meet federal constitutional requirements and is invalid on its face. I also conclude that the current statute violates sections 7 and 9 of article I of the Utah Constitution.

A. *Federal Law*

In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court struck down the death penalty as it then existed in the states, referring frequently to the evils of unlimited sentencing discretion. Justice White, for example, said that the current death penalty practice used "no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* at 313, 92 S.Ct. at 2764 (White, J., concurring). Four years later, the Court issued a series of death penalty cases interpreting *Furman* and amplifying its analysis. In *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), a plurality of the Court interpreted *Furman* as mandating that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Justice White commented in *Gregg* on the function of the statutory aggravating factors enacted by the Georgia legislature after *Furman:*

> The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute.... *As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate* as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to expect that juries—even given discretion *not* to impose the death penalty—will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly or freakishly or so infrequently that it loses its usefulness as a sentencing device.

*Id.* at 222, 96 S.Ct. at 2947–48 (White, J., concurring) (emphasis added).

In 1980, in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), Justice Stewart, quoting *Gregg,* wrote, "[I]f a state wishes to authorize capital punishment it has a constitutional responsibility to ... define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Id.* at 428, 100 S.Ct. at 1764. Then, in 1983, the Court decided *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and focused on the function of statutory aggravating circumstances:

> To avoid this constitutional flaw [failure to channel the sentencing decision patterns of juries], an aggravating circumstance must *genuinely narrow* the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.
>
> ....
>
> Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the

> stage of legislative definition: they circumscribe the class of persons eligible for the death penalty.

*Id.* at 877–78, 103 S.Ct. at 2742–43 (emphasis added) (footnote omitted).

The Supreme Court has consistently reaffirmed the constitutional necessity of limiting the pool of defendants who risk imposition of the death penalty. In *McCleskey v. Kemp,* 481 U.S. 279, 304, 107 S.Ct. 1756, 1773–74, 95 L.Ed.2d 262 (1987), the Court referred to "the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence" and elaborated on the narrowing process:

> First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold.... Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.

*Id.* at 305–06, 107 S.Ct. at 1774.

More recently, Chief Justice Rehnquist, writing for the Court in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), said:

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877[, 103 S.Ct. 2733, 2742.]
>
> ....
>
> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion....
>
> ... [T]he narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

*Id.* 484 U.S. at 244, 246, 108 S.Ct. at 554, 555 (citations omitted).

The Utah statute purports to perform the narrowing function by the first method described in *Lowenfield,* namely, by limiting the statutory definition of capital homicide to intentional killings accompanied by at least one aggravating circumstance. The state must prove the intentional killing and the aggravating circumstance at the guilt phase of a capital trial. Thus, all defendants convicted of an intentional killing exacerbated by a statutory aggravating circumstance become death-eligible; they are in the pool of persons subject to the death penalty. During the penalty phase of the trial, the sentencer has very broad discretion to consider virtually any relevant factor in aggravation or mitigation, *including but not limited to* the specific factors contained in the statute. Pursuant to the standard this court enunciated in *State v. Wood,* 648 P.2d 71 (Utah 1981) (per curiam), the sentencer must balance aggravation and mitigation, be persuaded beyond a reasonable doubt that the former outweighs the latter, and be persuaded to the same degree that death is appropriate in the circumstances. Thus, the decision to impose death on a particular defendant is highly individualized and is characterized by broad discretion in the sentencer. It is essential under federal constitutional standards, therefore, that the process by which defendants become eligible for death "genuinely narrow[s] the class of persons eligible" and "reasonably justif[ies] the imposition of [a death sentence] on the defendant compared to others found guilty of murder." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. In an article entitled "The New Role of Statutory Aggravating Circumstances in American Death Penalty Law," 22 Duq.

L.Rev. 317 (1984) [hereinafter Ledewitz], Bruce S. Ledewitz summarized the post-*Zant* standard as follows, "Thus, there are two requirements for a valid statutory aggravating circumstance: first, it must limit the class of murderers numerically and, second, it must represent a 'good reason' for choosing this defendant to be eligible for death, rather than other defendants who are not eligible for death." *Id.* at 351. Based on the federal case law, I conclude that similar requirements apply not only to a single aggravating circumstance, but also to a *system* of aggravating circumstances, and that Utah's system does not qualify.

Utah's statute contains seventeen separate circumstances that "aggravate" an intentional killing, making it eligible for the death penalty. Not only does this definitional scheme include more categories of death-eligible murders than that of any other state, but also it *excludes* almost no intentional killings at all. I have reviewed the aggravating circumstances used by the other thirty-six death-penalty states to narrow the class of death-eligible defendants, either by statutory definition (as occurs in Utah) or during the sentencing process or both. As one would expect, there is considerable overlap in the language and apparent intent of those statutes. My analysis, summarized in the appendix to this opinion, has identified twenty-two discrete aggravating circumstances extant in death penalty statutes nationally. Utah's statute contains seventeen of them. Utah Code Ann. § 76-5-202(1). It *excludes* only the following specific circumstances identified by other states: homicides committed (1) in connection with treason; (2) against an unusually vulnerable victim (e.g., a person under 15, over 62, handicapped, disabled, pregnant, "defenseless"); (3) in a premeditated, cold-blooded fashion ("lying in wait," "without any pretense of moral or legal justification"); (4) totally at random, with no motive whatsoever; and (5) with a motive predicated on a victim's race, color, religion, nationality, etc. *See* Appendix. This last category might in fact be included within the meaning of Utah Code Ann. § 76-5-202(1)(f), which states, "The homicide was committed for pecuniary or *other personal gain*" (emphasis added), thus further reducing the already very short list of homicides that the Utah Legislature has not defined as death-eligible. Furthermore, the four or five aggravating circumstances not contained in Utah's definition of capital homicide are quite likely to be unnecessary to classify any particular homicide as capital, given the extensiveness of the remainder of the list. For example, any one of the excluded categories of killings (vulnerable victims, treason, etc.) might very well be included as capital crimes in Utah pursuant to another category of aggravation, such as killing with a bomb, killing to conceal an offense, killing in an atrocious or cruel manner, knowingly creating risk of death to others, killing for personal gain, and so on. *See* Utah Code Ann. § 76-5-202(1)(a) through (q).

In short, Utah's statutory definition of capital homicide excludes so few categories and so few actual murders that it has in effect returned the state to where it was before *Furman* was decided; there is no meaningful narrowing of the class of death-eligible murders pursuant to objective, rational standards. As Ledewitz points out, "A death penalty generally applicable to all *Enmund*-eligible killers [i.e., those with sufficient direct culpability, *see Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)] would risk not disproportion or excessiveness, but rather simple arbitrariness." Ledewitz at 359 n. 158.

The requirement of one statutory aggravating circumstance may be understood as a way of reconciling nonstatutory aggravating circumstances with *Furman v. Georgia. Furman* invalidated state death penalty statutes because they were applied in an arbitrary way. Statutory aggravating circumstances as the sole justification for the death penalty were viewed by many states as a way to reduce this arbitrariness. The Court in *Barclay* and *Stephens* rejected this approach and approved nonstatutory aggravation. This means essentially that whatever strikes the sentencer as aggravating will justify the death penalty.

*Barclay,* where the judge's experiences in World War II led him to impose the death penalty, illustrates how this process can lead to divergent treatment of similar cases. To counteract this tendency, the Court has apparently fastened on to narrowing statutory aggravating circumstances to limit consideration by this potentially irrational sentencing system to a *small number of truly deserving murderers.*

*Id.* at 394 (emphasis added) (footnote omitted).

The foregoing analysis was written in 1984. No language in any United States Supreme Court opinion since then suggests that the Court is prepared to abandon the constitutional function of narrowing the class of death-eligible defendants performed by statutory aggravating factors. "[T]here is a required threshold below which the death penalty cannot be imposed." *McCleskey v. Kemp,* 481 U.S. 279, 305, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987). "[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988) (quoting *Zant v. Stephens,* 462 U.S. at 878, 103 S.Ct. at 2743). Unless the Court is now prepared to eliminate the constitutional requirement that statutory aggravating factors establish meaningful distinctions between murderers who are eligible for death and those who are not, I do not see how the Utah statutory scheme, which does not do so, can stand. Our statute is arbitrary on its face; it exposes the overwhelming majority of intentional killers to the death penalty and establishes no objective criteria for distinguishing those few "worst" crimes that the United States Supreme Court has acknowledged are appropriate for the ultimate penalty. *See Zant,* 462 U.S. at 876–78 & n. 15, 103 S.Ct. at 2742–43 & n. 15; *Gregg,* 428 U.S. at 182–84, 96 S.Ct. at 2929–30; *cf. State v. Pierre,* 572 P.2d 1338, 1356 (Utah 1977) (upholding earlier version of Utah's death penalty statute because it limited death to only "extreme and unusually serious and shocking crimes"), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

This analysis is not undertaken as a mere "counting" exercise, as Justice Zimmerman's opinion argues. It is rather an effort to identify the "known universe" of putatively death-worthy homicides, as reflected in the statutory schemes of the thirty-seven states that employ the death penalty. Justice Zimmerman does not suggest, and there is no reason to believe, that any type of homicide not currently included in this list should be reviewed as part of that universe. Thus, Justice Zimmerman's opinion misses the point. He seems to be discussing the *number* of death-eligible murderers, rather than the selected *class* of murderers drawn from the potential universe. My concern is not with the numbers, but with the basis for the distinctions to be drawn between one murder and another. For example, Justice Zimmerman posits a scenario wherein all murders committed in Utah are factually of the same type (i.e., include the same aggravating factor), resulting in death eligibility in all cases. I detect no constitutional problem with such a scenario because the statutory scheme would, notwithstanding the bizarre and coincidental factual result, follow *Zant*'s mandate that Utah narrow the *class* of death-eligible murderers. The number of *persons* within the class is not the issue—the number of *classes* within the potential universe of murders is.

B. *State Law: Article I, Sections 7 (Due Process) and 9 (Cruel and Unusual Punishment, Unnecessary Rigor)*

The Utah Constitution's Declaration of Rights contains a due process guarantee that is this court's obligation and prerogative to construe. "Due process of law in each particular case means, such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs." Thomas Cooley, *Constitutional Limitations* 741 (8th

ed.1927). Although we rarely have discussed article I, section 7 without referring to federal due process jurisprudence, we have on occasion predicated holdings solely on state due process principles. For example, in *State v. Copeland,* 765 P.2d 1266, 1271–72 (Utah 1988), we held that subsections (c) and (d) of Utah Code Ann. § 77-35-21.5(4) violated article I, section 7 of the Utah Constitution because their operation was arbitrary and capricious and their content was not rationally related to the criminal sentencing process at issue. Likewise, we have reviewed statutory sentencing schemes and particular sentences under article I, section 9. *See State v. Russell,* 791 P.2d 188 (Utah 1990); *State v. Gentry,* 747 P.2d 1032 (Utah 1987); *State v. Bishop,* 717 P.2d 261 (Utah 1986). For a Utah due process analysis in the civil context, see *Berry v. Beech Aircraft,* 717 P.2d 670, 675–76 (Utah 1985).

I submit that this court should independently articulate the minimum standards that apply under the Utah Constitution for our death penalty statutes. *Cf. California v. Ramos,* 463 U.S. 992, 1014, 103 S.Ct. 3446, 3460, (1983) ("States are free to provide greater protections in their criminal justice system than the Federal Constitution requires."). A comprehensive review of current state constitutional death penalty jurisprudence is found in James R. Acker & Elizabeth R. Walsh, *Challenging the Death Penalty Under State Constitutions,* 42 Vand.L.Rev. 1299 (1989) [hereinafter Acker & Walsh]. The authors comment on the differences in perspective and structural placement that affect legal development by state courts in this area:

> State supreme courts may not be as willing to tolerate the structural and procedural deficiencies in capital punishment legislation as has a majority of the United States Supreme Court. They may be persuaded for a number of reasons that state constitutions permit or require them to diverge from the judicial gloss Supreme Court precedent attaches to the eighth amendment. The Supreme Court is constrained by principles of federalism, its duty of fixing minimal constitutional standards for fifty individual states with tremendously varied histories and cultures, and by the inhibiting effect that federal constitutional adjudication has upon the states' abilities to adapt criminal laws and procedures to their unique needs. State supreme courts can be responsive to the values and traditions reflected in state constitutional provisions and to contemporary notions of fairness and decency in their states. Further, their decisions are not so wide reaching and typically not so immutable as the decisions of the Supreme Court.

*Id.* at 1361 (citations omitted).

As the foregoing article documents, a significant number of states have independently reviewed their death penalty statutes pursuant to the provisions of their state constitutions. Other opinions have been issued since the article was published in 1989. *See, e.g., State v. Black,* 815 S.W.2d 166 (Tenn.1991) (analyzing the constitutionality of the death penalty under numerous state provisions, including Tennessee's cruel-and-unusual-punishment clause).

Courts in only two states, California and Massachusetts, have ever declared the death penalty unconstitutional per se, *see People v. Anderson,* 6 Cal.3d 628, 100 Cal. Rptr. 152, 493 P.2d 880, *cert. denied,* 406 U.S. 958, 92 S.Ct. 2060, 32 L.Ed.2d 344 (1972); *District Atty. for Suffolk Dist. v. Watson,* 381 Mass. 648, 411 N.E.2d 1274 (1980), and in both states voters have subsequently amended their constitutions to affirm that death is a permissible penalty. Even after the amendments, however, both courts have asserted that although the death penalty itself cannot violate the amended constitution on a per se basis, any given statutory scheme is subject to judicial review under traditional state protections for due process and against cruel and unusual punishment. *See People v. Superior Court of Santa Clara County,* 31 Cal.3d 797, 183 Cal.Rptr. 800, 805–06, 647 P.2d 76, 81–82 (1982) (death penalty statute invalidated on state due process grounds); *Commonwealth v. Colon–Cruz,* 393 Mass. 150, 470 N.E.2d 116, 120–23 (1984) (same).

As mentioned above, numerous state courts have reviewed the validity of death penalty statutes under various provisions of their state constitutions. *See, e.g., People ex rel. Rice v. Cunningham,* 61 Ill.2d 353, 336 N.E.2d 1 (1975) (sentence review method in statute violated direct appeal provision of state constitution); *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188 (1987) (upholding death penalty statute under state constitutional provisions and analyzing challenges to jury qualification process and jury instructions pursuant to state constitution); *State v. Rondeau,* 89 N.M. 408, 553 P.2d 688 (1976) (capital punishment statute a deprivation of state due process provision); *State v. Wagner,* 305 Or. 115, 752 P.2d 1136 (1988) (upholding state death penalty statute under numerous provisions of Oregon constitution), *vacated,* 492 U.S. 914, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989). Also, nearly all the states that have considered due process and cruel-and-unusual-punishment challenges have predicated their holdings on their state provisions along with federal provisions, even when they have not undertaken independent analysis. Finally, for an extended discussion of case law regarding challenges to the death penalty predicated on state constitutional separation of powers doctrine and other state provisions without federal counterparts, see Acker & Walsh at 1356–60.

The present challenge to Utah's capital punishment statute is a question of first impression. No other state has considered the constitutionality of a statute as broad and comprehensive in its definition of death-eligible murders. A similar conceptual challenge was leveled at the Oregon statute in *Wagner,* 752 P.2d at 1157–58, but there, the statute contained only ten aggravating factors, as compared to Utah's seventeen. Thus, we are in uncharted territory.

The Utah Constitution contains protections against unfairness and cruel and unusual punishment, requiring a scheme which insures that the death penalty is not applied in an arbitrary manner. Such a scheme, this court said in *State v. Pierre,* 572 P.2d 1338, 1356 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978), must be "structured to provide reasonably that the unique and irretrievable sanction of death will be mandated by its provisions and processes only in extreme and unusually serious and shocking crimes and when mandated—as here—that the risk of discrimination, arbitrariness, caprice, and irrationality is reduced to a minimum."

The aggravating circumstances in Utah's statutory scheme ostensibly serve the constitutionally required function of reducing the risks of discrimination, arbitrariness, caprice, and irrationality. Given the nature of Utah's bifurcated capital trial system, the presence of an aggravating factor, to be determined at the guilt phase of a capital trial, should ensure that only "extreme and unusually serious and shocking crimes" become eligible for the death penalty. The jury in our system has extremely broad discretion to consider during the penalty phase "any matter the court deems relevant to sentence," whether in aggravation or mitigation, Utah Code Ann. § 76–3–207(2), and the balancing process we require during that phase, although highly individualized, does not contain any objective standards for the jury to follow. The result of the legislature's overbroad definition of capital murder is a lack of any rational distinction between capital and noncapital homicide. With no objective means to distinguish "extreme and unusually serious and shocking" crimes, the exercise of prosecutorial discretion becomes arbitrary and capricious by definition. The state cannot distinguish between a Mark Hofmann (who intentionally killed two people with bombs that endangered others, apparently for pecuniary gain, thus qualifying as a capital murderer under four separate categories of aggravating circumstances, but was permitted to plead guilty to second degree murder, *see State v. Hofmann,* No. CR86–834 (Jan. 23, 1987)), and an ElRoy Tillman (who bludgeoned the boyfriend of his former girlfriend into unconsciousness, set a fire that asphyxiated him, and was charged and convicted of capital

homicide and sentenced to death, *see State v. Tillman,* 750 P.2d 546 (Utah 1987)).

In *State v. Wood,* 648 P.2d 71 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982), this court vacated a death sentence, holding that "the sentencing process was flawed because the aggravating factor relied on ["ruthlessness and brutality"] was constitutionally impermissible in this case, since it describes all murders and therefore fails to provide any guideline for channeling discretion." *Id.* at 86. A similar defect now plagues the constitutionality of Utah's entire statute, which defines nearly every intentional murder as death-eligible. The statute contains no principled way to distinguish death-eligible murderers from nondeath-eligible murderers. The structure of our statute thus permits caprice and arbitrariness to dictate who will be exempted and who will be charged under the statute and fails to isolate only the worst of crimes for death-eligibility. The statute violates the principles of fundamental fairness guaranteed by the due process clause of the state constitution and renders Utah's death penalty scheme "cruel and unusual" within the meaning of article I, section 9. We should strike it on independent state grounds.

## IX. CONCLUSION

When a state undertakes the deprivation of life as a criminal sentence, it must meet the highest practicable standards of reliability and fairness. *See Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976); *State v. Pierre,* 572 P.2d 1338, 1356 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *see also Eddings v. Oklahoma,* 455 U.S. 104, 117–18, 102 S.Ct. 869, 878–79, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring) ("Court has gone to extraordinary measures to ... guarantee, as much as is humanly possible, that the [death] sentence was not imposed out of whim, passion, prejudice, or mistake."); *Barefoot v. Estelle,* 463 U.S. 880, 913–14, 103 S.Ct. 3383, 3405–06, 77 L.Ed.2d 1090 (1983) (Marshall, J., dissenting) ("Court has always insisted that the need for procedural safeguards is particularly great where life is at stake."). Utah's statute does not meet those standards, nor did its application in Young's trial. I would strike the statute and reverse the judgment of conviction and death.

## APPENDIX

Utah's statutory capital sentencing scheme contains seventeen discrete aggravating factors, any one of which suffices to aggravate an intentional or knowing homicide to an offense punishable by death. Using the Utah scheme as a starting point, I have analyzed the aggravating factors used by the other thirty-six states currently permitting capital punishment. My analysis addresses only the statutory aggravating factors that render a defendant *eligible* for the death penalty after the state establishes at least one of them. I do not address the totality of aggravating factors the sentencer may ultimately weigh in determining whether death is the appropriate sentence. I have concluded that Utah's scheme omits only five additional factors (excluding Georgia's anomalous category of "treason," a category unrelated to whether a homicide has occurred) found in any other state's scheme and that no other single state's scheme exposes a broader class of defendants to the death penalty than does Utah's.

Five states, including Utah, determine death eligibility at the guilt stage by including specific aggravating factors in their statutory definitions of capital offenses. Most states, however, use codified variants of common law capital offenses at the guilt stage and then determine death eligibility at the sentencing stage by requiring the state to establish the existence of a statutory aggravating factor before the sentencer may contemplate whether to impose the death penalty. Seven other states use a combination approach: First, they significantly narrow their class of capital offenses at the guilt stage to those homicides accompanied by certain statutorily defined aggravating factors. Then at

the sentencing phase, they employ a separate statutory list of aggravating factors, one of which must also be present before the defendant becomes death-eligible. (In most combination states, some overlap exists between the statutory aggravating factors included at the guilt phase and those included at the sentencing phase.)

In this appendix, I have matched the twenty-two total categories of aggravation I have identified with those states employing each category in their scheme. Part I briefly lists all twenty-two categories. Parts II and III cross-reference each category with each death penalty state: Part II is organized by category, and part III is organized by state. In part II, I have grouped the twenty-two total categories of aggravation into five types: those pertaining to the circumstances of the killing, those pertaining to the characteristics of the defendant, those pertaining to the characteristics of the victim, those pertaining to the method of the killing, and those pertaining to the motive for the killing. In both parts II and III, for simplicity in representing the seven combination states (those incorporating significant statutory aggravation both at the guilt stage and again at the sentencing stage), I have included only the aggravating factors relevant at the sentencing stage, thus underrepresenting the full extent to which these two-stage schemes narrow the class of death-eligible defendants. Regarding all thirty-seven states, although substantial similarity exists in the various aggravating factors used by each individual state, the overlap is not complete, and no single way exists to categorize the composite variety of aggravating factors; an analysis based on fewer or more categories of aggravation is possible, and I have taken some license in categorizing similar factors together. I am confident, however, that under any categorization, the Utah scheme is the most encompassing.

## I. A SHORT LIST OF ALL TWENTY-TWO AGGRAVATING FACTORS

(1) Two or more persons killed (or attempted to be killed) in one episode or course of conduct.

(2) Homicide committed during certain enumerated felonies.

(3) Homicide committed during hijacking.

(4) Homicide committed while holding victim as shield, as hostage, or for ransom.

(5) Homicide committed in conjunction with drug offenses.

(6) Perpetrator confined in prison (or otherwise in state custody, including parole, or escaped) at time of offense.

(7) Perpetrator previously convicted of first or second degree murder or other violent felony (or otherwise likely to constitute continuing threat to society).

(8) Perpetrator under sentence of death or life in prison at time of homicide.

(9) Victim a public official, ex-official, or candidate (or news reporter) killed during or because of the exercise of official duty.

(10) Victim a law enforcement employee, firefighter, judicial officer, or corrections officer killed during or because of the exercise of official duty.

(11) Victim especially vulnerable, e.g., under fifteen years old, over sixty-two years old, disabled, pregnant.

(12) Perpetrator knowingly created great risk of death to persons other than victim.

(13) Homicide committed by means of destructive device or bomb.

(14) Homicide committed by means of poison or lethal substance.

(15) Homicide committed in especially heinous, atrocious, or cruel manner, including torture.

(16) Homicide committed after lying in wait or in cold, calculated fashion without any pretense of moral justification.

(17) Homicide committed to escape from custody or avoid arrest.

(18) Homicide committed for pecuniary or other personal gain.

(19) Contract murders (murder for hire).

(20) Homicide committed to eliminate prospective or former witness or to impede government function.

APPENDIX—Continued

(21) Homicide committed because of victim's race, color, religion, nationality, or country of origin.

(22) Motiveless, random killing.

## II. AGGRAVATING FACTORS AND THE STATES USING EACH

### A. *Circumstances of Offense Factors*

(1) TWO OR MORE PERSONS KILLED (OR ATTEMPTED TO BE KILLED) IN ONE EPISODE OR COURSE OF CONDUCT: **Utah Code Ann. § 76-5-202(1)(b) (Supp.1992);** *see* Ariz.Rev.Stat.Ann. § 13-703(F)(8) (1989); Cal.Penal Code § 190.-2(a)(3) (West 1988 & Supp.1993); Del.Code Ann. tit. 11, § 4209(e)(1)k (1987 & Supp. 1992); Idaho Code § 19-2515(g)(2) (1987); Ill.Ann.Stat. ch. 38 ¶ 9-1(b)(3) (Smith-Hurd Supp.1992); Ind.Code Ann. § 35-50-2-9(b)(8) (Burns Supp.1992); Ky.Rev.Stat. Ann. § 532.025(2)(a)6 (Michie 1990); Md. Code Ann. art. 27, § 413(d)(9) (1987); Mass. Gen.Laws Ann. ch. 279, § 69(a)(8) (West Supp.1992); Mo.Rev.Stat. § 565.032.2(2) (Supp.1991); Mont.Code Ann. § 46-18-303(5) (1991); Neb.Rev.Stat. § 29-2523(1)(e) (1989); Ohio Rev.Code Ann. § 2929.04(A)(5) (Anderson 1987); Or.Rev.Stat. § 163.-095(1)(d) (1991); S.C.Code Ann. § 16-3-20(C)(a)(9) (Law. Co-op. Supp.1992); Tenn. Code Ann. § 39-13-204(i)(12) (1991); Tex.Penal Code Ann. § 19.03(a)(6) (West 1989); Va.Code Ann. § 18.2-31.7 (Michie Supp.1992); Wash.Rev.Code § 10.95.020(8) (1992).

(2) HOMICIDE COMMITTED DURING CERTAIN ENUMERATED FELONIES: **Utah Code Ann. § 76-5-202(1)(d) (Supp. 1992);** *see* Ala.Code § 13A-5-49(4) (Supp. 1992); Cal.Penal Code § 190.2(a)(17) (West 1988 & Supp.1993); Colo.Rev.Stat. § 16-11-103(5)(g) (Supp.1992); Conn.Gen.Stat. § 53a-46a(h)(1) (1993); Del.Code Ann. tit. 11, § 4209(e)(1)j (1987 & Supp.1992); Fla. Stat. § 921.141(5)(d) (1991); Ga.Code Ann. § 17-10-30(b)(2) (1990); Idaho Code §§ 19-2515(g)(7), 18-4003(d) (1987 & Supp.1992); Ill.Ann.Stat. ch. 38, ¶ 9-1(b)(6) (Smith-Hurd Supp.1992); Ind.Code Ann. § 35-50-2-9(b)(1), (12) (Burns Supp.1992); Ky.Rev. Stat.Ann. § 532.025(2)(a)2 (Michie 1990); La.Code Crim.P.Ann. art. 905.4.A(1) (West Supp.1992); Md.Code Ann. art. 27, § 413(d)(10) (1987); Mass.Gen.Laws Ann. ch. 279, § 69(a)(10) (West Supp.1992); Miss. Code Ann. § 99-19-101(5)(d) (Supp.1992); Mo.Rev.Stat. § 565.032.2(11) (Supp.1991); Mont.Code Ann. § 46-18-303(7), (9) (1991); Nev.Rev.Stat. Ann. § 200.033.4 (Michie 1992); N.J.Stat.Ann. § 2C:11-3 c(4)(g) (West Supp.1992); N.M.Stat.Ann. § 31-20A-5.B (Michie 1990); N.C.Gen.Stat. § 15A-2000(e)(5) (1988); Ohio Rev.Code Ann. § 2929.04(A)(7) (Anderson 1987); 42 Pa.Cons.Stat.Ann. § 9711(d)(6) (Supp.1992); S.C.Code Ann. § 16-3-20(C)(a)(1) (Law.Co-op. Supp.1992); Tenn.Code Ann. § 39-13-204(i)(7) (1991); Tex.Penal Code Ann. § 19.-03(a)(2) (West 1989); Va.Code Ann. § 18.2-31.1, .4, .5, .9 (Michie Supp.1992); Wash. Rev.Code § 10.95.020(9) (1992); Wyo.Stat. § 6-2-102(h)(iv) (1988).

(3) HOMICIDE COMMITTED DURING HIJACKING: **Utah Code Ann. § 76-5-202(1)(m) (Supp.1992);** *see* Fla.Stat. § 921.141(5)(d) (1991); Ga.Code Ann. § 17-10-30(a) (1990)*; Ill.Ann.Stat. ch. 38, ¶ 9-1(b)(4) (Smith-Hurd Supp.1992); Miss.Code Ann. § 99-19-101(5)(d) (Supp.1992); Mo. Rev.Stat. § 565.032.2(14) (Supp.1991); N.C.Gen.Stat. § 15A-2000(e)(5) (1988); 42 Pa.Cons.Stat.Ann. § 9711(d)(4) (Supp.1992); Tenn.Code Ann. § 39-13-204(i)(7) (1991); Wyo.Stat. § 6-2-102(h)(iv) (1988).

(4) HOMICIDE COMMITTED WHILE HOLDING VICTIM AS SHIELD, AS HOSTAGE, OR FOR RANSOM: **Utah Code Ann. § 76-5-202(1)(*o*) (Supp.1992);** *see* Colo.Rev.Stat. § 16-11-103(5)(d) (Supp. 1992); Del.Code Ann. tit. 11, § 4209(e)(1)e, f (1987 & 1992); Ind.Code Ann. § 35-50-2-9(b)(12)(B), (C) (Burns Supp.1992); Md.Code Ann. art. 27, § 413(d)(4) (1987); Mont.Code Ann. § 46-18-303(7) (1991); 42 Pa.Cons. Stat.Ann. § 9711(d)(3) (Supp.1992); Va. Code Ann. § 18.2-31.1, .8 (Michie Supp. 1992).

(5) HOMICIDE COMMITTED IN CONJUNCTION WITH DRUG OFFENSES: *See* Ind.Code Ann. § 35-50-2-9(b)(1)(H) (Burns Supp.1992); N.H.Rev.Stat.Ann. § 630:5.VII(d) (Supp.1992); 42 Pa.Cons.

Stat.Ann. § 9711(d)(14) (Supp.1992); S.D.Codified Laws Ann. § 23A-27A-1(10); Va.Code Ann. § 18.2-31.9 (Michie Supp. 1992).

*B. Characteristics of Perpetrator Factors*

(6) PERPETRATOR CONFINED IN PRISON (OR OTHERWISE IN STATE CUSTODY, INCLUDING PAROLE, OR ESCAPED) AT TIME OF OFFENSE: **Utah Code Ann. § 76-5-202(1)(a) (Supp. 1992)**; *see* Ala.Code § 13A-5-49(1) (Supp. 1992); Ariz.Rev.Stat.Ann. § 13-703(F)(7) (1989); Ark.Code Ann. § 5-4-604(1), (2) (Michie Supp.1991); Colo.Rev.Stat. § 16-11-103(5)(a) (Supp.1992); Del.Code Ann. tit. 11, § 4209(e)(1)a (1987 & Supp.1992); Fla. Stat. § 921.141(5)(a) (1991); Ga.Code Ann. § 17-10-30(b)(9) (1990); Idaho Code §§ 19-2515(g)(7), 18-4003(e) (1987 & Supp.1992); Ill.Ann.Stat. ch. 38, ¶ 9-1(b)(2) (Smith-Hurd Supp.1992); Ind.Code Ann. § 35-50-2-9(b)(9) (Burns Supp.1992); Ky.Rev.Stat. Ann. § 532.025(2)(a)5 (Michie 1990); La. Code Crim.P.Ann. art. 905.4.A(6) (West Supp.1992); Md.Code Ann. art. 27, § 413(d)(2) (1987); Mass.Gen.Laws Ann. ch. 279, § 69(a)(2) (West Supp.1992); Miss. Code Ann. § 99-19-101(5)(a) (Supp.1992); Mo.Rev.Stat. § 565.032.2(9) (Supp.1991); Mont.Code Ann. § 46-18-303(1), (8) (1991); Nev.Rev.Stat.Ann. § 200.033.1 (Michie 1992); N.M.Stat.Ann. § 31-20A-5.C-.E (Michie 1990); N.C.Gen.Stat. § 15A-2000(e)(1) (1988); Ohio Rev.Code Ann. § 2929.04(A)(4) (Anderson 1987); Okla.Stat.Ann. tit. 21, § 701.12.6 (West 1983); Or.Rev.Stat. § 163.095(2)(b), (f) (1991); S.D.Codified Laws Ann. § 23A-27A-1(8) (Supp.1992); Tenn.Code Ann. § 39-13-204(i)(8) (1991); Tex.Penal Code Ann. § 19.03(a)(5) (West 1989); Va.Code Ann. § 18.2-31.3 (Michie Supp.1992); Wash.Rev.Code § 10.95.020(2), (3) (1992); Wyo.Stat. § 6-2-102(h)(i) (1988).

(7) PERPETRATOR PREVIOUSLY CONVICTED OF FIRST OR SECOND DEGREE MURDER OR OTHER VIOLENT FELONY (OR OTHERWISE LIKELY TO CONSTITUTE CONTINUING THREAT TO SOCIETY): **Utah Code Ann. § 76-5-202(1)(h) (Supp.1992)**; *see* Ala.Code § 13A-5-49(2) (Supp.1992); Ark.Code Ann. § 5-4-604(3) (Michie Supp.1991); Ariz.Rev. Stat.Ann. § 13-703(F)(2) (1989); Cal.Penal Code § 190.2(a)(2) (West 1988 & Supp. 1993); Colo.Rev.Stat. § 16-11-103(5)(b) (Supp.1992); Conn.Gen.Stat. § 53a-46a(h)(2) (1993); Del.Code Ann. tit. 11, § 4209(e)(1)i (1987 & Supp.1992); Fla.Stat. § 921.141(5)(b) (1991); Ga.Code Ann. § 17-10-30(b)(1) (1990); Idaho Code § 19-2515(g)(1), (8) (1987); Ill.Ann.Stat. ch. 38, ¶ 9-1(b)(3) (Smith-Hurd Supp.1992); Ind. Code Ann. § 35-50-2-9(b)(7), (8) (Burns Supp.1992); Ky.Rev.Stat.Ann. § 532.-025(2)(a)1 (Michie 1990); La.Code Crim. P.Ann. art. 905.4.A(3) (West Supp.1992); Mass.Gen.Laws Ann. ch. 279, § 69(a)(4) (West Supp.1992); Miss.Code Ann. § 99-19-101(5)(b) (Supp.1992); Mo.Rev.Stat. § 565.032.2(1) (Supp.1991); Mont.Code Ann. § 46-18-303(2) (1991); Neb.Rev.Stat. § 29-2523(1)(a) (1989); Nev.Rev.Stat.Ann. § 200.033.2 (Michie 1992); N.H.Rev.Stat. Ann. § 630:5.VII(c) (Supp.1992); N.J.Stat. Ann. § 2C:11-3 c(4)(a) (West Supp.1992); N.C.Gen.Stat. § 15A-2000(e)(2), (3) (1988); Ohio Rev.Code Ann. § 2929.04(A)(5) (Anderson 1987); Okla.Stat.Ann. tit. 21, § 701.12.1, .7 (West 1983); Or.Rev.Stat. § 163.095(1)(c) (1991); 42 Pa.Cons.Stat. Ann. § 9711(d)(9) (Supp.1992); S.C.Code Ann. § 16-3-20(C)(a)(2) (Law.Co-op. Supp. 1992); S.D.Codified Laws Ann. § 23A-27A-1(1) (Supp.1992); Tenn.Code Ann. § 39-13-204(i)(2) (1991); Wyo.Stat. § 6-2-102(h)(ii) (1988).

(8) PERPETRATOR UNDER SENTENCE OF DEATH OR LIFE IN PRISON AT TIME OF HOMICIDE: **Utah Code Ann. § 76-5-202(1)(p) (Supp.1992)**; *see* Ariz.Rev.Stat.Ann. § 13-703(F)(1) (1989); Del.Code Ann. tit. 11, § 4209(e)(1)n (1987 & Supp.1992); Idaho Code §§ 19-2515(g)(7), 18-4003(c) (1987 & Supp.1992); Md.Code Ann. art. 27, § 413(d)(8) (1987); N.H.Rev. Stat.Ann. § 630:5.VII(b) (Supp.1992); 42 Pa.Cons.Stat.Ann. § 9711(d)(10) (Supp. 1992).

*C. Characteristics of Victim Factors*

(9) VICTIM A PUBLIC OFFICIAL, EX-OFFICIAL, OR CANDIDATE (OR NEWS

REPORTER) KILLED DURING OR BECAUSE OF THE EXERCISE OF OFFICIAL DUTY: **Utah Code Ann. § 76-5-202(1)(j) (Supp.1992);** *see* Cal.Penal Code § 190.2(a)(13) (West 1988 & Supp.1992); Colo.Rev.Stat. § 16-11-103(5)(c) (Supp. 1992); Ky.Rev.Stat.Ann. § 532.025(2)(a)5, (a)7 (Michie 1990); Mass.Gen.Laws Ann. ch. 279, § 69(a)(1), (3) (West Supp.1992); Mo. Rev.Stat. § 565.032.2(5) (Supp.1991); N.J.Stat.Ann. § 2C:11-3 c(4)(h) (West Supp. 1992); Ohio Rev.Code Ann. § 2929.04(A)(1) (Anderson 1987); 42 Pa.Cons.Stat.Ann. § 9711(d)(1) (Supp.1992); Tenn.Code Ann. § 39-13-204(i)(11) (1991); Wash.Rev.Code § 10.95.020(10) (1992).

(10) VICTIM A LAW ENFORCEMENT EMPLOYEE, FIREFIGHTER, JUDICIAL OFFICER, OR CORRECTIONS OFFICER KILLED DURING OR BECAUSE OF THE EXERCISE OF OFFICIAL DUTY: **Utah Code Ann. § 76-5-202(1)(k) (Supp. 1992);** *see* Ariz.Rev.Stat.Ann. § 13-703(F)(10) (1989); Cal.Penal Code § 190.-2(a)(7)-(9), (11), (12) (West 1988 & Supp. 1993); Colo.Rev.Stat. § 16-11-103(5)(c) (Supp.1992); Del.Code Ann. tit. 11, § 4209(e)(1)c, d (1987 & Supp.1992); Ga. Code Ann. § 17-10-30(b)(5), (8) (1990); Idaho Code § 19-2515(g)(9) (1987); Ill.Ann. Stat. ch. 38, ¶ 9-1(b)(1), (2) (Smith-Hurd Supp.1992); Ind.Code Ann. § 35-50-2-9(b)(6) (Burns Supp.1992); Ky.Rev.Stat. Ann. § 532.025(2)(a)5, (a)7 (Michie 1990); La.Code Crim.P.Ann. art. 905.4.A(2), (9) (West Supp.1992); Md.Code Ann. art. 27, § 413(d)(1) (1987); Mass.Gen.Laws Ann. ch. 279, § 69(a)(1), (3) (West Supp.1992); Mo. Rev.Stat. § 565.032.2(5), (8), (13) (Supp. 1991); Mont.Code Ann. § 46-18-303(6) (1991); Neb.Rev.Stat. § 29-2523(1)(g) (1989); Nev.Rev.Stat.Ann. § 200.033.7 (Michie 1992); N.J.Stat.Ann. § 2C:11-3 c(4)(h) (West Supp.1992); N.M.Stat.Ann. § 31-20A-5.A, .E (Michie 1990); N.C.Gen.Stat. § 15A-2000(e)(8) (1988); Ohio Rev.Code Ann. § 2929.04(A)(6) (Anderson 1987); Okla.Stat.Ann. tit. 21, § 701.12.8 (West 1983); Or.Rev.Stat. § 163.095(2)(a) (1991); 42 Pa.Cons.Stat.Ann. § 9711(d)(1) (Supp. 1992); S.C.Code Ann. § 16-3-20(C)(a)(5), (7) (Law.Co-op. Supp.1992); S.D.Codified Laws Ann. § 23A-27A-1(4), (7) (Supp.1992); Tenn.Code Ann. § 39-13-204(i)(9), (10) (1991); Tex.Penal Code Ann. § 19.03(a)(1) (West 1989); Va.Code Ann. § 18.2-31.6 (Michie Supp.1992); Wash.Rev.Code § 10.95.-020(1), (6) (1992); Wyo.Stat. § 6-2-102(h)(viii) (1988).

(11) VICTIM ESPECIALLY VULNERABLE, E.G., UNDER FIFTEEN YEARS OLD, OVER SIXTY-TWO YEARS OLD, DISABLED, PREGNANT: *See* Ariz.Rev. Stat.Ann. § 13-703(F)(9) (1989); Del.Code Ann. tit. 11, § 4209(e)(1)p-r (1987 & Supp. 1992); Idaho Code §§ 19-2515(g)(7), 18-4003(d) (1987 & Supp.1992); Ill.Ann.Stat. ch. 38, ¶ 9-1(b)(7) (Smith-Hurd Supp.1992); Ind.Code Ann. § 35-50-2-9(b)(11) (Burns Supp.1992); La.Code Crim.P.Ann. art. 905.-4.A(10) (West Supp.1992); Md.Code Ann. art. 27, § 413(d)(5) (1987); Mont.Code Ann. § 46-18-303(9) (1991); N.H.Rev.Stat.Ann. § 630:5.VII(g) (Supp.1992); S.C.Code Ann. § 16-3-20(C)(a)(10) (Law.Co-op. Supp.1992); Tenn.Code Ann. § 39-13-204(i)(1) (1991); Va.Code Ann. § 18.2-31.8 (Michie Supp. 1992).

*D. Method of Killing Factors*

(12) PERPETRATOR KNOWINGLY CREATED GREAT RISK OF DEATH TO PERSONS OTHER THAN VICTIM: **Utah Code Ann. § 76-5-202(1)(c) (Supp.1992);** *see* Ala.Code § 13A-5-49(3) (Supp.1992); Ariz.Rev.Stat.Ann. § 13-703(F)(3) (1989); Ark.Code Ann. § 5-4-604(4) (Michie Supp. 1991); Colo.Rev.Stat. § 16-11-103(5)(i) (Supp.1992); Conn.Gen.Stat. § 53a-46a(h)(3) (1993); Fla.Stat. § 921.141(5)(c) (1991); Ga.Code Ann. § 17-10-30(b)(3) (1990); Idaho Code § 19-2515(g)(3), (6) (1987) (risk to many persons or utter disregard for human life); La.Code Crim.P.Ann. art. 905.4.A(4) (West Supp.1992); Mass. Gen.Laws Ann. ch. 279, § 69(a)(9) (West Supp.1992); Miss.Code Ann. § 99-19-101(5)(c) (Supp.1992); Mo.Rev.Stat. § 565.-032.2(3) (Supp.1991); Neb.Rev.Stat. § 29-2523(1)(f) (1989); Nev.Rev.Stat.Ann. § 200.-033.3 (Michie 1992); N.H.Rev.Stat.Ann. § 630:5.VII(e) (Supp.1992); N.J.Stat.Ann. § 2C:11-3 c(4)(b) (West Supp.1992); N.C.Gen.Stat. § 15A-2000(e)(10) (1988); Okla.Stat.Ann. tit. 21, § 701.12.2 (West

1983); 42 Pa.Cons.Stat.Ann. § 9711(d)(7) (Supp.1992); S.C.Code Ann. § 16-3-20(C)(a)(3) (Law.Co-op. Supp.1992); S.D.Codified Laws Ann. § 23A-27A-1(2) (Supp. 1992); Tenn.Code Ann. § 39-13-204(i)(3) (1991); Wyo.Stat. § 6-2-102(h)(iii) (1988).

(13) HOMICIDE COMMITTED BY MEANS OF DESTRUCTIVE DEVICE OR BOMB: **Utah Code Ann. § 76-5-202(1)(*l*) (Supp.1992);** *see* Cal.Penal Code § 190.-2(a)(4), (6) (West 1988 & Supp.1993); Colo. Rev.Stat. § 16-11-103(5)(f)(I)-(III) (Supp. 1992) (including assault weapons); Del. Code Ann. tit. 11, § 4209(e)(1)*l* (1987 & Supp.1992); Fla.Stat. § 921.141(5)(d) (1991); Ga.Code Ann. § 17-10-30(b)(3) (1990); Ind. Code Ann. § 35-50-2-9(b)(2) (Burns Supp. 1992); Ky.Rev.Stat.Ann. § 532.025(2)(a)3 (Michie 1990); Mass.Gen.Laws Ann. ch. 279, § 69(a)(9) (West Supp.1992); Miss. Code Ann. § 99-19-101(5)(d) (Supp.1992); N.C.Gen.Stat. § 15A-2000(e)(5) (1988); Or. Rev.Stat. § 163.095(2)(c) (1991); Tenn.Code Ann. § 39-13-204(i)(7) (1991); Wyo.Stat. § 6-2-102(h)(iv) (1988).

(14) HOMICIDE COMMITTED BY MEANS OF POISON OR LETHAL SUBSTANCE: **Utah Code Ann. § 76-5-202(1)(n) (Supp.1992);** *see* Cal.Penal Code § 190.2(a)(19) (West 1988 & Supp.1993); Del.Code Ann. tit. 11, § 4209(e)(1)*l* (1987 & Supp.1992); S.C.Code Ann. § 16-3-20(C)(a)(1)(f) (Law.Co-op. Supp.1992).

(15) HOMICIDE COMMITTED IN ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL MANNER, INCLUDING TORTURE: **Utah Code Ann. § 76-5-202(1)(q) (Supp.1992);** *see* Ala.Code § 13A-5-49(8) (Supp.1992); Ariz.Rev.Stat.Ann. § 13-703(F)(6) (1989); Ark.Code Ann. § 5-4-604(8) (Michie Supp.1991); Cal.Penal Code § 190.2(a)(14), (18) (West 1988 & Supp. 1993); Colo.Rev.Stat. § 16-11-103(5)(j) (Supp.1992); Conn.Gen.Stat. § 53a-46a(h)(4) (1993); Del.Code Ann. tit. 11, § 4209(e)(1)*l* (1987 & Supp.1992); Fla.Stat. § 921.141(5)(h) (1991); Ga.Code Ann. § 17-10-30(b)(7) (1990); Idaho Code § 19-2515(g)(5) (1987); Ind.Code Ann. § 35-50-2-9(b)(10) (Burns Supp.1992); La.Code Crim.P.Ann. art. 905.4.A(7) (West Supp. 1992); Mass.Gen.Laws Ann. ch. 279, § 69(a)(7) (West Supp.1992); Miss.Code Ann. § 99-19-101(5)(h) (Supp.1992); Mo. Rev.Stat. § 565.032.2(7) (Supp.1991); Mont. Code Ann. § 46-18-303(3) (1991); Neb.Rev. Stat. § 29-2523(1)(d) (1989); Nev.Rev.Stat. Ann. § 200.033.8 (Michie 1992); N.H.Rev. Stat.Ann. § 630:5.VII(h) (Supp.1992); N.J.Stat.Ann. § 2C:11-3 c(4)(c) (West Supp. 1992); N.C.Gen.Stat. § 15A-2000(e)(9) (1988); Okla.Stat.Ann. tit. 21, § 701.12.4 (West 1983); Or.Rev.Stat. § 163.095(1)(e) (1991); 42 Pa.Cons.Stat.Ann. § 9711(d)(8) (Supp.1992); S.C.Code Ann. § 16-3-20(C)(a)(1)(h) (Law.Co-op. Supp.1992); S.D.Codified Laws Ann. § 23A-27A-1(6) (Supp.1992); Tenn.Code Ann. § 39-13-204(i)(5) (1991); Wyo.Stat. § 6-2-102(h)(vii) (1988).

(16) HOMICIDE COMMITTED AFTER LYING IN WAIT OR IN COLD, CALCULATED FASHION, WITHOUT ANY PRETENSE OF MORAL JUSTIFICATION: *See* Cal.Penal Code § 190.2(a)(15) (West 1988 & Supp.1993); Colo.Rev.Stat. § 16-11-103-(5)(f) (Supp.1992); Fla.Stat. § 921.-141(5)(i) (1991); Ind.Code Ann. § 35-50-2-9(b)(3) (Burns Supp.1992); Mont.Code Ann. § 46-18-303(4) (1991); N.H.Rev.Stat.Ann. § 630:5.VII(f) (Supp.1992).

### *E. Motive for Killing Factors*

(17) HOMICIDE COMMITTED TO ESCAPE FROM CUSTODY OR AVOID ARREST: **Utah Code Ann. § 76-5-202(1)(e) (Supp.1992);** *see* Ala.Code § 13A-5-49(5) (Supp.1992); Ark.Code Ann. § 5-4-604(5) (Michie Supp.1991); Cal.Penal Code § 190.-2(a)(5) (West 1988 & Supp.1993); Colo.Rev. Stat. § 16-11-103(5)(k) (Supp.1992); Del. Code Ann. tit. 11, § 4209(e)(1)b (1987 & Supp.1992); Fla.Stat. § 921.141(5)(e) (1991); Ga.Code Ann. § 17-10-30(b)(10) (1990); Idaho Code §§ 19-2515(g)(7), 18-4003(f) (1987 & Supp.1992); Md.Code Ann. art. 27, § 413(d)(3) (1987); Mass.Gen.Laws Ann. ch. 279, § 69(a)(6) (West Supp.1992); Miss. Code Ann. § 99-19-101(5)(e) (Supp.1992); Mo.Rev.Stat. § 565.032.2(10), (15), (16) (Supp.1991); Neb.Rev.Stat. § 29-2523(1)(b) (1989); Nev.Rev.Stat.Ann. § 200.033.5 (Michie 1992); N.H.Rev.Stat.Ann. § 630:5.VII(j) (Supp.1992); N.J.Stat.Ann.

§ 2C:11-3 c(4)(f) (West Supp.1992); N.M.Stat.Ann. § 31-20A-5.C (Michie 1990); N.C.Gen.Stat. § 15A-2000(e)(4) (1988); Ohio Rev.Code Ann. § 2929.04(A)(3) (Anderson 1987); Okla.Stat.Ann. tit. 21, § 701.12.5 (West 1983); Or.Rev.Stat. § 163.095(2)(e) (1991); S.D.Codified Laws Ann. § 23A-27A-1(9) (Supp.1992); Tenn. Code Ann. § 39-13-204(i)(6) (1991); Tex.Penal Code Ann. § 19.03(a)(4) (West 1989); Wash.Rev.Code § 10.95.020(7) (1992); Wyo. Stat. § 6-2-102(h)(v) (1988).

(18) HOMICIDE COMMITTED FOR PECUNIARY OR OTHER PERSONAL GAIN: **Utah Code Ann. § 76-5-202(1)(f) (Supp.1992);** *see* Ala.Code § 13A-5-49(6) (Supp.1992); Ariz.Rev.Stat.Ann. § 13-703(F)(5) (1989); Ark.Code Ann. § 5-4-604(6) (Michie Supp.1991); Cal.Penal Code § 190.2(a)(1) (West 1988 & Supp.1993); Colo.Rev.Stat. § 16-11-103(5)(h) (Supp. 1992); Conn.Gen.Stat. § 53a-46a(h)(6) (1993); Del.Code Ann. tit. 11, § 4209(e)(1)*o* (1987 & Supp.1992); Fla.Stat. § 921.-141(5)(f) (1991); Ga.Code Ann. § 17-10-30(b)(4) (1990); Idaho Code § 19-2515(g)(4) (1987); Ky.Rev.Stat.Ann. § 532.025(2)(a)4 (Michie 1990); Miss.Code Ann. § 99-19-101(5)(f) (Supp.1992); Mo.Rev.Stat. § 565.-032.2(4) (Supp.1991); Neb.Rev.Stat. § 29-2523(1)(c) (1989); Nev.Rev.Stat.Ann. § 200.-033.6 (Michie 1991); N.H.Rev.Stat.Ann. § 630:5.VII(i) (Supp.1992); N.J.Stat.Ann. § 2C:11-3 c(4)(d) (West Supp.1992); N.C.Gen.Stat. § 15A-2000(e)(6) (1988); Okla.Stat.Ann. tit. 21, § 701.12.3 (West 1983); S.C.Code Ann. § 16-3-20(C)(a)(4) (Law. Co-op. Supp.1992); S.D.Codified Laws Ann. § 23A-27A-1(3) (Supp.1992); Tenn.Code Ann. § 39-13-204(i)(4) (1991); Tex.Penal Code Ann. § 19.03(a)(3) (West 1989); Wyo.Stat. § 6-2-102(h)(vi) (1988).

(19) CONTRACT MURDERS (MURDER FOR HIRE): **Utah Code Ann. § 76-5-202(1)(g) (Supp.1992);** *see* Ariz.Rev.Stat. Ann. § 13-703(F)(4), (5) (1989); Colo.Rev. Stat. § 16-11-103(5)(e) (Supp.1992); Conn. Gen.Stat. § 53a-46a(h)(5) (1993); Del.Code Ann. tit. 11, § 4209(e)(1)h, (1)m (1987 & Supp.1992); Ga.Code Ann. § 17-10-30(b)(6) (1990); Idaho Code § 19-2515(g)(4) (1987); Ill.Ann.Stat. ch. 38, ¶ 9-1(b)(5) (Smith-Hurd Supp.1992); Ind.Code Ann. § 35-50-2-9(b)(4), (5) (Burns Supp.1992); Ky.Rev.Stat. Ann. § 532.025(2)(a)4 (Michie 1990); La. Code Crim.P.Ann. art. 905.4.A(5) (West Supp.1992); Md.Code Ann. art. 27, § 413(d)(6), (7) (1987); Mass.Gen.Laws Ann. ch. 279, § 69(a)(5) (West Supp.1992); Mo. Rev.Stat. § 565.032.2(6) (Supp.1991); Neb. Rev.Stat. § 29-2523(1)(c) (1989); Nev.Rev. Stat.Ann. § 200.033.6 (Michie 1992); N.J.Stat.Ann. § 2C:11-3 c(4)(e) (West Supp. 1992); N.M.Stat.Ann. § 31-20A-5.F (Michie 1990); Ohio Rev.Code Ann. § 2929.04(A)(2) (Anderson 1987); Okla.Stat.Ann. tit. 21, § 701.12.3 (West 1983); Or.Rev.Stat. § 163.095(1)(a), (b) (1991); 42 Pa.Cons.Stat. Ann. § 9711(d)(2) (Supp.1992); S.C.Code Ann. § 16-3-20(C)(a)(4), (6) (Law.Co-op. Supp.1992); S.D.Codified Laws Ann. § 23A-27A-1(3), (5) (Supp.1992); Tenn. Code Ann. § 39-13-204(i)(4) (1991); Tex.Penal Code Ann. § 19.03(a)(3) (West 1989); Va.Code Ann. § 18.2-31.2 (Michie Supp. 1992); Wash.Rev.Code § 10.95.020(4), (5) (1992).

(20) HOMICIDE COMMITTED TO ELIMINATE PROSPECTIVE OR FORMER WITNESS OR TO IMPEDE GOVERNMENT FUNCTION: **Utah Code Ann. § 76-5-202(1)(i) (Supp.1992);** *see* Ala.Code § 13A-5-49(7) (Supp.1992); Ark.Code Ann. § 5-4-604(7) (Michie Supp.1991); Cal.Penal Code § 190.2(a)(10) (West 1988 & Supp. 1993); Colo.Rev.Stat. § 16-11-103(5)(k) (Supp.1992); Del.Code Ann. tit. 11, § 4209(e)(1)g (1987 & Supp.1992); Fla.Stat. § 921.141(5)(g) (1991); Idaho Code § 19-2515(g)(10) (1987); Ill.Ann.Stat. ch. 38 ¶ 9-1(b)(8) (Smith-Hurd Supp.1992); Mass.Gen. Laws Ann. ch. 279, § 69(a)(3) (West Supp. 1992); Miss.Code Ann. § 99-19-101(5)(g) (Supp.1992); Mo.Rev.Stat. § 565.032.2(12), (16) (Supp.1991); Neb.Rev.Stat. § 29-2523(1)(h) (1989); N.M.Stat.Ann. § 31-20A-5.G (Michie 1990); N.C.Gen.Stat. § 15A-2000(e)(7), (8) (1988); Ohio Rev.Code Ann. § 2929.04(A)(8) (Anderson 1987); Or.Rev. Stat. § 163.095(2)(a)(E) (1991); 42 Pa.Cons. Stat.Ann. § 9711(d)(5), (15) (Supp.1992); Wash.Rev.Code § 10.95.020(6) (1992).

(21) HOMICIDE COMMITTED BECAUSE OF VICTIM'S RACE, COLOR, RELIGION, NATIONALITY, OR COUNTRY

OF ORIGIN: *See* Cal.Penal Code § 190.-2(a)(16) (West 1988 & Supp.1993).

(22) MOTIVELESS, RANDOM KILLING. *See* Nev.Rev.Stat.Ann. § 200.033.9 (Michie 1992).

III. STATES AND THE AGGRAVATING FACTORS EACH USES

| State | Aggravating Factors, numbered by above categories (state must prove at least one of the listed factors to render a defendant death-eligible) |
|---|---|
| Utah + | 1, 2, 3, 4, 6, 7, 8, 9, 10, 12, 13, 14, 15, 17, 18, 19, 20 |
| Alabama ++ | 2, 6, 7, 12, 15, 17, 18 |
| Arizona | 1, 6, 7, 8, 10, 11, 12, 15, 18, 19 |
| Arkansas ++ | 6, 7, 12, 15, 17, 18, 20 |
| California | 1, 2, 7, 9, 10, 13, 14, 15, 16, 17, 18, 20, 21 |
| Colorado | 2, 4, 6, 7, 9, 10, 12, 13, 15, 16, 17, 18, 19, 20 |
| Connecticut ++ | 2, 7, 12, 15, 18, 19 |
| Delaware | 1, 2, 4, 6, 7, 8, 10, 13, 14, 15, 17, 18, 19, 20 |
| Florida | 2, 3, 6, 7, 12, 13, 15, 16, 17, 18, 20 |
| Georgia * | 2, 3, 6, 7, 10, 12, 15, 17, 18, 19 |
| Idaho ++ | 1, 2, 6, 7, 8, 10, 11, 12, 15, 17, 18, 19, 20 |
| Illinois | 1, 2, 3, 6, 7, 10, 11, 19, 20 |
| Indiana | 1, 2, 4, 5, 6, 7, 10, 11, 13, 15, 16, 19 |
| Kentucky | 1, 2, 6, 7, 9, 10, 13, 18, 19 |
| Louisiana ++ | 2, 6, 7, 10, 11, 12, 15, 19 |
| Maryland | 1, 2, 4, 6, 8, 10, 11, 17, 19 |
| Massachusetts | 1, 2, 6, 7, 9, 10, 12, 13, 15, 17, 19 |
| Mississippi ++ | 2, 3, 6, 7, 12, 13, 15, 17, 18, 20 |
| Missouri | 1, 2, 3, 6, 7, 9, 10, 12, 15, 17, 18, 19, 20 |
| Montana | 1, 2, 4, 6, 7, 10, 11, 15, 16 |
| Nebraska | 1, 7, 10, 12, 15, 17, 18, 19, 20 |
| Nevada | 2, 6, 7, 10, 12, 15, 17, 18, 19, 22 |
| New Hampshire ++ | 5, 7, 8, 11, 12, 15, 16, 17, 18 |
| New Jersey | 2, 7, 9, 10, 12, 15, 17, 18, 19 |
| New Mexico | 2, 6, 10, 17, 19, 20 |
| North Carolina | 2, 3, 6, 7, 10, 12, 13, 15, 17, 18, 20 |
| Ohio | 1, 2, 6, 7, 9, 10, 17, 19, 20 |
| Oklahoma | 6, 7, 10, 12, 15, 17, 18, 19 |
| Oregon + | 1, 6, 7, 10, 13, 15, 17, 19, 20 |
| Pennsylvania | 2, 3, 4, 5, 7, 8, 9, 10, 12, 15, 19, 20 |
| South Carolina | 1, 2, 7, 10, 11, 12, 14, 15, 18, 19 |
| South Dakota | 5, 6, 7, 10, 12, 15, 17, 18, 19 |
| Tennessee | 1, 2, 3, 6, 7, 9, 10, 11, 12, 13, 15, 17, 18, 19 |
| Texas + | 1, 2, 6, 10, 17, 18, 19 |
| Virginia + | 1, 2, 4, 5, 6, 10, 11, 19 |
| Washington + | 1, 2, 6, 9, 10, 17, 19, 20 |
| Wyoming | 2, 3, 6, 7, 10, 12, 13, 15, 17, 18 |

+ These five states entirely incorporate aggravating factors into their guilt stage definitions of capital offense.

++ These seven states employ a combination scheme (a scheme that first narrows significantly the class of capital offenses at the guilt stage through the use of one statutory list of aggravating factors and then narrows it again at the sentencing phase through the use of a separate statutory list). In summarizing these combination schemes, for simplicity I have included only the aggravating factors each of these states utilizes at the sentencing stage. However, because these states have already substantially limited their capital offenses at the guilt stage, the above depiction of only the sentencing stage aggravating factors may erroneously create the impression that these schemes render eligible for death a broader class of defendants than in fact they do. To the extent that the guilt stage list includes fewer potential aggravating factors than does the sentencing stage list or to the extent that the aggravating factors available at the guilt stage differ

from those available at sentencing, my simplified representation of these schemes does not adequately convey the narrowing effect that the two-stage process may have. Unfortunately, a full comparative analysis of all of these complexities is beyond the scope of this appendix.

States identified above with neither + nor ++ incorporate their statutory aggravating factors entirely into the sentencing stage, although even in these states the breadth of the definitions of capital offenses varies considerably. For instance, some states may define as capital offenses only willful, deliberate, and premeditated homicides, while others may define as capital all intentional murders as well as all murders occurring during certain felonies, regardless of intent, and all murders caused by poisoning. Nevertheless, in my interpretation none of these variations suffice to transform the schemes in which they occur into what I have called combination schemes.

* The Georgia statute also defines treason and aircraft hijacking as capital offenses regardless of whether these offenses involve a homicide. Ga.Code Ann. § 17–10–30(a) (1990). These distinct categories of capital offenses are not analogous to the aggravating circumstances used to enhance a homicide to capital murder. I therefore have not included a separate category of aggravation for "treason," although I have listed Georgia in category three, the aggravating factor for homicides committed during hijacking.

---

ZIMMERMAN, Justice:

I join the Chief Justice's opinion in part and Justice Durham's opinion in part. I would reverse the guilt determination and remand for a new trial and sentencing.

I join parts III, V, VII, VIII, IX, XI, XIII, XIV, XVI, XVII, XVIII, and XIX of the Chief Justice's opinion. With respect to the remaining parts of the Chief Justice's opinion, I concur in the result or dissent in whole or in part, all as specified below.

I

With respect to part II of the Chief Justice's opinion, I join its result, dismissing defendant's claims of unconstitutionality lodged against the Utah death penalty scheme. However, I cannot agree with the Chief Justice, that our prior decisions have disposed of defendant's facial challenge to Utah's death penalty statute. Defendant argues that the statute makes so many intentional murders eligible for the death penalty that in operation, the statute fails to limit the penalty's availability to a distinct class of murders that are different in kind from those not punishable by death. Justice Durham correctly observes that this is a new claim and, like her, I would address it. Having done so, however, I am led to a conclusion different from Justice Durham's: I think the Utah death penalty scheme is not invalid under either the state or the federal constitution.

Justice Durham reasons as follows in finding the statute unconstitutional. First, the constitutional function performed by aggravating circumstances is to "'narrow the class of persons eligible for the death penalty and [the aggravating circumstances] must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" (Quoting *Zant v. Stephens,* 462 U.S. 862, 877–78, 103 S.Ct. 2733, 2742–43, 77 L.Ed.2d 235 (1983)). Second, Utah's statute lists seventeen separate circumstances that "aggravate" an intentional killing and make the perpetrator eligible for the death penalty. Third, the thirty-six other states with death penalty statutes have a cumulative total of twenty-two aggravating circumstances, but no single state statute includes as many of these as Utah's. Based upon these facts, Justice Durham concludes that the effect of Utah's extensive list of aggravating circumstances is that the statute "*excludes* almost no intentional killings at all" from the reach of the penalty, or stated differently, "excludes so few categories and so few actual murders that it has in effect returned the state to where it was before *Furman* was decided; there is no meaningful narrowing of the class of death-eligible murderers pursuant to objective, rational standards."

Therefore, she reasons, the Utah statute violates the federal constitution. By parallel reasoning, she concludes that it also violates the Utah Constitution.

I cannot agree with the assertions and assumptions underlying Justice Durham's conclusion that the statute performs no meaningful narrowing of the class of murders that are exposed to the death penalty. There are two basic flaws in Justice Durham's reasoning. First, she asserts as a factual matter that the Utah scheme excludes few actual murders from eligibility for the death penalty. Second, she assumes that simply by counting the aggravating circumstances listed in a statute and comparing the length of that list with similar lists from other states, one can conclude that the statute does not narrow the class of murders eligible for death and does not reasonably distinguish between those that are eligible for death and those that are not. I will address these points in order.

First, as a factual matter, we have before us no information about the number of murders committed in Utah over any relevant period, and we certainly do not know anything about whether the circumstances of those murders might bring some of them within the reach of the death penalty. Therefore, there is no empirical basis for Justice Durham's assertion that, factually, few Utah murders are not eligible for the death penalty. And, I might add, while courts need not have proof positive of legislative facts upon which they base legal rulings, *see* Utah R.Evid. 201 & Advisory Committee Note; Fed.R.Evid. 201 & Advisory Committee Note, a healthy skepticism about the ability of judges to intuit the true state of the world around us should make us cautious in founding the law on intuition about empirical facts, especially facts so readily available as those upon which Justice Durham's analysis is premised. *See McCormick on Evidence* § 331, at 929 (3d ed. 1984) (intellectual legitimacy of legal decisions founded on legislative facts turn on actual truth content of those facts); *cf. State v. Long,* 721 P.2d 483 (Utah 1986) (requirement of cautionary eyewitness instruction founded on nearly unanimous scientific judgments).

Second, even if we did know that most of the murders actually committed in Utah over some relevant period of time were eligible for the death penalty, that fact alone would not support the conclusion that the Utah statute does not pass constitutional muster. I find nothing in the United States Supreme Court's death penalty cases holding that the federal constitution requires that only some small percentage of murders actually committed can be eligible for death, although one can find isolated bits of language that can be so construed. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 304–05, 107 S.Ct. 1756, 1773–74, 95 L.Ed.2d 262 (1987); *Zant v. Stephens,* 462 U.S. 862, 877–78, 103 S.Ct. 2733, 2742–43, 77 L.Ed.2d 235 (1983); *Gregg v. Georgia,* 428 U.S. 153, 222, 96 S.Ct. 2909, 2947–48, 49 L.Ed.2d 859 (1976) (White, J., concurring). In my view, the principle the Court's cases articulate is that there must be a qualitative distinction between murders that are eligible for death and those that are not. *See State v. Tuttle,* 780 P.2d 1203, 1217 (Utah 1988) (citing *Gregg,* 428 U.S. at 188, 96 S.Ct. at 2932 (citing *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring))); *State v. Tillman,* 750 P.2d 546, 590 (Utah 1987) (Durham, J., concurring and dissenting, joined by Zimmerman, J.) (citing *People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 38–39, 609 P.2d 468, 505–06 (1980)). Therefore, the sheer number or percentage of murderers exposed to the death penalty, even if we knew those facts, would not tell us much in determining whether the statute imposing the death penalty was constitutional.

For example, during some period of time, Utah might have the unfortunate distinction of being the site of only murders of the most aggravated type, all of which are eligible for the death penalty. That fact alone would not create constitutional problems, however, if the statutory aggravating circumstances making these murders subject to the death penalty narrowed the death penalty's availability so that those murders could be reasonably distinguished from the universe of all possible murders,

even though no noncapital murders happened to be committed during the period in question. And to determine whether Utah's statute performs this discriminating function, one could not simply total the number of aggravating circumstances listed in our statute and compare them to similar lists in other states' statutes, as Justice Durham does. Nor can the question of whether Utah's statute performs this discrimination function be determined by trying to imagine the universe of all possible murders, as evidenced by the number of aggravating circumstances in all states, and then ask how large a proportion of that universe Utah's statute comprehends. Nothing in the Supreme Court's rather vague death penalty jurisprudence requires such an abstract undertaking. Instead, a determination of whether capital murders are qualitatively distinguishable from noncapital murders requires an evaluation of the operation of each aggravating circumstance. Yet Justice Durham offers no such analysis of the aggravating circumstances charged against Young or of other aggravating circumstances listed in the statute, probably because this court *has* performed such an analysis of some of the broadest aggravating circumstances and found them valid. We specifically considered the rationality of the aggravating circumstance as it qualifies the murder for death in at least four cases. *See State v. James,* 819 P.2d 781, 796–97 (Utah 1991) (subparagraph (h)); *Tuttle,* 780 P.2d at 1217 (subparagraph (q)); *State v. Holland,* 777 P.2d 1019, 1022–23 (Utah 1989) (subparagraph (h)); *State v. Brown,* 607 P.2d 261, 266–67 (Utah 1980) (subparagraph (h)). And Justice Durham signals no retreat from her votes in these cases.

It should be clear that if discrimination among murders is the crux of the narrowing of aggravating circumstances required by the federal constitution, judging a statute by the sheer number of aggravating circumstances is, at base, arbitrary. What would be the impact on Justice Durham's purely quantitative analysis if Utah's statute were amended to eliminate five or even ten of the aggravating circumstances that seldom, if ever, are actually used to make a murder eligible for death? Would that make the statute constitutional because a number of states then would have more aggravating circumstances than Utah, even though the number and percentage of total murders actually eligible for death would not have been materially diminished? Merely proposing the question suggests the untenability of an affirmative answer and of her position.

One further point: Justice Durham is prepared to declare the Utah statute unconstitutional under both the state and federal constitutions, but she offers no standards to guide a conscientious legislature in crafting a constitutional statute. She does not fix a specific number of aggravating circumstances that are permissible, she does not fix a percentage test for determining the number of murders that can be eligible for death, nor does she offer any test for determining what makes one murder qualitatively different from another. In my view, it would be irresponsible to strike down the Utah statute without articulating a standard for a statute that *would* pass constitutional muster.

Having said that I would reject Young's facial challenge to the Utah death penalty statute, I should note that I do share some of the general concerns Justice Durham expresses. Our statute began in 1973 with eight categories of aggravating circumstances. *See* 1973 Utah Laws ch. 196 (codified as Utah Code Ann. § 76–5–202 (Supp. 1973)). Over the intervening years, the legislature has made more and more categories of murder eligible for the death penalty. This is perhaps inevitable. I doubt very much that any Utah legislator has lost an election because he or she voted to increase the penalty on some crime. This legislative lengthening of the list of aggravating circumstances has created a real danger that some of these factors will not make reasonable qualitative distinctions between those murders that are eligible for the death penalty and those that are not, thus violating the standards fixed by the federal constitution for imposing the death penalty.

The remedy for this problem, however, is not to strike the entire statute and hope the legislature does better next time. Rather, it falls to this court and the other courts of this state to scrutinize these statutory aggravating circumstances and their application on a case-by-case basis and, when necessary, to give the statute a limiting construction to ensure that it does not sweep an indiscriminately broad category of murders within the reach of the death penalty. We did this in *Tuttle.* 780 P.2d at 1216–19; *see also State v. Wood,* 648 P.2d 71, 85–86 (Utah 1981), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). And two of us suggested that the rather broad aggravating circumstance relied upon in *Tillman,* 750 P.2d at 568, was unconstitutionally overinclusive when applied to the facts of that case. *Id.* at 590–91 (Durham, J., concurring and dissenting, joined by Zimmerman, J.) (citing Utah Code Ann. § 76–5–202(1)(d)). This course may not make us popular. *See, e.g.,* Michael Morris, *Utah Supreme Court Justices Seem Determined to Turn the Streets over to Murderers,* Deseret News, May 17, 1989, at B4 (Utah Central ed.); *Utah Supreme Court Wins "Dumb Quote of the Year" Award,* Davis County Clipper, April 26, 1989, at 11. On occasion, it may require overturning the imposition of the death penalty, but that is the only way we can be assured that the penalty's application in Utah stays within federal constitutional limits. In the present case, it cannot be contended seriously that Young's actions do not make him constitutionally eligible for the death penalty. Therefore, I find no basis for overturning its imposition on grounds that the statute is overinclusive as applied to him.

For the foregoing reasons, I would reject defendant's facial attack on the Utah death penalty statute under both the state and federal constitutions.

## II

I next address the contention that death qualifying a jury so biases the jury in favor of guilt that the procedure violates the Utah Constitution. The Chief Justice rejects this claim in part IV of his opinion, and Justice Durham accepts it in part VI of hers. Justice Durham relies upon empirical research that she says has found that death qualifying jurors before the guilt phase makes the resulting jury more prone to convict than would otherwise have been the case and that this is fundamentally unfair to defendant. The Chief Justice relies upon the federal courts' rejection of the same claim under the federal constitution and upon our decision in *State v. Moore,* 697 P.2d 233, 237–38 (Utah 1985), which concluded that as a matter of state constitutional law, any guilt-proneness that results from death qualifying a jury is counterbalanced by the requirement that the trial judge also exclude those who would automatically impose the death penalty upon a defendant convicted of first degree murder. Justice Durham's response is to observe that there is no empirical support for *Moore*'s assumption that removing automatic-death-penalty jurors counterbalances any bias that may be produced by death qualification and some for the contrary proposition.

I agree with Justice Durham that the empirical evidence raises serious questions about the impact of death qualification upon the fairness of the jury. However, from my reading of the scientific literature she cites, I find no scientific consensus on either the degree of pro-prosecution bias that death qualification introduces into the jury panel or the extent to which this bias skews the resulting jury verdicts. *See* John A. Wasleff, Note, *Lockhart v. McCree: Death Qualification as a Determinant of the Impartiality and Representativeness of a Jury in Death Penalty Cases,* 72 Cornell L.Rev. 1075, 1099–100 & n. 151 (1987) [hereinafter Wasleff]. *See generally* Rogers Elliott, *Social Science Data and the APA: The Lockhart Brief as a Case in Point,* 15 Law & Hum. Behav. 59 (1991); Rogers Elliott & Robert J. Robinson, *Death Penalty Attitudes and the Tendency to Convict or Acquit,* 15 Law & Hum. Behav. 389 (1991) [hereinafter *Death Penalty Attitudes*]. Absent strong agreement on the empirical question, I am loath to declare a practice that has persisted for

a number of years violative of the state constitution on empirical grounds alone.

I have two other bases for disagreeing with Justice Durham's opinion that using a death-qualified jury in the guilt phase of a case denies a defendant a state constitutional right. First, I see no reason for singling out the uncertain effect of death qualification for constitutional condemnation when we tolerate, indeed, have always tolerated, other procedures used in seating juries that have a biasing effect of one kind or another. Without going into the minutia of how juries are selected, I will give one obvious example of a procedure that may—and in fact is calculated to—result in a jury that is more or less conviction-prone than would be the case if the first twelve persons called for jury duty were permitted to try the case: peremptory challenges. There can be no doubt that each side in a jury trial uses its peremptory challenges to attempt to stack the jury in favor of the result sought by that side. It is no response to this observation to say that because both sides have the opportunity to use peremptory challenges, each will operate to cancel out the other's attempted biasing of the jury. As is true throughout the law, the theory that equal adversaries produce a balanced and "true" result gives way upon close examination to the cold fact that all lawyers, like all judges and all auto mechanics, are not equally skilled or equally diligent. There is no reason to believe that any particular jury is going to be impartial simply because both sides have exercised their peremptory challenges.

Indeed, there is every reason to believe that those challenges, when used skillfully, can have a significant biasing effect. Both an empirical study, *see* Bruce J. Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis,* 81 Mich.L.Rev. 1, 5, 28–35 (1982), and press accounts of attorneys who have taken advantage of professional jury selection consultants, *see* Gail Diane Cox, *Experts Helped Pick King Jury,* Nat'l L.J., May 25, 1992, at 3; Roy E. Black, *Subvert Damaging Testimony from Winning: Successful Strategies from 10 Litigators Who Stand Apart from the Crowd,* Nat'l L.J., Feb. 3, 1992, at S3; Fred Strasser, *Smith Jury Consultant Reflects,* Nat'l L.J., Dec. 30, 1991, at 3, suggest that the canny use of peremptories can introduce significant bias into a jury panel. *See State v. Cantu,* 750 P.2d 591, 596 (Utah 1988). One commentator has noted the logical similarity between the operation of peremptory challenges and the death qualification of jurors:

> Holding death qualification unconstitutional would threaten the use of ... peremptory challenges.... A prosecutor's peremptory challenges, in the very nature of the practice, would alter the attitude pattern of the jury in favor of the prosecution. There is no material difference between removing a *Witherspoon*-excludable for cause or by peremptory challenge. Either way, the prosecutor removes a juror that [sic] may be unsympathetic to the prosecution's case.

Wasleff at 1102–03 (footnotes omitted).

I do not say all this in defense of death qualification, but only to explain why I decline to find that the unquantified biasing supposedly produced by death qualification is unconstitutional. It seems to me that if our concern is biasing the jury either way, we should be no more ready to accept the use of peremptory challenges than we are the process of death qualification. The real issue should be whether the jury is biased through the procedures used to seat them, not which procedure produced the bias. If we accept the one, I cannot see how we can find it fundamentally unfair to accept the other.

Second, on a more fundamental level, I think that the constitutional standard of jury impartiality Justice Durham would embed in the Utah Constitution is unrealistic. The jury system as it actually functions in death penalty cases, as in all others, is not a scientifically constructed, finely tuned balancing instrument for determining absolute truth. Rather, like any other human institution, it is a rough approximation of an articulated ideal. One particular jury may more closely approximate that ideal than another, but that does not make the one that falls further from

perfection unconstitutional. *See State v. Andrews,* 843 P.2d 1027, 1034–35 (Utah 1992) (Zimmerman, J., concurring). In my view, Justice Durham applies a standard of constitutionality that is too close to the ideal, one that is unrealistic. I suspect that the United States Supreme Court has made a similar judgment in ruling that the degree of bias produced by death qualification does not violate the federal constitution.

Having said why I cannot join in a finding that death qualification violates the Utah Constitution, I should note that if I *were* convinced that there was reliable scientific evidence demonstrating the degree of pro-prosecution bias that death qualification introduces into the jury panel or the extent to which this bias skews the resulting jury verdicts, my view would change. I would entertain the idea of exercising our inherent supervisory authority over the lower courts, *see State v. Thurman,* 846 P.2d 1256 (1993); *State v. James,* 767 P.2d 549, 557 (Utah 1989); *In re Criminal Investigation,* 754 P.2d 633, 642 (Utah 1988); *State v. Bishop,* 753 P.2d 439, 499 (Utah 1988) (Zimmerman, J., concurring); *State v. Lafferty,* 749 P.2d 1239, 1260 (Utah 1988); *Long,* 721 P.2d at 492; *In re Clatterbuck,* 700 P.2d 1076, 1081 (Utah 1985), to require that in future death penalty cases, sufficient alternative jurors be seated at the beginning of the guilt phase of the trial so that if a guilty verdict were returned, the court could then death qualify the penalty jury as provided by *Moore* and proceed with the penalty determination.[1] As Justice Durham notes in her opinion, such an exercise of supervisory authority was suggested by Justice Daniel O'Hern of the New Jersey Supreme Court in *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 295 (1987) (O'Hern, J., concurring in the result).

This course would have the advantage of allowing us to change an administrative practice that conveniently permits the use of only one jury but apparently has unacceptable side effects, without first deciding that its effects are so uniform and so severe as to violate the constitutional command of fairness and, perhaps, unnecessarily trivialize that command in the process. It would also permit us to abolish prospectively a questionable practice that has gone on for years without requiring us to reverse convictions of all those tried by death-qualified juries who still await execution or who were convicted of a capital offense but sentenced to life. Such wholesale reversal would be a consequence of Justice Durham's reasoning, a consequence that she does not mention.

Although this exercise of our supervisory power would have the aforementioned salutary effects, I would not undertake this course unless I were first convinced of the scientific soundness of our intervention. The evidence on which Justice Durham relies does not appear to me to be sufficiently definitive to show that such a step does not have a reasonable likelihood of producing unforeseen deleterious consequences. *See Death Penalty Attitudes* at 401–03 & n. 1.

As a procedural matter, I observe that in past cases in which we have relied upon our own reading of the results of scientific studies as a basis for promulgating a new rule of law or exercising our inherent supervisory authority, the empirical evidence has been readily understandable by the relatively unsophisticated reader. There also has been a substantial consensus on the operation of the legal rule or procedure in question and on the impact of that particular rule or procedure on the judicial process. *See, e.g., State v. Ramirez,* 817 P.2d 774, 779–80 (Utah 1991); *Tuttle,* 780 P.2d at 1210; *Kofford v. Flora,* 744 P.2d 1343, 1348 (Utah 1987); *Long,* 721 P.2d at 488. But where, as here, the scientific literature is abstruse and lacking in apparent consensus on critical issues, we should not act to change a rule of law or procedure upon little more than assertions by advocates that the evidence proves something. *See generally Death Penalty Attitudes.* Instead, if, as appears to be the case here, the science is conflicting but raises serious

1. In impaneling this jury, the court could, of course, exclude any "nullifiers," or people who refuse to find a defendant guilty if there is any chance that he or she might receive the death penalty.

questions as to the fairness of a procedure or a rule of law, we should request expert amicus briefs and supplemental briefing from both parties to clarify the complex and often contradictory scientific studies on this issue. We should give the parties a chance to enlighten us. *See, e.g.*, Robert E. Keeton, *Legislative Facts and Similar Things: Deciding Disputed Premise Facts,* 73 Minn.L.Rev. 1 (1988); Laurens Walker & John Monahan, *Social Frameworks: A New Use of Social Science in Law,* 73 Va.L.Rev. 559 (1987). Once this is done, we would be in a position to better evaluate the scientific evidence and act upon it.[2] But until that is done, I would not change the present method for impaneling death-penalty juries.

Accordingly, I reject Young's constitutional challenge to the death qualification of his jury. I concur in the result with part IV of the Chief Justice's opinion.

III

The next issue is the for-cause challenge to the jurors, dealt with in part VI of the Chief Justice's opinion and part VII of Justice Durham's. I concur in the Chief Justice's analysis, except as to juror Cole. As to him, I concur with Justice Durham that he should have been stricken for cause. He displayed a clear view that if defendant was convicted of a murder that was at all aggravated, death was the only appropriate penalty. The prosecutor's attempt to rehabilitate him was ineffective because the hypothetical instruction upon which he based his questions was one that would never be given by a trial judge in submitting the penalty question to a jury. The failure to strike this juror constitutes harmful error and requires vacation of the verdict and death penalty. I would therefore remand this case for a new trial. *See State v. Jones,* 734 P.2d 473, 475 (Utah 1987); *State v. Hewitt,* 689 P.2d 22, 26 (Utah 1984).

IV

In addition, regarding defendant's entitlement to a guilty and mentally ill instruction and verdict, I join Justice Durham in part IV of her opinion and dissent from part X of the Chief Justice's opinion. Justice Durham would hold that defendant was entitled to such an instruction and verdict form, and I agree that under rule 21.5 of the Utah Rules of Criminal Procedure, such a verdict and instruction form are available upon request without regard to whether a defendant offers an insanity defense. *See* Utah R.Crim.P. 21.5. I also agree that the failure to give such an instruction and verdict form was harmful error. However, in finding harmfulness, I rely on the cumulative effect of this error and the other errors identified below that occurred during the penalty phase.

V

Regarding the shackling of defendant during the penalty phase, I dissent from part XII of the Chief Justice's opinion and I join part I of Justice Durham's opinion to the extent she finds that the trial court failed to show that the shackling was a necessity, thus abusing its discretion.

VI

On the question of the denial of allocution to defendant, I dissent from part XV of the Chief Justice's opinion and join part II of Justice Durham's opinion to the extent it holds that defendant had a statutory right to allocution that was wrongfully denied him.

I do not find it necessary to determine whether a denial of this right warrants an automatic reversal or whether it is to be appraised under our usual harmless error rule. Even if the usual harmless error standard applies, given the errors discussed in the preceding paragraphs that occurred in connection with the penalty phase, I conclude that the cumulative effect of these errors undermines my confi-

2. For the degree of rigor with which we should examine empirical evidence upon which changes in the law are made, see *State v. Rimmasch,* 775 P.2d 388, 400–03 (Utah 1989).

dence in the outcome of the penalty phase and requires reversal of the death penalty.

VII

I would vacate the conviction and remand for a new trial. Given this conclusion, I have no occasion to consider the other issues addressed by Justice Durham.

Because of the viciousness of the crime of which Young was convicted and his past record of homicide, our decision today is bound to arouse adverse comment. Obviously, anticipation of that comment has not deterred us from voting as we think the law requires. However, it is worth noting that in voting to reverse defendant's conviction, no member of this court has suggested that he is innocent of the appalling crime of which he was convicted or that the commission of that crime by one with defendant's past record of violent crime cannot be punished by death. But we are saying that the processes by which such a conviction is entered and such a sentence is imposed must comply with Utah's statutes and the federal and state constitutions, something that did not occur here.

STEWART, Justice:

I concur in the result reached by Justice Zimmerman's opinion and for the most part with his reasons, except as to his concurrence with Justice Durham on the issue of shackling. On that point I concur with Chief Justice Hall. I would, however, give somewhat more credence than Justice Zimmerman does to the studies suggesting that death-qualified juries are more likely to be conviction prone than non-death-qualified juries. Nevertheless, I believe that if a trial judge allows a sensitive and searching voir dire, conviction-prone persons can be weeded out. Although that task is difficult, it presents fewer difficulties than the remedy suggested by Justice Durham. I also agree with Justice Zimmerman that the propensity of the Legislature to continually add new aggravating circumstances to the definition of capital homicide raises difficult problems for the courts and that a judicial narrowing of some of those aggravating circumstances may be constitutionally necessary, but I do not believe that the Utah capital homicide statute is unconstitutional.

In addition, I address the role that sympathy and compassion should play in the penalty phase of a capital case because I would go somewhat further than does Justice Durham.

I. ROLE OF SYMPATHY IN DETERMINING PENALTY IN CAPITAL CASE

I agree with Justice Durham's conclusion that the trial court should not have instructed the jury in the penalty phase that it could not be swayed by "mere sentiment ... [or] sympathy" for defendant. However, in my view, the reason that the instruction was wrong is that it did not properly state when sympathy could be used and when it could not.

It is contrary to the most fundamental values upon which this society is built to bar a sentencing authority from employing a sympathetic evaluation of mitigating evidence in assessing the moral responsibility of a defendant when deciding whether to take the life of a citizen as punishment for a capital crime. The jury is typically instructed that sympathy is not appropriate in determining the guilt of the defendant. To avoid confusion and ensure clarity in instructions in the penalty phase, an instruction telling the jury that it can make a sympathetic evaluation of the mitigating evidence is not only appropriate, but essential. A sympathetic evaluation of the mitigating evidence is required if the mitigating evidence is to have any relevance to the moral responsibility of the defendant. I believe that result is required by *State v. Wood,* 648 P.2d 71, 80–85 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982), and *State v. Holland,* 777 P.2d 1019, 1026–28 (Utah 1989), and by our general responsibility to ensure that instructions in every case adequately inform the jury of how it should reach a proper result.

Accordingly, I submit that a jury should be affirmatively instructed that a sympa-

thetic or empathetic evaluation of the mitigating evidence may be appropriate and relevant to the issue of the defendant's moral culpability. It is, after all, the issue of the extent of the defendant's moral culpability that the jury must decide in determining whether a life or a death sentence is appropriate. If a jury is not allowed to make a sympathetic evaluation of the mitigating evidence, that evidence loses its relevance to and its meaning for the critical issue to be decided.[1]

The Utah capital punishment sentencing procedure presumes that a life sentence, not the death penalty, is the appropriate sentence in a capital homicide case. It follows that the State has the burden of convincing a jury that the death penalty is the *only* appropriate penalty. *See State v. Pierre,* 572 P.2d 1338, 1347–48 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978). The capital homicide sentencing statute, Utah Code Ann. § 76–3–207(2), provides that evidence as to "the defendant's character, background, history, mental and physical condition, and any other facts in ... mitigation of the penalty" may be adduced at the penalty hearing.[2] Indeed, that is required under the Constitution of the United States. *Eddings v. Oklahoma,* 455 U.S. 104, 113–15, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604–09, 98 S.Ct. 2954, 2964–67, 57 L.Ed.2d 973 (1978) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 303–04, 96 S.Ct. 2978, 2990–91, 49 L.Ed.2d 944 (1976) (plurality opinion); *see also California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). That is also implicit in our case law. *See State v. Holland,* 777 P.2d at 1026–28; *State v. Wood,* 648 P.2d at 80–85.

Although defendant's proposed instruction No. 5 could have been framed more artfully, it, or something similar, should have been given in the penalty phase. That instruction stated:

> In the guilt phase of this case, you were instructed that you should not base your verdict on various irrelevant matters, including sympathy.
>
> You are now instructed that sympathy *does* play a legitimate part in the determination of whether a defendant shall suffer death or serve a life sentence in prison.
>
> If after consideration of all the circumstances, you feel sympathy for the defendant that is based on the evidence you have heard, and based on such sympathy you are inclined to extend mercy to the

1. It is essential to note that the Legislature has abolished the common law defense of insanity that absolved a defendant of criminal liability if he did not know right from wrong or acted pursuant to an irresistible impulse. *Compare* Utah Code Ann. § 76–2–305 (1990 & Supp.1992) *with State v. Holt,* 22 Utah 2d 109, 111, 449 P.2d 119, 120 (1969) *and State v. Poulson,* 14 Utah 2d 213, 215–16, 381 P.2d 93, 94–95 (1963). The common law defense of insanity drew a sharp distinction between those who were thought to be both morally and legally culpable and those who were not. The consequence of a successful insanity defense under that law was an acquittal. Under present law, the issue of the defendant's moral culpability, as opposed to his legal culpability, is largely deferred to the penalty phase. Whether a convicted defendant has diminished moral culpability, no moral culpability, or full moral culpability determines whether the defendant should receive a life or a death sentence.

Because mental illness can affect moral culpability, as the capital sentencing statute expressly provides, Utah Code Ann. § 76–3–207(2)(d), I concur with Justice Durham that the jury should be required, when appropriate, to determine whether a defendant is guilty and mentally ill.

2. Utah Code Ann. § 76–3–207(2) states:

> Mitigating circumstances shall include the following:
>
> (a) The defendant has no significant history of prior criminal activity;
>
> (b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
>
> (c) The defendant acted under extreme duress or under the substantial domination of another person;
>
> (d) At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;
>
> (e) The youth of the defendant at the time of the crime;
>
> (f) The defendant was an accomplice in the murder committed by another person and his participation was relatively minor;
>
> (g) And any other fact in mitigation of the penalty.

> defendant, the law enables you to act upon such sympathy and fix the penalty at life imprisonment.[3]

(Emphasis in original.)

It is important to delineate precisely what such an instruction would and would not allow the jury to do. First, it has no place in the determination of guilt and therefore would not allow a jury to exonerate or pardon a defendant for the crime he committed. Second, the instruction would not allow the jury to act in a mindless, irrational, or emotional fashion; it does not make sympathy in and of itself a mitigating factor. Third, the instruction makes explicit that the jurors' sympathy must be based on the evidence, namely, the mitigating evidence submitted by the defendant. Fourth, whatever sympathy the mitigating evidence evokes can be used only to decide *which* penalty to impose, not *whether* a penalty should be imposed. What the instruction does is to tell the jury that weighing mitigating and aggravating circumstances is not a sterile mathematical or mechanical process and that the jury should not impassively dismiss whatever significance and meaning the defendant's past experiences have to the issue of which punishment to impose. In short, the jurors are not to take leave of their humanity at the courthouse doors. Nor should they act like robots with respect to evidence that has relevance only when understood in human terms.

If a jury is to properly perform its critical constitutional function under the standards stated in *Wood* and *Holland,* it must understand what is meant by the term "mitigating circumstances" and how it should deal with them. A sympathetic response to mitigating evidence for the purpose of addressing the degree of moral responsibility does not invite caprice or irrationality. On the contrary, for the jury to act morally and legally in assessing the mitigating evidence, it must act with sympathetic, human understanding. The psychology of child development has long recognized that children do not learn moral conduct simply by rational means. A sense of sympathy is absolutely essential to the development of moral human conduct. Psychopaths use reason well, but their moral capacity is lacking because they do not have the ability to empathize and sympathize. Mature adults cannot exercise moral judgment about others without a sympathetic or empathetic response to those whom they judge. Certainly it is not possible for jurors to perform their constitutional tasks by totally forsaking their sympathetic sensibilities.

No sharp line differentiates between rational understanding and sympathy with respect to the capacity to make moral judgments. The law has long recognized that both qualities are essential to proper judgment and has accorded sympathy an established role in the criminal justice system. In non-capital crimes, judges in granting probation and parole and the Board of Pardons in fixing the length of prison terms are, and ought to be, sympathetically sensitive to mitigating factors that bear on the degree of a criminal's moral culpability.

In short, sympathy is a means whereby jurors seek to understand and give human meaning to the "facts" of a defendant's "character, background, history, [and] mental and physical condition" for the purpose of assessing the degree of the defendant's moral culpability. It is both senseless and illogical to say that the jury must hear mitigating evidence, but that it can give no meaning to that evidence based on a sympathetic evaluation of it. To contend otherwise is to say that the jury must "weigh" the aggravating evidence against the mitigating evidence, which has been shorn of relevant meaning. The reason for allowing the defendant to present mitigating evidence is to provide the jury with a basis for exercising a moral judgment. *See Wood,* 648 P.2d at 83–84. To do that, the jurors

3. Instead of telling the jury it could "feel sympathy for the defendant," the instruction should have told the jury that if a sympathetic or empathetic evaluation of the mitigating evidence showed a significantly reduced moral capacity and restraint, the jury should consider that as a factor in favor of a life sentence. *See State v. Sessions,* 645 P.2d 643, 645 (Utah 1982) (diminished capacity partial defense).

must be able to respond to that evidence in a manner that reflects mature moral judgment. In short, jurors should be encouraged to seek to understand, based on their understanding of human nature, the mind and the heart of the defendant and his moral capacity. That does not mean that a jury, once it understands the defendant's evidence, will necessarily vote for a life sentence or act capriciously. To understand is not necessarily to condone or justify.

The judicial system need not subscribe to a philosophy of Determinism to recognize, for example, that a defendant who has been brutally, cruelly, and constantly abused physically, emotionally, and sexually as a child and teenager is not likely to have the self-discipline and moral standards of those reared in better circumstances, or that a woman who is viciously and repeatedly battered for years by a brutally abusive husband may react violently in what she subjectively thinks is self-defense, even though that defense is not available under the objective standards of the law. In imposing a penalty, surely a jury is entitled to treat such persons differently from a contract killer, a Mafia assassin, or a terrorist who bombs a commercial airliner in flight.

In *Wood,* we made clear that the process of "weighing" mitigating circumstances against aggravating circumstances in the penalty phase is an imprecise and somewhat misleading metaphor. 648 P.2d at 84. In *Holland,* we stated, "There is a tendency to deal with the aggravating and the mitigating factors in a mechanical fashion." 777 P.2d at 1027. That point gave rise to our emphasis on the importance of the second part of the *Wood* test:

> To avoid having the first part of the *Wood* test produce an unduly broad application of the ultimate sanction, *Wood* also requires the sentencing authority *to take a long, hard second look at the totality of the circumstances in light of societal values and the high value that this state and the Eighth Amendment place on the value of all human life and the humanity of every human being, no matter how depraved he or she may have become or how far he or she may have fallen from the norms of a civilized society. It is in applying the second part of the test that the sentencing authority may rely on leniency to refuse to impose the death penalty, "[e]ven in the face of overwhelming aggravating evidence...."* *Satterwhite v. Texas,* 486 U.S. 249, [261–62] 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring). After considering all aspects of the case, in addition to the particular aggravating and mitigating circumstances relied on by the State and the defendant, the sentencing authority must be persuaded beyond a reasonable doubt that the imposition of the death penalty is "justified and appropriate" in the circumstances. *Wood,* 648 P.2d at 84. Thus, the sentencing authority may refuse to impose the death penalty even though it concedes that the aggravating circumstances "outweigh" the mitigating circumstances beyond a reasonable doubt.

*Id.* at 1028 (emphasis added).

Denying the jury the right to rely on sympathy and compassion is simply inconsistent with the right of the jury under *Holland* to use "leniency to refuse to impose the death penalty, [e]ven in the face of overwhelming aggravating evidence." *Id.* (quoting *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring)). Leniency, if deemed appropriate by a jury, will not undermine the safety of society. Society can protect itself by imprisoning dangerous people for life.[4]

The crime committed in the instant case was cruel and heinous, and the jury im-

4. In capital homicide cases, prosecutors often argue that defendants should be executed because they are likely to be paroled, or might be, and will surely kill again. That argument is disingenuous, unprofessional, and improper and should be prohibited by all trial judges. It assumes that the Board of Pardons will not keep those who are a danger to others in prison, for life if necessary. Nothing in the history of the state of Utah indicates that the Board has been remiss in its duty.

posed the death sentence. Perhaps, after a second penalty hearing, the decision will be the same. But that decision can be made only after the jury has had the opportunity to give proper consideration to the mitigating circumstances that defendant adduced in the penalty phase.[5]

Finally, both Chief Justice Hall and Justice Durham discuss at length the United States Supreme Court cases of *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) and *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). In my view, those cases do not control this case. In *Brown,* the United States Supreme Court held that the California Supreme Court had erred in holding that an antisympathy instruction violated the Eighth and Fourteenth Amendments to the United States Constitution. The instruction there prohibited the jury from employing "mere sympathy." That decision does not bar a sympathy instruction such as the one discussed above.

*Saffle* is a decision about the scope of federal habeas corpus law and the federal rule that those courts may not fashion a new rule of law in a habeas case. The holding of *Saffle* is that an antisympathy instruction does not violate the rule set down by *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), that a court must admit, and a sentencer must consider, mitigating circumstances. The instruction in *Saffle* did not tie the role of sympathy to the evaluation of mitigating evidence, as I have indicated should be done.

## II. THE *WOOD* INSTRUCTION

The trial court's instruction on the application of the *Wood* standards was erroneous. Instruction No. 7 improperly merged the two prongs of the *Wood* standard.

## III. REBUTTAL ARGUMENT IN THE PENALTY PHASE

Under the procedure outlined by Utah Code Ann. § 76-3-207, I do not believe that the prosecution is entitled to rebuttal argument in the penalty hearing. That statute does not contemplate it. At the end of the penalty hearing, if there is no rebuttal, the prosecutor will already have argued to the jury three times at the guilt phase and

5. Defense counsel's closing argument referred to some of the mitigating evidence in this case:

> David's defects are severe. His brain is damaged. It's abnormal. He has pervasive developmental disorder, organic personality syndrome, he has borderline intelligence, and other mood disorders. He was diagnosed by each Doctor, uncontested, unrebutted by the State. What does Mr. Shepherd [the prosecutor] say to you about these things? What is he asking of you? That you ignore this evidence? That this evidence—oh, never mind, not that big of a deal, it really doesn't have anything to do with David the murderer.
>
> Ladies and gentlemen, that is why we are here. It has everything to do with David the murderer. It is the guts upon which you base a decision whether or not to kill him. What kind of a person is he? What is it Mr. Shepherd is asking you to do? To ignore that David had severe disturbance in thinking and mood? To ignore his inability, utter inability to modulate his own behavior and emotion? To ignore his impaired judgment, and his impulsivity? To ignore his cognitive deficits that he can't reason, he can't problem solve, he doesn't know what to do with new information? To ignore organic brain damage? To ignore a CAT scan that shows that part of his brain has turned to bone? To ignore the fact that perhaps fifty years ago he might have qualified for a lobotomy? To ignore the fact that this person's cognitive age is nine to twelve? And his emotional age is somewhere between six and nine? To ignore the fact that he has autistic similarities, he's got a vacuum in his conscience, he can't relate to people? Is this a polite request to ignore evidence simply because he doesn't like it? Evidence he failed to challenge, he failed to dispute, he failed to rebut, even though it is his burden?
>
> Is he asking you to ignore Doctor Lebegue's testimony? David's mental illness obviously enters into all of his actions. Is he asking you to ignore Doctor Lebegue's testimony that all of these homicides were a product of rage reaction? Is he asking you to ignore that but for David's brain damage, these homicides would not have occurred? Let's make something very clear here. This is not a case about comparing David to other brain damaged people, and saying, they didn't turn out to be murderers. This is a case about comparing murderers to other [murderers] and making a decision about which murderer should die. We kill murderers for acts that are commensurate with their ability to control themselves, to control their behavior.

twice at the penalty phase. Defense counsel will have argued twice at the guilt phase and twice at the penalty phase. Although the prosecutor surely should have the opportunity to adduce rebuttal evidence, there is no need to provide rebuttal argument. The rules of criminal procedure do not address the problem. Since the primary issue is the extent of comparative moral culpability, and not primarily a factual issue, it is sufficient and fair for each side to address the jury once on closing argument.

## IV. ADDITIONAL STATUTORY AGGRAVATING CIRCUMSTANCE IN THE PENALTY PHASE

It was error for the State to insinuate for the first time at the penalty hearing the statutory aggravating circumstance stated in Utah Code Ann. § 76–5–202(1)(q) (1990) as a basis for imposing the death penalty. *See State v. Carter*, 776 P.2d 886 (Utah 1989). The State cannot argue a statutory aggravating circumstance in the penalty phase that it did not assert in the guilt phase. Basic fairness precludes such a disingenuous tactic. The evidence as to the nature of the crime was before the jury, and the prosecution argued it effectively, but asserting a new statutory aggravating circumstance into the penalty hearing is a recipe for confusion and error.